1  HARMEET K. DHILLON (SBN: 207873)
   harmeet@dhillonlaw.com
2  KRISTA L. BAUGHMAN (SBN: 264600)
   kbaughman@dhillonlaw.com
3  GREGORY R. MICHAEL (SBN: 306814)
   gmichael@dhillonlaw.com
4  DHILLON LAW GROUP INC.
5  177 Post Street, Suite 700
   San Francisco, California 94108
6  Telephone: (415) 433-1700
7  Facsimile: (415) 520-6593

8  Attorneys for Plaintiffs and
   the Proposed Class
9

10            UNITED STATES DISTRICT COURT

11           NORTHERN DISTRICT OF CALIFORNIA

12                  SAN JOSE DIVISION

13

14  JUAN HERNANDEZ, an individual; NATHAN       Case Number:
    VELASQUEZ, an individual; FRANK
15  VELASQUEZ, an individual; RACHEL CASEY,
    an individual; MARK DOERING, an individual;   **CLASS ACTION COMPLAINT FOR**
16  MARY DOERING, an individual; BARBARA          **CIVIL RIGHTS VIOLATIONS AND**
    ARIGONI, an individual; DUSTIN HAINES-        **RELATED CLAIMS**
17  SCRODIN, an individual; ANDREW ZAMBETTI,
    an individual; CHRISTINA WONG, an individual;  DEMAND FOR JURY TRIAL
18  CRAIG PARSONS, an individual; I.P., a minor
19  individual; GREG HYVER, an individual; and
    TODD BROOME, an individual, on behalf of
20  themselves and all others similarly situated,

21              Plaintiffs,

22                  v.

23  CITY OF SAN JOSE, a municipal corporation;
24  SAM LICCARDO, sued in his individual capacity;
    EDGARDO GARCIA, sued in his individual
25  capacity; ANTHONY YI, an individual; H.A., a
    minor individual; S.M., a minor individual; and
26  DOES 1-38, individuals,
27
              Defendants.
28

1    Plaintiffs Juan Hernandez, Nathan Velasquez, Frank Velasquez, Rachel Casey, Mark

2    Doering, Mary Doering, Barbara Arigoni, Dustin Haines-Scrodin, Andrew Zambetti, Christina

3    Wong, Craig Parsons, I.P., a minor, Greg Hyver, and Todd Broome, on behalf of themselves and

4    all others similarly situated, bring this class action lawsuit against Defendants the City of San Jose,

5    its mayor, Sam Liccardo, in his individual capacity, its chief of police, Edgardo Garcia, in his

6    individual capacity, and DOES 1 through 15, inclusive, (collectively, the "City Defendants"), for

7    compensatory, punitive, equitable, and injunctive relief following the City Defendants' many

8    violations of the  constitutional and statutory rights of the class of attendees of the Donald J. Trump

9    presidential campaign rally ("Trump Rally") held on June 2, 2016, in San Jose, California.

10    Plaintiffs Juan Hernandez, Dustin Haines-Scrodin, Andrew Zambetti, I.P., Nathan Velasquez,

11    Frank Velasquez, Rachel Casey, Barbara Arigoni, Mark Doering, and Mary Doering, also bring

12    individual claims against their attackers, including Anthony Yi, H.A., a minor, S.M., a minor, and

13    DOES 16-38.

### INTRODUCTION

14

15    1.    This Action concerns the City Defendants' deprivation of the free speech, free

16    assembly, and due process rights of the class alleged herein, which attended the Trump Rally, only

17    to be directed by the City Defendants or their agents, many wearing riot gear, into a mob of

18    approximately four hundred anti-Trump protesters, where they were violently threatened,

19    intimidated, and coerced, and several were brutally assaulted. The City Defendants were fully

20    aware of the already volatile situation involving hundreds of protesters outside the Trump Rally,

21    and knowingly created a dangerous situation for all Trump Rally attendees by requiring all persons

22    leaving the event to walk directly into and through a mob of physically violent and aggressive anti-

23    Trump protestors, and by restricting their ability to exit safely, in alternative directions, away from

24    the violent mob. In addition to creating this dangerous situation, the City Defendants directed the

25    approximately 250 San Jose police officers, or other local officers subject to the City Defendants'

26    control, not to intervene as they witnessed the many violent criminal acts perpetrated by dozens of

27    anti-Trump protesters on the Class members.

28    2.    As a result of the City Defendants' acts and omissions, the Class members have been



Complaint                                                Case No. _____

deprived of their constitutional and statutory rights to free speech, freedom of assembly, and due process, and seek compensation for the harm caused by the City Defendants' intentional, deliberate, reckless, and/or negligent conduct, and injunctive relief to prevent the City Defendants from repeating their wrongful conduct.

3.      Plaintiffs attended the Trump Rally and were subjected to the violent acts of the anti-Trump protesters, as a result of the City Defendants' conduct. For example, Juan Hernandez was struck in the head by an anti-Trump protester and suffered a broken nose. Dustin Haines-Scrodin was also repeatedly hit in the face by a protester. Andrew Zambetti was struck in the head with a bag full of hard objects believed to be rocks, causing bloodshed and injury.

4.      I.P., a fourteen-year old, was hit in the back of the head, twice, by H.A., an anti-Trump protester. He then ran to a nearby San Jose Fire Department vehicle to ask for help, but I.P. was denied any help, and shortly thereafter, he was chased and tackled to the ground by S.M., another protester.

5.      Nathan Velasquez was stuck in the head by Anthony Yi, causing him severe physical trauma, including a concussion, and extreme emotional distress.

6.      Rachel Casey was attacked by a mob of protesters, who threw eggs, a tomato, a bottle of water, and other objects, and also spat on her, while surrounding and wrongfully confining her against the Marriott Hotel.

7.      Barbara Arigoni, a seventy-one year old woman, was attacked by three female protesters who pulled her hair and broke her glasses. Mark Doering intervened, only to be struck in the head and shoulders, while his wife, Mary Doering, called on the nearby police for assistance. Her pleas went unanswered. Instead, the police waited for the attack to conclude, and then belatedly apologized to the Doerings and Arigoni, stating that they could not intervene, and could not arrest the attackers, who remained nearby and subject to apprehension, had the officers tried.

8.      In addition to suing the City Defendants as class representatives, these Plaintiffs bring claims against their attackers, many of whom have yet to be identified publicly by the authorities, and therefore are sued as Doe defendants.

//

Complaint                                    Case No. _____

**JURISDICTION AND VENUE**

9.     This action arises under 42 U.S.C. § 1983 in relation to the City Defendants' deprivation of the class's constitutional rights. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331, 1343, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the related state claims.

10.     Venue is proper in this judicial district under 28 U.S.C. § 1391, because a substantial part of the acts or omissions giving rise to the claims for relief occurred in or were directed to this District, and each of the Defendants is subject to the personal jurisdiction of this Court.

11.     This Court has personal jurisdiction over the Defendants, because each Defendant is domiciled in the State of California, has sufficient minimum contacts with California, and otherwise has intentionally availed himself, herself, or itself of significant benefits provided by the State of California, rendering the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice

**INTRADISTICT ASSIGNMENT**

12.     This Action is properly assigned to the San Jose Division of the Court, as the conduct giving rise to this dispute occurred in Santa Clara County, California.

**PARTIES**

13.     Juan Hernandez ("Hernandez") is an individual who, at all times relevant to the Complaint, was domiciled in Santa Clara, California.

14.     Craig Parsons is an individual, who at all times relevant to the Complaint, was domiciled in Hollister, California.

15.     I.P. is a fourteen-year-old individual who, at all times relevant to the Complaint, was domiciled in Hollister, California. I.P. is the child of Craig Parsons.

16.     Nathan Velasquez is an individual who, at all times relevant to the Complaint, was domiciled in San Jose, California.

17.     Frank Velasquez is an individual who, at all times relevant to the Complaint, was domiciled in San Jose, California. Frank Velasquez is the father of Nathan Velasquez.

18.     Rachel Casey ("Casey") is an individual who, at all times relevant to the Complaint,



Complaint                                                                 Case No. _____

1    was domiciled in San Jose, California, and currently resides in Loxahatchee, Florida.

2        19.    Mark Doering is an individual who, at all times relevant to the Complaint, was

3    domiciled in Campbell, California.

4        20.    Mary Doering is an individual who, at all times relevant to the Complaint, was

5    domiciled in Campbell, California.

6        21.    Barbara Arigoni ("Arigoni") is an individual who, at all times relevant to the

7    Complaint, was domiciled in San Jose, California.

8        22.    Dustin Haines-Scrodin ("Hanes-Scrodin") is an individual who, at all times relevant to

9    the Complaint, was domiciled in San Jose, California.

10       23.    Andrew Zambetti ("Zambetti") is an individual who, at all times relevant to the

11   Complaint, was domiciled in Walnut Creek, California.

12       24.    Christina Wong ("Wong") is an individual who, at all times relevant to the Complaint,

13   was domiciled in Castro Valley, California.

14       25.    Greg Hyver ("Hyver") is an individual who, at all times relevant to the Complaint, was

15   domiciled in Soquel, California.

16       26.    Todd Broome ("Broome") is an individual who, at all times relevant to the Complaint,

17   was domiciled in Sunnyvale, California.

18       27.    Defendant City of San Jose (the "City"), is a municipal entity duly organized and

19   existing under the laws of the State of California.

20       28.    Defendant Sam Liccardo ("Liccardo") is an individual, who at all times relevant to the

21   Complaint, was the Mayor of the City and was domiciled in San Jose, California. Liccardo is being

22   sued in his individual capacity.

23       29.    Defendant Edgardo Garcia ("Garcia") is an individual, who at all times relevant to the

24   Complaint, was the Chief of Police for the City and domiciled in San Jose, California. Garcia is being

25   sued in his individual capacity.

26       30.    Defendant Anthony Yi ("Yi") is an individual who, at all times relevant to the

27   Complaint, was domiciled in San Jose, California.

28       31.    Defendant H.A. is an individual and minor who, according to press releases from the

Complaint                                    Case No. _____

San Jose Police Department, at all times relevant to the Complaint, was domiciled in San Jose, California.

32.    Defendant S.M. is an individual and minor who, according to press releases from the San Jose Police Department, at all times relevant to the Complaint, was domiciled in Milpitas, California.

33.    Plaintiffs are unaware of the true names and/or capacities of defendants sued herein as DOES 1 through 38, inclusive, and therefore sue said defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff believes and alleges that each of the DOE defendants is legally responsible and liable for the incident, injuries, and damages set forth in this Complaint. Each defendant proximately caused injuries and damages because of their active participation in the subject incident, and/or because of their negligence, breach of duty, negligent supervision, management or control, violation of public policy, or tortious conduct. Each defendant is liable for his/her personal conduct, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, ownership, entrustment, custody, care or control or upon any other act or omission. Plaintiffs will ask leave to amend this Complaint subject to further discovery.

34.    In committing the acts alleged herein, the City, Liccardo, Garcia, and DOES 1 through 15, inclusive, and each of them, acted within the course and scope of their employment.

35.    In doing the acts and/or omissions alleged herein, the City Defendants, and each of them, acted under color of authority and/or under color of law.

36.    Due to the acts and/or omissions alleged herein, the City Defendants, and each of them, acted as the agent, servant, and employee and/or in concert with each of said other City Defendants herein.

37.    In order to comply with all applicable administrative claim requirements under California law, Plaintiffs have filed on behalf of themselves and all those similarly situated claims to the proper City entity duly charged with processing such claims.

//

//

6

Complaint                                                Case No. _____

## FACTUAL BACKGROUND

### Plaintiffs Attend Donald Trump Rally

38.     In or around May, 2016, Donald J. Trump ("Trump") became the presumptive nominee of the Republican Party for President of the United States, by virtue of amassing the number of pledged delegates around the United States and territories, to secure the nomination at the Republican National Convention.

39.     Trump's presidential campaign team, working in conjunction with local Republican Party members in the San Francisco Bay Area, organized a Trump campaign rally to take place on June 2, 2016, at the McEnery Convention Center in San Jose, California.

40.     Upon learning of the planned Trump Rally, several organizations, including Silicon Valley Rising and the South Bay Labor Council began to organize and promote a "Dump the Trump" counter-rally and protest, scheduled for the same day, and organized to take place outside the McEnery Convention Center.

41.     Liccardo, the mayor of San Jose, is a registered Democrat and an outspoken critic of Trump.

42.     Just prior to the Trump Rally, and in accordance with its policies, the San Jose Police Department shut down the streets surrounding the convention center to vehicle and pedestrian traffic.

43.     In a public statement before the Trump Rally, Police Chief Garcia stated, "we will do everything possible to protect the First Amendment, those attending our Community, and our Officers."

44.     Despite this representation, Defendants not only failed to protect those attending the Trump Rally, but created the danger that ultimately harmed the class members and deprived them of their constitutional and statutory rights.

### San Jose Police Direct Rally Attendees into the Mob of Violent Protesters

45.     At the conclusion of the Trump Rally, the attendees were directed to leave from the east-northeast exit of the McEnery Convention Center by the San Jose police, and police officers and other personnel from nearby cities and counties, who did so at the direction of the City Defendants.

7

Complaint                                                     Case No. _____

Liccardo and Garcia each acted as a final policymaker for the City in directing the officers actions.

46.     Outside this exit, a police line directed the Trump supporters to turn north and to proceed along Market Street, into the crowd of violent anti-Trump protesters.

47.     The police also actively prevented the Trump Rally attendees from proceeding south along Market Street, away from the anti-Trump protesters, or from leaving the convention center through alternative exits.

48.     As detailed below, the class members were chased and subjected to violence, harassment, and intimidation on the basis of their real or perceived political affiliations, and several were beaten, victimized by theft, had objects such as bottles and eggs thrown at them by the protesters in full view of hundreds of police officers. Protesters also hurled insults, accused the class members of being racists, and held signs reading, "We need socialism" and "A vote for Trump is a vote for fascism," while others waved Mexican flags. At least one individual was seen burning an American flag, and another burning a hat displaying Trump's "Make America Great" campaign slogan.

49.     The violence continued to escalate, until dozens of fights had broken out amongst the crowd, leaving many class members bruised and bloodied.

**The City Defendants Fail to Protect Class Members from the Dangers They Created**

50.     The City Defendants instructed and directed the police officers and other City employees not to intervene in the many brutal attacks made against the Trump Rally attendees, or otherwise failed properly to train the police officers to protect against the same.

51.     Instead of stopping the attacks, and as a result of the direction of the City Defendants, several officers and other city personnel, including members of the San Jose Fire Department, refused to respond to pleas for help from several of the Trump supporters. These refusals were made despite the fact that the San Jose police officers were armed and, in many cases, wearing riot gear, and were often mere feet away from ongoing acts of physical violence.

52.     Several officers told Trump supporters that the police were not permitted to provide assistance to those trying to return to their vehicles and leave the area, stating that providing assistance to these citizens was not a part of the City's plan or procedure in relation to the Trump Rally.

Complaint                                              Case No. _____

53.     The San Jose Police Department failed to declare the demonstration an unlawful assembly until a full thirty minutes or more of violent altercations had ensued, following the conclusion of the Trump Rally.

54.     It was not until approximately one hour after the Trump Rally's conclusion that police brought out megaphones and told demonstrators to leave or face arrest.

55.     Very shortly after these events, Liccardo used the situation as a platform to express his personal political views, and cast blame on Trump for the violence, stating publicly:

> San Jose police officers performed admirably and professionally to contain acts of violence and protect individuals' rights to assemble, protest, and express their political views. While it's a sad statement about our political discourse that Mr. Trump has focused on stirring antagonism instead of offering real solutions to our nation's challenges, there is absolutely no place for violence against people who are simply exercising their rights to participate in the political process.

56.     On information and belief, the City Defendants acted with discriminatory animus against the class members, based upon the real or perceived political affiliations of the class members, intending to prevent, or with reckless disregard that their conduct would so prevent, the class members from supporting the candidate of their choice, and to discourage others from doing the same.

57.     In so doing, the City Defendants violated the class members' constitutional and statutory rights to free speech, peaceful assembly, and due process.

58.     The Plaintiffs and class members were subjected to the violent acts of approximately four hundred anti-Trump protesters, without police intervention, because the City Defendants required the class members to exit the Trump Rally directly into the mob located a block away, in furtherance of the City Defendants' own political objectives and biases. The individual stories and claims of the Plaintiffs are set forth below.

**Hernandez and Haines-Scrodin Are Repeatedly Struck in the Face**

59.     Hernandez and Haines-Scrodin attended the Trump Rally, exited the east-northeast exit of the McEnery Convention Center, and were directed by the San Jose police to walk through the anti-Trump protesters, rather than being allowed to turn south, in the direction of safety.

60.     Soon after following the directions of the San Jose police, Hernandez and Haines-



Complaint                                        Case No. _____

Scrodin were struck repeatedly in their faces and heads by an anti-Trump protester.

61. The anti-Trump protester also yelled racial slurs at Hernandez and Haines-Scrodin.

62. Hernandez suffered a broken nose, abrasions, and other severe bodily injuries as a result of the attack, as well as severe emotional distress.

63. Haines-Scrodin also suffered bodily injuries and severe emotional distress as a result of the attack.

64. Despite the San Jose police being in close proximity to this attack, the San Jose police did not intervene or offer their assistance, and failed to do so at the direction of the City Defendants.

**Frank and Nathan Velasquez Are Assaulted; Nathan Is Struck by Anthony Yi**

65. Frank Velasquez and his son, Nathan Velasquez, attended the Trump Rally and exited the east-northeast exit of the convention center.

66. After being directed by the San Jose police to walk through the anti-Trump protest, rather than to the south, Anthony Yi, an anti-Trump protester, took Nathan Velasquez's hat, which Nathan had been wearing.

67. After running approximately twenty-five yards, however, Yi slipped and fell near the intersection of San Carlos Street and Almaden Boulevard.

68. As Yi had taken more than one hat from the Trump supporters, Frank Velasquez picked one up to determine whether this hat was the one taken from Nathan.

69. Nathan then tried to help Yi get back on his feet, as well as determine whether either of the other hats were the hat that Yi had taken from him.

70. As Yi stood up, Yi struck Nathan in the head with his fist, causing Nathan severe bodily harm, including a concussion, and severe emotional distress.

71. Yi also possessed a knife at this time, but dropped the knife on the ground during the altercation.

72. Immediately following the attack, Nathan was pursued by a reporter who asked Nathan Velasquez several questions pertaining to the events that just occurred.

73. As the reporter was questioning Nathan, Yi and other protesters stood opposite the reporter and continued to make verbal threats and hand gestures indicating that Yi and other

10



Complaint                                                              Case No. _____

protesters intended to continue their attack.

74.     Shortly thereafter, Nathan and his father moved quickly back to the police line, which was about one hundred yards away from the location of the original attack on the corner of San Carlos Street and Almaden Boulevard, and were pursued by Yi and five or six other protesters.

75.     After explaining the situation to the police, Frank and his son were permitted to stand in vicinity of the police, where they hoped that the violent attacks against them would not continue.

76.     Nathan Velasquez has been unable to work due to his injuries and the emotional distress caused by Yi's conduct. Frank Velasquez has also suffered emotional distress arising from these events, which have negatively affected his ability to manage the affairs of his San Jose based business, particularly as his customers, employees, and vendors have witnessed an unclear narrative of these events on national news, as well as witnessing police standing by and doing nothing to prevent the assaults.

**Protesters Taunt, Chase, Corner, and Throw Eggs at Casey**

77.     Casey, who was wearing a Trump jersey that she purchased on her way into the convention center, decided to the leave the Trump Rally about an hour after arriving, and was met with the same police line, which refused to intervene between the protesters and those departing the Trump Rally, and which directed her into the waiting, violent mob.

78.     As she walked away from the police line, however, Casey began to feel uncomfortable due to the chants and taunts being shouted at her by the crowd of protesters.

79.     Two protesters, one wearing a green shirt and the other wearing a black and white mask, approached Casey, raised their middle fingers in her direction, and began yelling, "Fuck Trump!"

80.     As Casey continued to make her way through the protest, the crowd began to follow and throw objects at her.

81.     Fearing for her safety, Casey made her way to the entrance of the Marriot hotel, located approximately two hundred feet from where the police line was located, but she was initially refused entry, as the security guards in the hotel held the doors shut.

Complaint                                        Case No. _____

82. Bystanders inside the Marriot began yelling to let her inside as the protesters continued to surround and throw objects at Casey, including approximately seven eggs, a tomato, and a bottle of water, while others spat at her. She was struck in the head by at least one egg that smashed upon impact.

83. The crowd continued to yell "Fuck Trump" as they attacked her, while she remained trapped between the large crowd of violent protesters and the closed Marriot doors.

84. Eventually, the Marriot guards opened the doors and allowed Casey to escape the mob.

85. Despite the police officers being nearby, and having directed Casey into the violent mob in the first place, the police did not take any action to come to Casey's aid.

**I.P. Is Assaulted and Denied Assistance by the San Jose Fire Department**

86. I.P., a fourteen-year-old minor, attended the Trump Rally with his father, Craig Parsons.

87. After the rally concluded, I.P. and his father exited the east-northeast exit of the McEnery Convention Center, where a line of police officers prevented I.P. and his father from turning right, to safety. Instead, I.P. and his father were directed by police to turn left, into the anti-Trump protesters.

88. Thereafter, I.P. was struck in the back of his head, twice, by H.A., without warning, and without seeing the attacker approaching.

89. At this time, members of the crowd began repeatedly shouting, "Kill him!"

90. I.P. then ran towards a nearby San Jose Fire Department vehicle while being chased by a mob of anti-Trump protesters, and asked for the Fire Department employees' assistance.

91. The San Jose Fire Department refused to offer I.P., a minor, any assistance, despite his pleas for help and the imminent danger.

92. Shortly after being denied help, I.P. was chased by protesters and S.M. tackled I.P. to the ground.

93. Still, the San Jose Police and Fire Departments, which were present in large numbers in the vicinity, failed to come to I.P.'s aid.

94. After being attacked, I.P. made his way to a police skirmish line, and was only later



Complaint                                      Case No. _____

1   allowed to cross the line to safety.

2   95.   I.P.'s father, Craig Parsons, saw I.P. cross the skirmish line, approached the police,

3   told them that I.P. was his son, and requested to cross the skirmish line to be with I.P., a recent

4   victim of several violent attacks.

5   96.   The police denied Craig Parsons' request.

6   **Zambetti Is Beaten with a Bag of Rocks**

7   97.   Zambetti also attended the Trump Rally, left through the east-northeast exit and was

8   directed by the San Jose police to walk through the anti-Trump protest, rather than through

9   alternative, safe routes.

10   98.   Shortly after following the directions of the police, Zambetti was hit in the head by

11   an individual with a bag containing hard objects, which Zambetti believes to have been rocks.

12   99.   Zambetti suffered a concussion and other severe bodily injuries as a result of this

13   attack, and was bleeding from the face and ear area at the scene.

14   100.   Despite the hundreds of San Jose police in close proximity to this attack, they refrained

15   from intervening or offering their assistance, as instructed by the City Defendants.

16   **Mark and Mary Doering and Arigoni Are Assaulted by Three Females**

17   101.   Mark and Mary Doering, a married couple, and Arigoni, a seventy-one-year old

18   woman, attended the Trump Rally, arriving separately by the municipal light rail.

19   102.   Upon exiting the rally, the Doerings were directed by the San Jose police, or other

20   officers under the control of the City Defendants, to return to the light rail system. Arigoni was

21   similarly directed to the light rail station by the police.

22   103.   The Doerings, following the police's instruction, walked to the light rail station

23   along with another individual.

24   104.   The Doerings then carefully made their way through the mob of anti-Trump

25   protesters until they were met with additional police officers near the intersection of West San

26   Carlos Street and Market Street.

27   105.   Again, the Doerings were told by the police to proceed to the light rail station.

28   106.   After arriving at light rail station, they discovered that the station was inoperable

13



because a police skirmish line near the intersection of West San Carlos Street and Almaden
Boulevard, and many protesters, blocked the light rail tracks into the convention center station, or
otherwise rendered service to the station impossible.

107.     The Doerings met Arigoni at the light rail station, where Arigoni was waiting with
two other women.

108.     The Doerings, Arigoni, and the three other women then left the station towards the
San Jose Civic and Montgomery Theater, away from the protesters and the police skirmish line, in
order to take a bus out of the area.

109.     At this time, the police began declaring from a police helicopter circling overhead
that the assembly as unlawful, and that the protesters must disperse.

110.     The Doerings and Arigoni walked up the north-facing sidewalk of West San Carlos
Street, as per the instructions received from an officer from the Santa Clara Sherriff's Office,
acting under the control of the City Defendants, towards the bus.

111.     As the Doerings and Arigoni approached the intersection of West San Carlos and
Market Street, a group of three females, who had covered their faces with bandanas, attacked Arigoni,
pulled her by the hair, removed her glasses from her head and broke them, causing her to fear for her
safety and suffer bodily harm.

112.     One of these females told Arigoni to "go back to [her] country."

113.     On information and belief, these individuals attacked Arigoni on the basis of her real or
perceived nationality and/or her political affiliations.

114.     As this attack was occurring, approximately eight San Jose police officers, or other
officers under the control of the City Defendants, stood nearby, but did not intervene.

115.     Witnessing these events, and upon learning that the San Jose police were not coming to
Arigoni's aid, Mark Doering confronted the attackers himself, who then focused their attack on Mark.

116.     One of the females attempted to bite Mark Doering, while two others started punching
him in the shoulders and head, knocking off his glasses and ripping his shirt. This caused Mark and
Mary Doering to fear for their safety, and Mark Doering to suffer bodily harm and property damage.

117.     Throughout the attack, Mary Doering screamed for help from the nearby police, who



14

Complaint                                                    Case No. _____

stood on the opposite side of the street.

118.    Approximately eight police officers were within approximately thirty-feet of the attacks on Arigoni and the Doerings.

119.    None of these officers intervened during the attacks, called for reinforcement, or gave verbal instructions for the attackers to stop.

120.    Shortly after the attacks, a police officer came over to Arigoni and the Doerings and apologized twice, stating, "I'm so sorry," but also stated that the police could not do anything, and that they would not arrest the three females that had attacked Mark Doering and Arigoni, all of whom remained nearby and could have been apprehended, had the police desired to do so.

121.    Overhearing the police officer's remarks, one of the attackers began shouting that the police would not interfere, encouraging other protesters to commit additional illegal acts against other Trump supporters.

122.    Despite the San Jose police directing the Doerings and Arigoni into the mob, toward the location where the attacks occurred, and being present in large numbers during attacks, the San Jose police and other City employees did not intervene or offer any assistance – the police merely watched and apologized.

**Christina Wong and Her Son Are Assaulted**

123.    Wong attended the Trump Rally with her eighteen-year-old son, hoping to expose her son to a major political rally before he casts his vote for the first time.

124.    Upon arriving at the convention center, Wong parked in the garage next to the convention center's South Hall.

125.    When the rally ended, Wong and her son exited the main auditorium and headed towards the direction of the parking garage entrance door, located on South Market Street.

126.    Upon reaching the exit closest to the parking garage, Wong and her son were met with a police line and metal fences blocking the most direct path to her vehicle, in the parking garage.

127.    Wong told a San Jose police officer that she had parked in the nearby garage, and that she and her son simply wished to leave.

15



Complaint                                          Case No. _____

128.    Rather than permit Wong and her son to walk the short distance of approximately two hundred feet, the officer directed her and her son away from the garage, towards the anti-Trump protesters.

129.    The officer said "Good luck!" as she and her son began to make their way towards the violent protest.

130.    After hearing the screams, chants, and loud commotions in the direction of where the officer instructed her to go, she told her son that they needed to find an alternative route, in the opposite direction.

131.    Wong and her son then climbed over a fence in order to get to Almaden Street, while discussing whether and how to conceal their Trump signs and hat.

132.    Despite climbing over the fence, Wong and her son were soon confronted by anti-Trump protesters who shoved Wong's son in the shoulder as he passed.

133.    Wong and her son then ran for their vehicle, while protesters screamed "Fuck Donald Trump!" and helicopters circled overhead.

**Hyver Dashes for His Car to Escape the Danger**

134.    Hyver attended the Trump Rally, and parked his car near the intersection of South 2nd Street and East Williams Street, to the southwest of the convention center.

135.    Rather than permit Hyver to turn to south, along Market Street, as he requested, the San Jose police instructed him to turn north, directly into the violent protest.

136.    When he left the rally, Hyver decided not to wear his Trump t-shirt for fear of his safety.

137.    Despite taking such precautions, several of the anti-Trump protesters taunted and jeered at Hyver as he made his way through the crowd, in the near-opposite direction of his vehicle.

138.    As he eventually approached his car, Hyver noticed that several people were following him.

139.    Frightened for his safety, Hyver ran the approximately 100 remaining feet to his car.

140.    As a result of the City Defendants' conduct, including knowingly directing Hyver into a dangerous situation, Hyver does not feel safe attending another Trump event.

16



Complaint                                        Case No. _____

**The Police Direct Broome, His Wife, and Three-Year-Old Son into the Mob**

141.    Broome attended the Trump Rally with his wife, Michelle Broome, and his three-year-old son.

142.    Prior to leaving the rally, Broome spoke with police officers inside the rally, emphasizing his concerns over getting his family safely to his car in the nearby parking garage.

143.    The San Jose police officers stated that they could not help him, and that providing assistance to individuals going back to the parking garage was not a part of the San Jose Police Department plan.

144.    Upon leaving the convention center, Broome was directed by the police into the anti-Trump mob of protesters.

145.    Several protesters personally accosted Broome and his family as they made their way through the mob of protesters, and eventually to safety.

**Class Action Allegations**

146.    Plaintiffs Hernandez, Nathan Velasquez, Frank Velasquez, Casey, Mark Doering, Mary Doering, Arigoni, Haines-Scrodin, Zambetti, Wong, Parsons, I.P., Hyver, and Broome (collectively, the "Class Representatives") bring this Action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The class that the Class Representatives seek to represent is composed of and defined as follows:

> **All persons who attended the June 2, 2016 Trump Rally at the McEnery Convention Center in San Jose, California, and exited the rally from the east-northeast exit. Excluded from the Class are Defendants' officers and directors and the immediate families of the Defendants' officer and directors. Also excluded from the Class are the Defendants' legal representatives, heirs, successors or assigns, and any entity in which Defendants have or have had a controlling interest (the "Class").**

147.    This Class is so numerous that joinder of all members is impracticable. An estimated 7,000 and 10,000 persons attended the Trump Rally, and a majority, if not all, were directed by the police as instructed by the City Defendants, directly into the violent anti-Trump mob.

148.    Many common questions of law and fact involve and affect the parties to be

17

Complaint                                                Case No. _____

represented. These common questions of law or fact predominate over any questions affecting only individual members of the Class. Common questions include, but are not limited to, the following:

a.      Whether the City violated the Class's constitutional rights of due process, freedom of speech, and peaceful assembly by directing the Class members into a violent mob and ordering the police not intervene as the Class members were heckled and attacked by anti-Trump protesters, or otherwise failing to train the police and fire department to respond to the dangerous situation the City Defendants created in an effective manner;

b.      Whether Liccardo is individually liable, as a final policymaker for the City, for directing the Class members into the violent mob, and ordering the police not to intervene as the Class members were heckled and attacked by anti-Trump protesters;

c.      Whether Garcia is individually liable, as a final policymaker for the City, for directing the Class members into the violent mob, and ordering the police not intervene as the Class members were heckled and attacked by anti-Trump protesters;

d.      Whether the Class is entitled to equitable relief.

149.    The Class Representatives' claims are typical of the claims of the Class they seek to represent, in that the Class Representatives, and all members of the proposed Class (a) attended the Trump Rally on June 2, 2016, in San Jose, California, (b) were directed by San Jose police, or other local police officers acting at the direction of the City Defendants, into the mob of violent anti-Trump protesters, (c) were prevented from exiting the McEnery Convention Center through alternative, safer routes, (d) were not assisted by the police or fire department employees, which refused to intervene or actively protect the Class from the anti-Trump protesters, such that (e) the City Defendants deprived the Class members of their constitutional rights.

150.    The Class Representatives will fairly and adequately protect the interests of the Class, and have retained attorneys experienced in class actions and complex litigation as their counsel.

151.    The City Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate.

152.    The Class Representatives aver that the prerequisites for class action treatment apply to this action, and that questions of law or fact common to the Class predominate over any questions

affecting only individual members and that class action treatment is superior to other available methods for the fair and efficient adjudication of the controversy which is the subject of this action. The Class Representatives further state that the interest of judicial economy will be served by concentrating litigation concerning these claims in this Court, and that the management of this Class will not be difficult.

**FIRST CLAIM FOR RELIEF**

**Violation of the First and Fourteenth Amendments (42 U.S.C. § 1983)**

**(By Class Against City of San Jose, Liccardo, in his individual capacity,**

**Garcia, in his individual capacity, and DOES 1-15)**

153.    The Class Representatives incorporate by reference their allegations in the preceding paragraphs as if fully set forth herein.

154.    Liccardo, Garcia, and/or high-ranking City officials, including high-ranking police supervisors such as DOES 1-15, and/or each of them, acting as final policymakers for the City with regard to the decisions on when, how, and where to restrict the movement of the Class members and the anti-Trump protestors, required that the Class members exit the Trump Rally by walking directly into the violent mob, or otherwise failed to train and supervise the San Jose police officers at the Trump Rally.

155.    The Class Representatives are also informed and believe and thereon allege that the City Defendants and/or DOES 1-15, and/or each of them, knew and/or reasonably should have known not to direct the Class members into the violent mob of anti-Trump protesters as the Class members left the Trump Rally.

156.    The City Defendants created a dangerous situation by denying the Class members the ability to exit the Trump Rally safely, through alternative routes, by affirmatively directing the Class members to the violent mob of anti-Trump protestors, and by failing to train and/or supervise the San Jose police officers, and other locally affiliated police officers, to handle and respond to the events alleged herein safely.

157.    The City Defendants and/or DOES 1-15, and/or each of them, acting as final policymakers for the City with regard to whether, when, and how to instruct the San Jose police

19



Complaint                                                    Case No. _____

officers monitoring the event to intervene in the violent acts perpetrated on the Class members, directed the San Jose police officers and Fire Department employees not to intervene and/or failed to direct officers to intervene in the numerous illegal acts perpetrated by the anti-Trump protestors against the Class members.

158.    By directing the San Jose police officers and Fire Department employees not to intervene, and/or failing to direct the San Jose police officers to intervene in the dangerous situation that the City Defendants created, the City Defendants deprived the Class members of their constitutional rights to free speech, peaceful assembly, and due process under the First and Fourteenth Amendments.

159.    The Class Representatives are informed and believe and herein allege that Liccardo and Garcia acted maliciously and in bad faith in depriving the Class members of their constitutional rights, and targeted the Class members on the basis of their real or perceived political affiliations.

160.    As a result of the deliberate indifference, reckless and/or conscious disregard of the acts of the City Defendants, and/or DOES 1-15, and/or each of them, the City Defendants encouraged the police officers to continue to act wrongfully and/or failed to train and/or failed to supervise these individuals, resulting in the violation of the Class members' constitutional rights to free speech, freedom of assembly, and due process, under the First and Fourteenth Amendments.

161.    As a direct and proximate consequence of the City Defendants' violations of the Class members' federal civil rights under 42 U.S.C. § 1983 and the First and Fourteenth Amendments, the Class members were physically, mentally, and emotionally injured and damaged, in addition to being deprived of their constitutional rights.

162.    The Class Representatives found it necessary to engage the services of private counsel to vindicate their rights under the law. The Class Representatives are therefore entitled to an award of attorneys' fees and/or costs pursuant to 42 U.S.C. § 1988.

163.    The Class is also entitled to compensatory damages and seeks injunctive relief, enjoining the City Defendants from further violating the Class's civil rights, including by requiring the City Defendants to protect attendees of all future political rallies in San Jose from physical attacks or other displays of violence by protesters, prohibiting the City Defendants from instructing the police,

Complaint                                      Case No. _____

fire department employees, or other agents under their control to the contrary, and prohibiting the City Defendants from maintaining a policy or practice that allows, permits, or encourages these violent acts.

## SECOND CLAIM FOR RELIEF

### Violation of Right to Enjoy Civil Rights (Cal. Civ. Code § 52.1)

### (By Class Against City of San Jose, Liccardo, his individual capacity,

### Garcia, in his individual capacity, and DOES 1-15)

164.   The Class Representatives incorporate by reference their allegations in the preceding paragraphs as if fully set forth herein.

165.   The City Defendants and DOES 1-15, inclusive, by committing the above-described conduct, interfered, and attempted to interfere, by threats, intimidation, and coercion, with the Class members' peaceable exercise and enjoyment of rights secured by the Constitution and the laws of the United States and California, including the deprivation of the rights to free speech, peaceful assembly, and due process.

166.   The City Defendants instructed police officers to require the Class members to exit the convention center in the direction of the violent mob, prevented the Class members from using alternative, safer routes, and failed to assist the Class members after directing them to the dangerous situation. Such actions constitute threats, intimidation, or coercion, and resulted in violations of the Class members' civil and statutory rights.

167.   A substantial motivating reason for the City Defendants' conduct was the Class members' real or perceived political affiliations.

168.   The Class Representatives are informed and believe and herein allege that Liccardo and Garcia acted maliciously and in bad faith in depriving the Class members of their constitutional rights, and targeted the Class members on the basis of their real or perceived political affiliations.

169.   As a result of the wrongful acts alleged herein, the Class members are entitled to damages.

170.   The City Defendants committed the wrongful acts alleged herein maliciously, fraudulently, and oppressively, and/or with reckless and conscious disregard for the rights and safety



of the Class members and/or with an improper and evil motive amounting to malice. The Class members are thus entitled to recover punitive damages, in addition to compensatory damages, from the City Defendants in an amount according to proof.

171.    The Class is also entitled to attorneys' fees pursuant to California Civil Code § 52.1(h) and seeks injunctive relief, enjoining the City Defendants from further violating the Class's civil rights, including by requiring the City Defendants to protect attendees of all future political rallies in San Jose from physical attacks or other displays of violence by protesters, prohibiting the City Defendants from instructing the police, fire, and other parties under their control to the contrary, and prohibiting the City Defendants from maintaining a policy or practice that allows, permits, or encourages these violent acts.

### THIRD CLAIM FOR RELIEF

### Violation of State Statutory Rights (Cal. Civ. Code § 51.7)

### (By Class Against City of San Jose, Liccardo, in his individual capacity,

### Garcia, in his individual capacity, and DOES 1-15)

172.    The Class Representatives incorporate by reference their allegations in the preceding paragraphs as if fully set forth herein.

173.    The City Defendants and DOES 1-15 knowingly directed the Class members toward the violent mob of protesters, thereby denying the Class members their constitutional rights to free speech, peaceful assembly, and due process.

174.    The City Defendants also aided, incited, or conspired in the denial of these rights to the Class members, by directing the Class members toward the anti-Trump protesters, and by failing to intervene in the dangerous situation the City Defendants had created.

175.    The Class Representatives are informed and believe and thereon allege that the City Defendants' acts of actual or intended violence or intimidation by threat of violence, including by refusing the Class members the ability to leave the convention center through alternative routes and maliciously subjecting the Class members to the violence and intimidate of the mob, were motivated by prejudice against the Class members, based on the Class members' real or perceived political affiliations, which the City Defendants perceived based upon the Class members' attendances at the

22

Trump Rally.

176.    The City Defendants' actions were directed against each of the Class members, as the City Defendants required each of them to exit the Trump Rally in the direction of the violent mob of anti-Trump protesters.

177.    As a direct and proximate result of the City Defendants' wrongful conduct, each of the Class members were denied their civil liberties, and were required to walk through a violent mob that attacked, taunted, or otherwise intimidated the Class members based upon their real or perceived political affiliations.

178.    Under the provisions of California Civil Code § 52(b), the City Defendants are liable for punitive damages for each violation of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000 per violation.

179.    The Class also seeks injunctive relief, enjoining the City Defendants from further violating the Class's civil rights, including by requiring the City Defendants to protect attendees of all future political rallies in San Jose from physical attacks or other displays of violence by protesters, prohibiting the City Defendants from instructing the police, fire department employees, and other parties under their control to the contrary, and prohibiting the City Defendants from maintaining a policy or practice that allows, permits, or encourages these violent acts.

## FOURTH CLAIM FOR RELIEF

### Negligence

### (By Class Against City of San Jose and DOES 1-15)

180.    The Class Representatives incorporate by reference their allegations in the preceding paragraphs as if fully set forth herein.

181.    At all times herein mentioned, the City and DOES 1-15, inclusive, had a duty of care to avoid causing unnecessary physical harm and distress to persons by restricting the Class members' ability to depart from the Trump Rally safely, and to avoid directing the Class members into a violent mob of anti-Trump protesters, and to provide aid after creating the dangerous situation that caused the Class members harm.

182.    The wrongful conduct of the City and DOES 1-15, inclusive, as set forth herein, did not

Complaint                                                          Case No. _____

1    comply with the standard of care to be exercised by reasonable persons, and proximately caused each

2    of the Class members to suffer injuries and damages set forth herein.

3         183.    Pursuant to Government Code § 815.2(a), the City is vicariously liable to the Class for

4    injuries and damages suffered as alleged herein, incurred as a proximate result of the aforementioned

5    wrongful conduct of the City and DOES 1-15, inclusive.

6         184.    As a proximate result of the City and DOES 1-15, inclusive, negligent conduct, the

7    Class have suffered severe emotional and mental distress from being chased, assaulted, intimidated,

8    and/or otherwise aggressively confronted by the violent mob of anti-Trump protesters, and several

9    were beaten and/or struck with objects, which occurred as a result of the City's and DOES 1-15,

10   inclusive, conduct.

11        185.    The Class is therefore entitled to compensatory damages, according to proof at trial.

12   **FIFTH CLAIM FOR RELIEF**

13   **Assault**

14   **(By Juan Hernandez and Dustin Haines-Scrodin against DOE 16)**

15        186.    Hernandez and Haines-Scrodin incorporate by reference all allegations in the preceding

16   paragraphs as if fully set forth herein.

17        187.    DOE 16 intentionally, willfully, wantonly, and maliciously threatened to strike

18   Hernandez and Haines-Scrodin, each, and to inflict severe bodily injury, in a manner so as to cause

19   Hernandez and Haines-Scrodin reasonably to believe that each was about to be struck in a harmful and

20   offensive manner.

21        188.    In light of DOE 16's violent demeanor and conduct surrounding these events, including

22   but not limited to striking Hernandez and Haines-Scrodin in the head, a reasonable person in

23   Hernandez and Haines-Scrodin's situation would have been offended by the threatened violent

24   touching.

25        189.    At no time did Hernandez or Haines-Scrodin consent to DOE 16's threatened conduct.

26        190.    As a direct and proximate result of DOE 16's threatening conduct, coupled with the

27   present ability to carry out such threats, Hernandez and Haines-Scrodin felt imminent apprehension of

28   such contact, and therefore suffered severe emotional distress and other injuries to their persons, in an

24



Complaint                                          Case No. _____

1   amount to be shown according to proof.

2       191.    DOE 16's conduct was not limited to threats; rather, DOE 16 actually struck Hernandez

3   and Haines-Scrodin in their heads, repeatedly.

4       192.    As a direct and proximate result of DOE 16's conduct, Hernandez and Haines-Scrodin

5   were required to obtain medical services and treatment in an amount according to proof at trial, and

6   will, in the future, be compelled to incur additional obligations for medical treatment in an amount

7   according to proof at trial.

8       193.    Hernandez and Haines-Scrodin are informed and believe and allege thereon that such

9   acts directed towards each of them were malicious and belligerent, and were done with a conscious

10  disregard of Hernandez and Haines-Scrodin's right to be free from such tortious and criminal

11  behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294,

12  entitling Hernandez and Haines-Scrodin to punitive damages, in addition to compensatory damages, in

13  an amount appropriate to punish and set an example of DOE 16.

14                        **SIXTH CLAIM FOR RELIEF**

15                                **Battery**

16              **(By Juan Hernandez and Haines-Scrodin against DOE 16)**

17      194.    Hernandez and Haines-Scrodin incorporate by reference all allegations in the preceding

18  paragraphs as if fully set forth herein.

19      195.    DOE 16 intentionally and/or recklessly struck Hernandez in the head, broke his nose,

20  and inflicted severe bodily injury on Hernandez, and also struck Haines-Scrodin in the face repeatedly.

21      196.    DOE 16 did such acts with the intent to cause a harmful or offensive contact with the

22  body of Hernandez, and with the body of Haines-Scrodin.

23      197.    At no time did Hernandez or Haines-Scrodin consent to DOE 16's harmful touching.

24      198.    As a direct and proximate result of DOE 16's conduct, Hernandez and Haines-Scrodin

25  each suffered severe bodily injuries. Hernandez and Haines-Scrodin have also suffered damages

26  related to the shock and emotional distress of being violently attacked, as well as physical pain and

27  suffering.

28      199.    As a direct and proximate result of DOE 16's conduct, Hernandez was required to



Complaint                                          Case No. _____

obtain medical services and treatment in an amount according to proof at trial, and will, in the future, be compelled to incur additional obligations for medical treatment in an amount according to proof at trial.

200.    As a direct and proximate result of DOE 16's conduct, Haines-Scrodin was harmed, in an amount according to proof at trial.

201.    Hernandez and Haines-Scrodin are informed and believe and allege thereon that such acts directed towards them were malicious and belligerent, and the acts were done with a conscious disregard of Hernandez and Haines-Scrodin's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Hernandez and Haines-Scrodin to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set an example of DOE 16.

**SEVENTH CLAIM FOR RELIEF**

**Violation of State Statutory Rights (Cal. Civ. Code § 51.7)**

**(By Juan Hernandez and Haines-Scrodin against DOE 16)**

202.    Hernandez and Haines-Scrodin incorporate by reference all allegations in the preceding paragraphs as if fully set forth herein.

203.    DOE 16 used violence, or intimidation by threats of violence, against Hernandez and Haines-Scrodin, including by striking Hernandez and Haines-Scrodin in the head, causing each of them injury.

204.    Hernandez and Haines-Scrodin are informed and believe and thereon allege that DOE 16's acts of actual or intended violence or intimidation were motivated by prejudice against Hernandez and Haines-Scrodin, based on Hernandez and Haines-Scrodin's real or perceived political affiliations and/or real or perceived races or nationalities, which DOE 16 perceived based upon, among other reasons, Hernandez and Haines-Scrodin's attendance at the Trump Rally and appearances.

205.    As a direct and proximate result of DOE 16's wrongful conduct, Hernandez and Haines-Scrodin suffered harm, including physical bodily injury and emotional distress.

206.    Under the provisions of California Civil Code § 52(b), DOE 16 is liable for punitive

26



Complaint                                                              Case No. _____

1  damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees,

2  and an additional penalty of $25,000, per violation.

3  **EIGHTH CLAIM FOR RELIEF**

4  **Assault**

5  **(By Andrew Zambetti against DOE 17)**

6  207.   Zambetti incorporates by reference all allegations in the preceding paragraphs as if fully

7  set forth herein.

8  208.   DOE 17 intentionally, willfully, wantonly, and maliciously threatened to strike

9  Zambetti and to inflict severe bodily injury, in a manner so as to cause Zambetti to reasonably believe

10  he was about to be struck in a harmful and offensive manner.

11  209.   In light of DOE 17's violent demeanor and conduct surrounding these events, including

12  but not limited to striking Zambetti in the head with a bag filled with hard objects, believed to be

13  rocks, a reasonable person in Zambetti's situation would have been offended by the threatened, violent

14  touching.

15  210.   At no time did Zambetti consent to DOE 17's threatened conduct.

16  211.   As a direct and proximate result of DOE 17's threatening conduct, coupled with the

17  present ability to carry out such threats, Zambetti felt imminent apprehension of such contact, and he

18  therefore suffered severe emotional distress and other injuries to his person, in an amount to be shown

19  according to proof.

20  212.   As a direct and proximate result of DOE 17's conduct, Zambetti was required to obtain

21  medical services and treatment in an amount according to proof at trial, and will, in the future, be

22  compelled to incur additional obligations for medical treatment in an amount according to proof at

23  trial.

24  213.   Zambetti is informed and believes and alleges thereon that such acts directed toward

25  him were malicious and belligerent, and the acts were done with a conscious disregard of Zambetti's

26  right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or

27  malice pursuant to California Civil Code § 3294, entitling Zambetti to punitive damages, in addition to

28  compensatory damages, in an amount appropriate to punish and set an example of DOE 17.

27



Complaint                                                    Case No. _____

**NINTH CLAIM FOR RELIEF**

**Battery**

**(By Andrew Zambetti against DOE 17)**

214.    Zambetti incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

215.    DOE 17 intentionally and/or recklessly performed acts which resulted in striking Zambetti in the head, inflicting severe bodily injury.

216.    DOE 17 performed such acts with the intent to cause a harmful or offensive contact with the body of Zambetti.

217.    At no time did Zambetti consent to DOE 17's harmful touching.

218.    As a direct and proximate result of DOE 17's conduct, Zambetti suffered severe bodily injuries. Zambetti has also suffered damages related to the shock and emotional distress of being violently attacked, as well as physical pain and suffering.

219.    As a direct and proximate result of DOE 17's conduct, Zambetti was required to obtain medical services and treatment in an amount according to proof at trial, and will, in the future, be compelled to incur additional obligations for medical treatment in an amount according to proof at trial.

220.    Zambetti is informed and believes and alleges thereon that such acts directed toward him were malicious and belligerent, and the acts were done with a conscious disregard of Zambetti's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Zambetti to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set an example of DOE 17.

**TENTH CLAIM FOR RELIEF**

**Violation of State Statutory Rights (Cal. Civ. Code § 51.7)**

**(By Andrew Zambetti against DOE 17)**

221.    Zambetti incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

222.    DOE 17 used violence, or intimidation by threats of violence, against Zambetti,



28

Complaint                                             Case No. _____

including by striking Zambetti in the head, severely injuring Zambetti.

223.    Zambetti is informed and believes and thereon alleges that DOE 17's acts of actual or intended violence or intimidation were motivated by prejudice against Zambetti, based on Zambetti's real or perceived political affiliations, which DOE 17 perceived based upon, among other reasons, Zambetti's attendance at the Trump Rally.

224.    As a direct and proximate result of DOE 17's wrongful conduct, Zambetti suffered harm, including physical bodily injury and emotional distress.

225.    Under the provisions of California Civil Code § 52(b), DOE 17 is liable for punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000.

## ELEVENTH CLAIM FOR RELIEF

### Assault

### (By I.P. against H.A. and S.M.)

226.    I.P. incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

227.    H.A. and S.M. intentionally, willfully, wantonly, and maliciously threatened to strike I.P. and to inflict severe bodily injury, in a manner so as to cause I.P. to reasonably believe he was about to be struck, tackled, or otherwise harmed, and did so in a harmful and offensive manner.

228.    In light of H.A. and S.M.'s violent demeanor and conduct surrounding these events, including but not limited to H.A. striking I.P. in the head twice and S.M. chasing and tackling I.P., a reasonable person in I.P.'s situation would have been offended by the threatened, violent touching.

229.    At no time did I.P. consent to H.A and S.M.'s threatened conduct.

230.    As a direct and proximate result of H.A. and S.M.'s threatening conduct, coupled with the present ability to carry out such threats, I.P. felt imminent apprehension of such contact, and he therefore suffered severe emotional distress and other injuries to his person, in an amount to be shown according to proof.

231.    As a direct and proximate result of H.A. and S.M.'s conduct, I.P. was harmed in an amount according to proof at trial, and will, in the future, be compelled to incur additional obligations

29



1  for medical treatment in an amount according to proof at trial.

2      232.    I.P. is informed and believes and alleges thereon that such acts directed towards him

3  were malicious and belligerent, and the acts were done with a conscious disregard of I.P's right to be

4  free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice

5  pursuant to California Civil Code § 3294, entitling I.P. to punitive damages, in addition to

6  compensatory damages, in an amount appropriate to punish and set an example of H.A and S.M.

7  **TWELETH CLAIM FOR RELIEF**

8  **Battery**

9  **(By I.P. against H.A. and S.M.)**

10      233.    I.P. incorporates by reference all allegations in the preceding paragraphs as if fully set

11  forth herein.

12      234.    H.A. and S.M. intentionally and/or recklessly did acts, which resulted in H.A. striking

13  I.P. in the head twice, and S.M. tackling I.P., and thereby inflicting bodily injury.

14      235.    H.A. and S.M. acted with the intent to cause a harmful or offensive contact with the

15  body of I.P.

16      236.    At no time did I.P. consent to any of H.A. and S.M.'s harmful touching.

17      237.    As a direct and proximate result of H.A. and S.M.'s conduct, I.P. suffered severe bodily

18  injuries. I.P. has also suffered damages related to the shock and emotional distress of being violently

19  attacked, as well as physical pain and suffering.

20      238.    As a direct and proximate result of H.A. and S.M.'s conduct, I.P. was required to obtain

21  medical services and treatment in an amount according to proof at trial, and will, in the future, be

22  compelled to incur additional obligations for medical treatment in an amount according to proof at

23  trial.

24      239.    I.P. is informed and believes and alleges thereon that such acts directed towards him

25  were malicious and belligerent, and the acts were done with a conscious disregard of I.P's right to be

26  free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice

27  pursuant to California Civil Code § 3294, entitling I.P. to punitive damages, in addition to

28  compensatory damages, in an amount appropriate to punish and set examples of H.A and S.M.

Complaint                Case No. _____

**THIRTEENTH CLAIM FOR RELIEF**

**Violation of State Statutory Rights (Cal. Civ. Code § 51.7)**

**(By I.P. against H.A. and S.M.)**

240.     I.P. incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

241.     H.A. and S.M. used violence, or intimidation by threats of violence, against I.P., including by H.A. striking I.P. in the head, twice, and S.M. chasing and tackling I.P. to the ground.

242.     I.P. is informed and believes and thereon alleges that H.A. and S.M.'s acts of actual or intended violence or intimidation were motivated by prejudice against I.P., based on I.P.'s real or perceived political affiliations and/or race, which H.A. and S.M. perceived based upon, among other reasons, I.P.'s attendance at the Trump Rally and his appearance.

243.     As a direct and proximate result of H.A. and S.M.'s wrongful conduct, I.P. suffered harm, including physical bodily injury and emotional distress.

244.     Under the provisions of California Civil Code § 52(b), H.A. and S.M. are liable for punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000, per violation.

**FOURTEENTH CLAIM FOR RELIEF**

**Assault**

**(By Nathan Velasquez and Frank Velasquez against Anthony Yi)**

245.     Nathan Velasquez and Frank Velasquez incorporate by reference all allegations in the preceding paragraphs as if fully set forth herein.

246.     Yi intentionally, willfully, wantonly, and maliciously threatened to violently touch Nathan Velasquez and Frank Velasquez, and to inflict severe bodily injury, in a manner so as to cause Nathan Velasquez and Frank Velasquez to reasonably believe that each was about to be struck or violently touched in a harmful and offensive manner.

247.     In light of Yi's violent demeanor and conduct surrounding these events, including but not limited to striking Nathan Velasquez in the head, a reasonable person in Nathan Velasquez and Frank Velasquez's situation would have been offended by the threatened violent touching.

31



Complaint                                                    Case No. _____



248.     At no time did Nathan Velasquez or Frank Velasquez consent to Yi's threatened conduct.

249.     As a direct and proximate result of Yi's threatening conduct, coupled with the present ability to carry out such threats, Nathan Velasquez and Frank Velasquez felt imminent apprehension of such contact, and they therefore suffered severe emotional distress and other injuries to their persons, in an amount to be shown according to proof.

250.     As a direct and proximate result of Yi's conduct, Nathan Velasquez was required to obtain medical services and treatment in an amount according to proof at trial, and will, in the future, be compelled to incur additional obligations for medical treatment in an amount according to proof at trial. Frank Velasquez also suffered harm in an amount according to proof at trial.

251.     Nathan Velasquez and Frank Velasquez are informed and believe and allege thereon that such acts directed towards them were malicious and belligerent, and the acts were done with a conscious disregard of Nathan Velasquez and Frank Velasquez's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Nathan Velasquez and Frank Velasquez to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set an example of Yi.

### FIFTEENTH CLAIM FOR RELIEF

### Battery

### (By Nathan Velasquez against Anthony Yi)

252.     Nathan Velasquez incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

253.     Yi intentionally and/or recklessly did acts which resulted in striking Nathan Velasquez in the head, inflicting severe bodily injury.

254.     Yi did such acts with the intent to cause a harmful or offensive contact with the body of Nathan Velasquez.

255.     At no time did Nathan Velasquez consent to Yi's harmful touching.

256.     As a direct and proximate result of Yi's conduct, Nathan Velasquez suffered severe bodily injuries. Nathan Velasquez has also suffered damages related to the shock and emotional



32

distress of being violently attacked, as well as physical pain and suffering.

257.    As a direct and proximate result of Yi's conduct, Nathan Velasquez was required to obtain medical services and treatment in an amount according to proof at trial, and will, in the future, be compelled to incur additional obligations for medical treatment in an amount according to proof at trial.

258.    Nathan Velasquez is informed and believes and alleges thereon that such acts directed towards him were malicious and belligerent, and the acts were done with a conscious disregard of Nathan Velasquez's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Nathan Velasquez to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set an example of Yi.

**SIXTEENTH CLAIM FOR RELIEF**

**Violation of State Statutory Rights (Cal. Civ. Code § 51.7)**

**(By Nathan Velasquez and Frank Velasquez against Anthony Yi)**

259.    Nathan Velasquez and Frank Velasquez incorporate by reference all allegations in the preceding paragraphs as if fully set forth herein.

260.    Yi used violence, or intimidation by threats of violence, against Nathan Velasquez and Frank Velasquez, including by striking Nathan Velasquez in the head, severely injuring Nathan Velasquez, and by threatening both with violent touching.

261.    Nathan Velasquez and Frank Velasquez are informed and believe and thereon allege that Yi's acts of actual or intended violence or intimidation were motivated by prejudice against Nathan Velasquez and Frank Velasquez, based on Nathan Velasquez and Frank Velasquez's real or perceived political affiliations, which Yi perceived based upon, among other reasons, Nathan Velasquez and Frank Velasquez's attendance at the Trump Rally.

262.    As a direct and proximate result of Yi's wrongful conduct, Nathan Velasquez and Frank Velasquez suffered harm, including physical bodily injury and emotional distress.

263.    Under the provisions of California Civil Code § 52(b), Yi is liable for punitive damages, in addition to compensatory damages, under of Civil Code § 51.7, reasonable attorneys'

Complaint                                          Case No. _____

1    fees, and an additional penalty of $25,000 per violation.

2    **SEVENTEENTH CLAIM FOR RELIEF**

3    **Intentional Infliction of Emotional Distress**

4    **(By Nathan Velasquez against Anthony Yi)**

5    264.    Nathan Velasquez incorporates by reference all allegations in the preceding paragraphs

6    as if fully set forth herein.

7    265.    Yi's above-described conduct was extreme, unreasonable, and outrageous.

8    266.    In engaging in the above-described conduct, Yi intentionally ignored or recklessly

9    disregarded the foreseeable risk that Nathan Velasquez would suffer extreme emotional distress as a

10   result of Yi's conduct.

11   267.    As a direct and proximate result of Yi's conduct, Nathan Velasquez suffered severe

12   emotional distress, and has been unable to return to work.

13   268.    Nathan Velasquez is informed and believes and alleges thereon that such acts directed

14   towards him were malicious and belligerent, and the acts were done with a conscious disregard of

15   Nathan Velasquez's right to be free from such tortious and criminal behavior, such as to constitute

16   oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Nathan Velasquez to

17   punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set

18   an example of Yi.

19   **EIGHTEENTH CLAIM FOR RELIEF**

20   **Negligent Infliction of Emotional Distress**

21   **(By Nathan Velasquez against Anthony Yi)**

22   269.    Nathan Velasquez incorporates by reference all allegations in the preceding paragraphs

23   as if fully set forth herein.

24   270.    Yi's above-described conduct was extreme, unreasonable, and outrageous, including by

25   striking Nathan Velasquez in the head.

26   271.    In engaging in the above-described conduct, Yi negligently disregarded the foreseeable

27   risk that Nathan Velasquez would suffer extreme emotional distress as a result of Yi's conduct.

28   272.    As a direct and proximate result of Yi's conduct, Nathan Velasquez suffered severe

34



Complaint                                    Case No. _____

1    emotional distress, and has been unable to return to work.

2        273.    Nathan Velasquez is informed and believes and alleges thereon that such acts directed

3    towards him were malicious and belligerent, and the acts were done with a conscious disregard of

4    Nathan Velasquez's right to be free from such tortious and criminal behavior, such as to constitute

5    oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Nathan Velasquez to

6    punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set

7    an example of Yi.

8                        **NINETEENTH CLAIM FOR RELIEF**

9                                        **Assault**

10                      **(By Rachel Casey against DOES 18-35)**

11       274.    Casey incorporates by reference all allegations in the preceding paragraphs as if fully set

12   forth herein.

13       275.    DOES 18-35 intentionally, willfully, wantonly, and maliciously threatened to violently

14   touch Casey and to inflict severe bodily injury, in a manner so as to cause Casey to reasonably believe

15   she was about to be touched in a harmful and offensive manner.

16       276.    In light of DOES 18-35s' violent demeanor and conduct surrounding these events,

17   including but not limited to striking Casey in the head, a reasonable person in Casey's situation would

18   have been offended by the threatened, violent touching.

19       277.    At no time did Casey consent to DOES 18-35s' threatened conduct.

20       278.    As a direct and proximate result of DOES 18-35s' threatening conduct, coupled with

21   the present ability to carry out such threats, Casey felt imminent apprehension of such contact, and she

22   therefore suffered severe emotional distress and other injuries to her person, in an amount to be shown

23   according to proof.

24       279.    As a direct and proximate result of DOES 18-35s' conduct, Casey was harmed in an

25   amount according to proof at trial.

26       280.    Casey is informed and believes and alleges thereon that such acts directed towards her

27   were malicious and belligerent, and the acts were done with a conscious disregard of Casey's right to

28   be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice



Complaint                                                    Case No. _____

1    pursuant to California Civil Code § 3294, entitling Casey to punitive damages, in addition to

2    compensatory damages, in an amount appropriate to punish and set examples of DOES 18-35.

3    **TWEENTIETH CLAIM FOR RELIEF**

4    **Battery**

5    **(By Rachel Casey against DOES 18-35)**

6    281.    Casey incorporates by reference all allegations in the preceding paragraphs as if fully set

7    forth herein.

8    282.    DOES 18-35 intentionally and/or recklessly did acts which resulted in object being

9    thrown at Casey, inflicting bodily injury.

10    283.    DOES 18-35 did such acts with the intent to cause a harmful or offensive contact with

11    the body of Casey.

12    284.    At no time did Casey consent to DOES 18-35s' harmful touching.

13    285.    As a direct and proximate result of DOES 18-35s' conduct, Casey suffered severe

14    bodily injuries. Casey has also suffered damages related to the shock and emotional distress of being

15    violently attacked, as well as physical pain and suffering.

16    286.    As a direct and proximate result of DOES 18-35s' conduct, Casey was harmed in an

17    amount according to proof at trial.

18    287.    Casey is informed and believes and alleges thereon that such acts directed towards her

19    were malicious and belligerent, and the acts were done with a conscious disregard of Casey's right to

20    be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice

21    pursuant to California Civil Code § 3294, entitling Casey to punitive damages, in addition to

22    compensatory damages, in an amount appropriate to punish and set examples of DOES 18-35.

23    **TWENTY-FIRST CLAIM FOR RELIEF**

24    **Violation of State Statutory Rights (Cal. Civ. Code § 51.7)**

25    **(By Rachel Casey against DOES 18-35)**

26    288.    Casey incorporates by reference all allegations in the preceding paragraphs as if fully set

27    forth herein.

28    289.    DOES 18-35s used violence, or intimidation by threats of violence, against Casey,

36



Complaint                                                Case No. _____

1   including by throwing objects at Casey, injuring her.

2       290.   Casey is informed and believes and thereon alleges that DOES 20-35s' acts of actual or

3   intended violence or intimidation were motivated by prejudice against Casey, based on Casey's real or

4   perceived political affiliations, which DOES 18-35s' perceived based upon, among other reasons,

5   Casey's attendance at the Trump Rally.

6       291.   As a direct and proximate result of DOES 18-35s' wrongful conduct, Casey suffered

7   harm, including physical bodily injury and emotional distress.

8       292.   Under the provisions of California Civil Code § 52(b), DOES 18-35 are liable for

9   punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable

10   attorneys' fees, and an additional penalty of $25,000 each.

11   **TWENTY-SECOND CLAIM FOR RELIEF**

12   **False Imprisonment**

13   **(By Rachel Casey against DOES 18-35)**

14       293.   Casey incorporates by reference all allegations in the preceding paragraphs as if fully set

15   forth herein.

16       294.   DOES 18-35 intentionally deprived Casey of her freedom of movement by use of

17   threats, force, threats, and intimidation.

18       295.   The confinement, restraint, and/or detention compelled Casey to stay or go until she

19   was permitted to enter the Marriott.

20       296.   Casey did not knowingly or voluntarily consent to this confinement, restraint, and/or

21   detention.

22       297.   As a direct and proximate result of DOES 18-35s' wrongful conduct, Casey was

23   harmed in an amount according to proof at trial.

24       298.   Casey is informed and believes and alleges thereon that such acts directed towards her

25   were malicious and belligerent, and the acts were done with a conscious disregard of Casey's right to

26   be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice

27   pursuant to California Civil Code § 3294, entitling Casey to punitive damages, in addition to

28   compensatory damages, in an amount appropriate to punish and set examples of DOES 18-35.

37



**TWENTY-THIRD CLAIM FOR RELIEF**

**Assault**

**(By Barbara Arigoni against DOES 36-38)**

299.    Arigoni incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

300.    DOES 36-38 intentionally, willfully, wantonly, and maliciously threatened to harmfully and offensively touch Arigoni, and to inflict severe bodily injury, in a manner so as to cause Arigoni to reasonably believe she was about to be harmed.

301.    In light of DOES 36-38s' violent demeanor and conduct surrounding these events, including but not limited to pulling Arigoni's hair and breaking her glasses, a reasonable person in Argioni's situation would have been offended by the threatened, violent touching.

302.    At no time did Arigoni consent to DOES 36-38s' threatened conduct.

303.    As a direct and proximate result of DOES 36-38s' threatening conduct, coupled with the present ability to carry out such threats, Arigoni felt imminent apprehension of such contact, and she therefore suffered severe emotional distress and other injuries to her person, in an amount to be shown according to proof.

304.    As a direct and proximate result of DOES 36-38s' conduct, Arigoni was harmed in an amount according to proof at trial.

305.    Arigoni is informed and believes and alleges thereon that such acts directed towards her were malicious and belligerent, and the acts were done with a conscious disregard of Arigoni's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Arigoni to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set examples of DOES 36-38.

**TWENTY-FOURTH CLAIM FOR RELIEF**

**Battery**

**(By Barbara Arigoni against DOES 36-38)**

306.    Arigoni incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

Complaint                                                    Case No. _____

307.    DOES 36-38 intentionally and/or recklessly did acts which resulted in pulling Arigoni's hair, taking her glasses, and breaking her glasses, and causing her bodily injury.

308.    DOES 36-38 did such acts with the intent to cause a harmful or offensive contact with the body of Arigoni.

309.    At no time did Arigoni consent to DOES 36-38s' harmful touching.

310.    As a direct and proximate result of DOES 36-38s' conduct, Arigoni suffered severe bodily injuries. Arigoni has also suffered damages related to the shock and emotional distress of being violently attacked, as well as physical pain and suffering.

311.    As a direct and proximate result of DOES 36-38s' conduct, Arigoni was harmed in an amount according to proof at trial.

312.    Arigoni is informed and believes and alleges thereon that such acts directed towards her were malicious and belligerent, and the acts were done with a conscious disregard of Arigoni's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Arigoni to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set examples of DOES 36-38.

### TWENTY-FIFTH CLAIM FOR RELIEF

### Violation of State Statutory Rights (Cal. Civ. Code § 51.7)

### (By Barbara Arigoni against DOES 36-38)

313.    Arigoni incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

314.    DOES 36-38 used violence, or intimidation by threats of violence, against Arigoni, including by pulling Arigoni's hair and breaking her glasses, injuring Arigoni.

315.    Arigoni is informed and believes and thereon alleges that DOES 36-38s' acts of actual or intended violence or intimidation were motivated by prejudice against Arigoni, based on Arigoni's real or perceived political affiliations, which DOES 36-38 perceived based upon, among other reasons, Arigoni's attendance at the Trump Rally.

316.    As a direct and proximate result of DOES 36-38s' wrongful conduct, Arigoni suffered harm, including physical bodily injury and emotional distress.



39

Complaint                                    Case No. _____

317.   Under the provisions of California Civil Code § 52(b), DOES 36-38 are liable for punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000.

### TWENTY-SIXTH CLAIM FOR RELIEF

### Assault

### (By Mark Doering and Mary Doering against DOES 36-38)

318.   Mark Doering and Mary Doering incorporate by reference all allegations in the preceding paragraphs as if fully set forth herein.

319.   DOES 36-38 intentionally, willfully, wantonly, and maliciously threatened to harmfully and offensively touch Mark Doering and Mary Doering, and to inflict severe bodily injury, in a manner so as to cause the Doerings to reasonably believe they were about to be harmed.

320.   In light of DOES 36-38s' violent demeanor and conduct surrounding these events, including but not limited to attempting to bite Mark Doering, striking his head and shoulders, and breaking his glasses, a reasonable person in the Doerings' situation would have been offended by the threatened, violent touching.

321.   At no time did Mark Doering or Mary Doering consent to DOES 36-38s' threatened conduct.

322.   As a direct and proximate result of DOES 36-38s' threatening conduct, coupled with the present ability to carry out such threats, Mark Doering and Mary Doering felt imminent apprehension of such contact, and therefore suffered severe emotional distress and other injuries to their persons, in an amount to be shown according to proof.

323.   As a direct and proximate result of DOES 36-38s' conduct, Mark Doering and Mary Doering were harmed in an amount according to proof at trial.

324.   Mark Doering and Mary Doering are informed and believe and allege thereon that such acts directed towards them were malicious and belligerent, and the acts were done with a conscious disregard of the Doerings' right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Mark Doering and Mary Doering to punitive damages, in addition to compensatory damages, in an amount



appropriate to punish and set examples of DOES 36-38.

### TWENTY-SEVENTH CLAIM FOR RELIEF

### Battery

### (By Mark Doering against DOES 36-38)

325.    Mark Doering incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

326.    DOES 36-38 intentionally and/or recklessly did acts which resulted in striking Mark Doering in his head and shoulders, taking his glasses, and breaking his glasses, and causing him bodily injury.

327.    DOES 36-38 did such acts with the intent to cause a harmful or offensive contact with the body of Mark Doering.

328.    At no time did Mark Doering consent to DOES 36-38s' harmful touching.

329.    As a direct and proximate result of DOES 36-38s' conduct, Mark Doering suffered severe bodily injuries. Mark Doering has also suffered damages related to the shock and emotional distress of being violently attacked, as well as physical pain and suffering.

330.    As a direct and proximate result of DOES 36-38s' conduct, Mark Doering was harmed in an amount according to proof at trial.

331.    Mark Doering is informed and believes and alleges thereon that such acts directed towards him were malicious and belligerent, and the acts were done with a conscious disregard of Mark Doering's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Mark Doering to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set examples of DOES 36-38.

### TWENTY-EIGHTH CLAIM FOR RELIEF

### Violation of State Statutory Rights (Cal. Civ. Code § 51.7)

### (By Mark Doering and Mary Doering against DOES 36-38)

332.    Mark Doering and Mary Doering incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.



---

41

Complaint                                        Case No. _____

333.    DOES 36-38 used violence, or intimidation by threats of violence, against Mark Doering and Mary Doering, including by attempting to bite Mark Doering, hitting his head and shoulders, and by breaking Mark Doering's glasses, and otherwise injuring Mark Doering.

334.    Mark Doering and Mary Doering are informed and believe and thereon allege that DOES 36-38s' acts of actual or intended violence or intimidation were motivated by prejudice against Mark Doering and Mary Doering, based on Mark Doering and Mary Doering's real or perceived political affiliations, which DOES 36-38 perceived based upon, among other reasons, the Doerings' attendance at the Trump Rally.

335.    As a direct and proximate result of DOES 36-38s' wrongful conduct, Mark Doering and Mary Doering suffered harm, including Mark Doering suffering physical bodily injury and Mark Doering and Mary Doering suffering emotional distress.

336.    Under the provisions of California Civil Code § 52(b), DOES 36-38 are liable for punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000 per violation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray on behalf of themselves and all those similarly situated for the following:

    i.    For all damages legally and/or proximately caused to Plaintiffs by Defendants in an amount to be determined at trial;

    ii.    For punitive and exemplary damages for all claims for which such damages are authorized;

    iii.    For temporary, preliminary, and permanent injunctive relief, enjoining the City Defendants from further violating the Class's civil rights, including by requiring the City Defendants to protect attendees of all future political rallies in San Jose from physical attacks or other displays of violence by protesters, prohibiting the City Defendants from instructing the police, fire department employees, and other parties under their control to the contrary, and prohibiting the City Defendants from maintaining a policy or practice that allows, permits, or encourages these violent acts;

42

Complaint          Case No. _____

iv.   For civil penalties under California Civil Code §52(b) for which such penalties are authorized;

v.    For an award of attorneys' fees incurred in bringing this Action against the City Defendants, pursuant to 42 U.S.C. § 1988 and Cal. Civ. Code §§ 52.1(h), 52(b);

vi.   For costs of suit incurred herein; and

vii.  For such other and further relief as the Court deems just and proper.

Date: July 14, 2016                         DHILLON LAW GROUP INC.

By: _____

HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
KRISTA L. BAUGHMAN (SBN: 264600)
kbaughman@dhillonlaw.com
GREGORY R. MICHAEL (SBN: 306814)
gmichael@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Attorneys for Plaintiffs and the Proposed Class

43



Complaint                                    Case No. _____

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs on behalf of themselves and all those similarly situated demand trial by jury in this action of all issues so triable.

Date: July 14, 2016                    DHILLON LAW GROUP INC.


By: _____

HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
KRISTA L. BAUGHMAN (SBN: 264600)
kbaughman@dhillonlaw.com
GREGORY R. MICHAEL (SBN: 306814)
gmichael@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Attorneys for Plaintiffs and Proposed Class



44

Complaint                                        Case No. _____