1  HARMEET K. DHILLON (SBN: 207873)
   harmeet@dhillonlaw.com
2  KRISTA L. BAUGHMAN (SBN: 264600)
   kbaughman@dhillonlaw.com
3  GREGORY R. MICHAEL (SBN: 306814)
   gmichael@dhillonlaw.com
4  DHILLON LAW GROUP INC.
5  177 Post Street, Suite 700
   San Francisco, California 94108
6  Telephone: (415) 433-1700
   Facsimile: (415) 520-6593
7

8  Attorneys for Plaintiffs and the Proposed Class

9

10                  **UNITED STATES DISTRICT COURT**

11                 **NORTHERN DISTRICT OF CALIFORNIA**

12                       **SAN JOSE DIVISION**

13  JUAN HERNANDEZ; NATHAN VELASQUEZ;         Case Number: 5:16-cv-03957-LHK
    FRANK VELASQUEZ; RACHEL CASEY; MARK
14  DOERING; MARY DOERING; BARBARA
    ARIGONI; DUSTIN HAINES-SCRODIN; ANDREW    **FIRST AMENDED CLASS ACTION**
15  ZAMBETTI; CHRISTINA WONG; CRAIG           **COMPLAINT FOR CIVIL RIGHTS**
    PARSONS; I.P., a minor; GREG HYVER; TODD  **VIOLATIONS AND RELATED**
16  BROOME; MARTIN MERCADO; CHRISTOPHER       **CLAIMS**
    HOLLAND; THEODORE JONES; DONOVAN
17  ROST; MICHELE WILSON; and COLE CASSADY,   **DEMAND FOR JURY TRIAL**
    all individuals, on behalf of themselves and all others
18  similarly situated,
19
20              Plaintiffs,
21              v.
22  CITY OF SAN JOSE, a municipal corporation;
    EDGARDO GARCIA; LOYD KINSWORTHY; LISA
23  GANNON; KEVIN ABRUZZINI; PAUL MESSIER;
    PAUL SPAGNOLI; JOHNSON FONG; JASON TA,
24  sued in their individual capacities; H.A., a minor
    individual; S.M., a minor individual; ANTHONY YI;
25  VICTOR GASCA; DANIEL ARIGA; RAFAEL
    MEDINA; and ANTHONY MCBRIDE, all
26  individuals; and DOES 1-55, individuals,
27
28              Defendants.



First Amended Complaint                                    Case No. 5:16-cv-03957-LHK

1    Plaintiffs Juan Hernandez, Nathan Velasquez, Frank Velasquez, Rachel Casey, Mark

2  Doering, Mary Doering, Barbara Arigoni, Dustin Haines-Scrodin, Andrew Zambetti, Christina

3  Wong, Craig Parsons, I.P., a minor, Greg Hyver, Todd Broome, Martin Mercado, Christopher

4  Holland, Theodore Jones, Donovan Rost, Michele Wilson, and Cole Cassady, on behalf of

5  themselves and all others similarly situated, bring this class action lawsuit against Defendants the

6  City of San Jose; its Chief of Police, Edgardo Garcia, in his individual capacity; police Captain

7  Loyd Kinsworthy, in his individual capacity; police Lieutenants Lisa Gannon, Kevin Abruzzini, Paul

8  Messier, Paul Spagnoli, Johnson Fong, and Jason Ta, in their individual capacities; and police officer

9  DOES 1 through 15, inclusive (collectively, the "City Defendants"), for compensatory, punitive,

10  equitable, and injunctive relief following the City Defendants' many violations of the

11  constitutional and statutory rights of the class of attendees of the Donald J. Trump presidential

12  campaign rally ("Rally") held on June 2, 2016, in San Jose, California.

13    Plaintiffs Juan Hernandez, Dustin Haines-Scrodin, Andrew Zambetti, I.P., Nathan

14  Velasquez, Frank Velasquez, Rachel Casey, Barbara Arigoni, Mark Doering, Mary Doering, Martin

15  Mercado, Christopher Holland, Theodore Jones, Donovan Rost, Michele Wilson, and Cole Cassady

16  also bring individual claims against their attackers, including H.A., a minor, S.M., a minor,

17  Anthony Kwangho Yi, Victor Jesus Gasca, Daniel Modesto Arciga, Rafael Chimal Medina,

18  Anthony James McBride, and DOES 16-55.

19                                    **INTRODUCTION**

20    1.    This Action concerns the City Defendants' deprivation of the due process rights of

21  the individuals and class alleged herein, who attended the Rally, only to be directed by the City

22  Defendants or other City police officers and mutual aid officers under the City Defendants' control,

23  many wearing riot gear, directly into a mob of approximately four hundred anti-Trump protesters,

24  where the Class members were violently threatened, intimidated, and coerced, and several were

25  brutally assaulted. The City Defendants were fully aware of the volatile situation involving

26  hundreds of protesters as the Rally concluded. In fact, as early as 6p.m. the day of the Rally, the

27  San Jose police warned all officers deployed around that Rally that assaults had already been

28  reported outside the Rally. The City Defendants knowingly created a dangerous situation for all



First Amended Complaint                                    Case No. 5:16-cv-03957-LHK

1  Rally attendees by requiring all people leaving the event to walk directly into and through a mob of

2  physically violent and aggressive anti-Trump protesters, and by restricting their ability to exit

3  safely, in alternative directions, away from the violent mob. In addition to creating this dangerous

4  situation, the City Defendants directed the approximately 250 San Jose police officers and mutual

5  aid officers under the City's control, not to intervene while they witnessed the many violent

6  criminal acts perpetrated by dozens of anti-Trump protesters on the Class members.

7          2.      As a result of the City Defendants' acts and omissions, the Class members have been

8  deprived of their constitutional and statutory rights to due process, and seek compensation for the

9  harm caused by the City Defendants' intentional, deliberate, reckless, and/or negligent conduct, and

10  injunctive relief to prevent the City Defendants from repeating their wrongful conduct.

11          3.      Plaintiffs attended the Trump Rally and were subjected to the violent acts of the anti-

12  Trump protesters, as a result of the City Defendants' conduct.

13          4.      Plaintiff Juan Hernandez and Dustin Haines-Scrodin were repeatedly struck in the

14  head and face by Defendant Victor Gasca, causing Hernandez to suffer a broken nose.

15          5.      Plaintiff Andrew Zambetti was struck in the head with a bag full of hard objects

16  believed to be rocks, causing bloodshed and injury.

17          6.      Plaintiff I.P., a fourteen-year old, was hit in the back of the head, twice, by

18  Defendant H.A., an anti-Trump protester.

19          7.      At this time, members of the crowd began repeatedly shouting, "Kill him!"

20          8.      I.P. then ran to a nearby San Jose Fire Department vehicle to ask for help, but the

21  Fire Department refused to help him, and shortly thereafter, he was chased and tackled to the

22  ground by Defendant S.M., another protester.

23          9.      Plaintiff Nathan Velasquez was stuck in the head by Defendant Anthony Yi, causing

24  him severe physical trauma, including a concussion, and extreme emotional distress.

25          10.     Plaintiff Rachel Casey was attacked by a mob of protesters, including Defendants

26  Anthony McBride, Victor Gasca, and Daniel Arciga, as well as several others who threw eggs, a

27  tomato, a bottle of water, and other objects, and also spat on her, while McBride, Gasca, and

28  Arciga surrounded and wrongfully confined her against the Marriott Hotel.

3

11.     Plaintiff Barbara Arigoni, a seventy-one year old woman, was attacked by three female protesters who pulled her hair and broke her glasses. Plaintiff Mark Doering intervened, only to be struck in the head and shoulders, while his wife, Plaintiff Mary Doering, and Arigoni's friend, Plaintiff Michele Wilson, called on the nearby police for assistance. Their pleas went unanswered. Instead, the police waited for the attack to conclude, and then belatedly apologized to the Doerings and Arigoni, stating that they could not intervene, and could not arrest the attackers, despite the fact that the attackers remained nearby and subject to apprehension.

12.     Plaintiffs Martin Mercado, Christopher Holland, Theodore Jones, Donovan Rost, and Cole Cassady were also battered by several anti-Trump protesters, including, in some instances, being struck in the head and face, kicked in the back, spat upon, and otherwise harassed and assaulted.

13.     In addition to suing the City Defendants on behalf of the class, certain Plaintiffs bring individual claims against their attackers, many of whom have yet to be identified publicly by the authorities, and therefore are sued as Doe defendants.

**JURISDICTION AND VENUE**

14.     This action arises under 42 U.S.C. § 1983 in relation to the City Defendants' deprivation of the class's constitutional rights. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331, 1343, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the related state claims.

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391, because a substantial part of the acts or omissions giving rise to the claims for relief occurred in or were directed to this District, and each of the Defendants is subject to the personal jurisdiction of this Court.

16.     This Court has personal jurisdiction over the Defendants, because each Defendant is domiciled in the State of California, has sufficient minimum contacts with California, and otherwise has intentionally availed himself, herself, or itself of significant benefits provided by the State of California, rendering the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

//



4

First Amended Complaint                                                  Case No. 5:16-cv-03957-LHK

1  **INTRADISTRICT ASSIGNMENT**

2      17.    This Action is properly assigned to the San Jose Division of the Court, as the conduct

3  giving rise to this dispute occurred in Santa Clara County, California.

4  **PARTIES**

5  **Plaintiffs**

6      18.    Juan Hernandez ("Hernandez") is an individual who, at all times relevant to the

7  Complaint, was domiciled in Santa Clara, California.

8      19.    Craig Parsons is an individual, who at all times relevant to the Complaint, was

9  domiciled in Hollister, California.

10      20.    I.P., at all times relevant to the Complaint, was a fourteen-year-old individual, who

11  was domiciled in Hollister, California. I.P. is the child of Craig Parsons.

12      21.    Nathan Velasquez is an individual who, at all times relevant to the Complaint, was

13  domiciled in San Jose, California.

14      22.    Frank Velasquez is an individual who, at all times relevant to the Complaint, was

15  domiciled in San Jose, California. Frank Velasquez is the father of Nathan Velasquez.

16      23.    Rachel Casey ("Casey") is an individual who, at all times relevant to the Complaint,

17  was domiciled in San Jose, California, and currently resides in Loxahatchee, Florida.

18      24.    Mark Doering is an individual who, at all times relevant to the Complaint, was

19  domiciled in Campbell, California.

20      25.    Mary Doering is an individual who, at all times relevant to the Complaint, was

21  domiciled in Campbell, California.

22      26.    Barbara Arigoni ("Arigoni") is an individual who, at all times relevant to the

23  Complaint, was domiciled in San Jose, California.

24      27.    Dustin Haines-Scrodin ("Hanes-Scrodin") is an individual who, at all times relevant to

25  the Complaint, was domiciled in San Jose, California.

26      28.    Andrew Zambetti ("Zambetti") is an individual who, at all times relevant to the

27  Complaint, was domiciled in Walnut Creek, California.

28      29.    Christina Wong ("Wong") is an individual who, at all times relevant to the Complaint,

5

was domiciled in Castro Valley, California.

30.     Greg Hyver ("Hyver") is an individual who, at all times relevant to the Complaint, was domiciled in Soquel, California.

31.     Todd Broome ("Broome") is an individual who, at all times relevant to the Complaint, was domiciled in Sunnyvale, California.

32.     Martin Mercado ("Mercado") is an individual who, at all times relevant to the Complaint, was domiciled in Concord, California.

33.     Christopher Holland ("Holland") is an individual who, at all times relevant to the Complaint was domiciled in Los Altos, California.

34.     Theodore Jones ("Jones") is an individual who, at all times relevant to the Complaint was domiciled in Oakland, California.

35.     Donovan Rost ("Rost") is an individual who, at all times relevant to the Complaint, was domiciled in San Jose, California.

36.     Michele Wilson ("Wilson") is an individual who, at all times relevant to the Complaint was domiciled in Campbell, California.

37.     Cole Cassady ("Cassady") is an individual who, at all times relevant to the Complaint, was domiciled in San Jose, California.

**City Defendants**

38.     City of San Jose (the "City"), is a municipal entity duly organized and existing under the laws of the State of California.

39.     Defendant Edgardo Garcia ("Garcia") is an individual, who at all times relevant to the Complaint, was the Chief of Police for the City and domiciled in San Jose, California. Garcia is being sued in his individual capacity.

40.     Defendant Loyd Kinsworthy ("Kinsworthy") is an individual, who at all times relevant to the Complaint, was Captain in the San Jose Police Department, and Commander of the Special Operations Division, and on information and belief is domiciled in San Jose, California. Kinsworthy is being sued in his individual capacity.

41.     Defendant Lisa Gannon ("Gannon") is an individual, who at all times relevant to the



Complaint, was a Lieutenant in the San Jose Police Department, and is domiciled in San Jose, California. Gannon is being sued in her individual capacity.

42.     Defendant Kevin Abruzzini ("Abruzzini") is an individual, who at all times relevant to the Complaint, was a Lieutenant in the San Jose Police Department, and is domiciled in San Jose, California. Abruzzini is being sued in his individual capacity.

43.     Defendant Paul Messier ("Messier") is an individual, who at all times relevant to the Complaint, was a Lieutenant in the San Jose Police Department, and is domiciled in San Jose, California. Messier is being sued in his individual capacity.

44.     Defendant Paul Spagnoli ("Spagnoli") is an individual, who at all times relevant to the Complaint, was a Lieutenant in the San Jose Police Department, and on information and belief is domiciled in Burlingame, California. Spagnoli is being sued in his individual capacity.

45.     Defendant Johnson Fong ("Fong") is an individual, who at all times relevant to the Complaint, was a Lieutenant in the San Jose Police Department, and is domiciled in San Jose, California. Fong is being sued in his individual capacity. According to email records obtained by Plaintiffs pursuant to a Public Records Act request, Lt. Fong acted as the sub-commander at the Trump Rally.

46.     Defendant Jason Ta ("Ta") is an individual, who at all times relevant to the Complaint, was a Lieutenant in the San Jose Police Department, and on information and belief is domiciled in Gilroy, California. Ta is being sued in his individual capacity.

47.     At this time, Plaintiffs do not assert claims against Sam Liccardo, who at all times relevant to the Complaint was the Mayor of the City of San Jose. Plaintiffs will move for leave to amend the First Amended Complaint and assert claims against Mayor Liccardo, if warranted by evidence obtained in the course of this litigation.

48.     Plaintiffs are unaware of the true names and/or capacities of defendants sued herein as DOES 1 through 15, inclusive, and therefore sue said defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff believes and alleges that each of the DOE defendants is legally responsible and liable for the incident, injuries, and damages set forth in this Complaint. Each defendant proximately caused injuries and

First Amended Complaint                                              Case No. 5:16-cv-03957-LHK

damages because of his or her active participation in the subject incident, and/or because of his or her negligence, breach of duty, negligent supervision, management or control, violation of public policy, or tortious conduct. Each defendant is liable for his/her personal conduct, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, ownership, entrustment, custody, care or control or upon any other act or omission. Plaintiffs will ask leave to amend this Complaint subject to further discovery.

49.     In committing the acts alleged herein, Garcia, Kinsworthy, Gannon, Abruzzini, Messier, Spagnoli, Fong, Ta, and DOES 1 through 15, inclusive, and each of them, acted within the course and scope of their employment with the City.

50.     In doing the acts and/or omissions alleged herein, the City Defendants, and each of them, acted under color of authority and/or under color of state law.

51.     Due to the acts and/or omissions alleged herein, the City Defendants, and each of them, acted as the agent, servant, and employee and/or in concert with each of said other City Defendants herein.

52.     Police Chief Garcia, Captain Kinsworthy, Lieutenants Lisa Gannon, Kevin Abruzzini, Paul Messier, Paul Spagnoli, Johnson Fong, and Jason Ta, and DOES 1-15, are hereafter collectively referred to as the "Individual City Defendants."

**Individual Defendants**

53.     Defendant H.A. is an individual and minor who, according to press releases from the San Jose Police Department, at all times relevant to the Complaint, was domiciled in San Jose, California.

54.     Defendant S.M. is an individual and minor who, according to press releases from the San Jose Police Department, at all times relevant to the Complaint, was domiciled in Milpitas, California.

55.     Defendant Anthony Kwangho Yi ("Yi") is an individual who, at all times relevant to the Complaint, was domiciled in San Jose, California.

56.     Defendant Victor Jesus Gasca ("Gasca") is an individual who, at all times relevant to the Complaint, was domiciled in San Jose, California.

8

57.    Defendant Daniel Modesto Arciga ("Arciga") is an individual who, at all times relevant to the Complaint, was domiciled in San Jose, California.

58.    Defendant Rafael Chimal Medina ("Medina") is an individual who, at all times relevant to the Complaint was domiciled in San Jose, California.

59.    Defendant Anthony James McBride ("McBride") is an individual who, at all times relevant to the Complaint, was domiciled in San Jose, California.

60.    Plaintiffs are unaware of the true names and/or capacities of defendants sued herein as DOES 16 through 55, inclusive, and therefore sue said defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiffs believe and allege that each of the DOE defendants is legally responsible and liable for the incident, injuries, and damages set forth in this Complaint. Each defendant proximately caused injuries and damages because of their active participation in the subject incident, and/or because of their negligence, breach of duty, negligent supervision, management or control, violation of public policy, or tortious conduct. Each defendant is liable for his/her personal conduct, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, ownership, entrustment, custody, care or control or upon any other act or omission. Plaintiffs will ask leave to amend this Complaint subject to further discovery.

61.    In order to comply with all applicable administrative claim requirements under California law, Plaintiffs have filed on behalf of themselves and all those similarly situated claims to the proper City entity duly charged with processing such claims.

## FACTUAL BACKGROUND

### The City Prepares for the Trump Rally

62.    In or around May 2016, Donald J. Trump ("Trump"), currently the President-Designate of the United States, became the presumptive nominee of the Republican Party for President of the United States, by virtue of amassing the number of pledged delegates around the United States and territories, to secure the nomination at the Republican National Convention.

63.    Trump's presidential campaign team, working in conjunction with local Republican Party members in the San Francisco Bay Area, organized a Trump campaign rally to take place on

9

1   June 2, 2016, at the McEnery Convention Center in San Jose, California.

2         64.     On or before May 28, 2016, the City, and specifically Police Chief Garcia, learned

3   that the Trump campaign would hold a rally in San Jose, as indicated by email records between San

4   Jose Police Department agents at and around that time, and by Police Chief Garcia's statements to

5   the San Jose Police Officers' Association after the Rally. By the morning of May 30, 2016, the

6   Trump campaign staff and Trump's Secret Service detail informed the City and Garcia of the exact

7   time and location of the Trump Rally.

8         65.     Before learning of the Trump Rally, the City maintained and promulgated official

9   practices and procedures regarding how the San Jose Police Department and other personnel are to

10   handle demonstrations and civil disturbances. For example, the San Jose Police Department Duty

11   Manual ("Duty Manual") describes the San Jose Police Department's policies, rules, and

12   procedures under such circumstances.

13         66.     As relevant here, section L 2300 *et seq.*, titled "Demonstrations and Civil

14   Disturbances," constitutes the City's officially promulgated policies on how and whether San Jose

15   police officers shall intervene in demonstrations and civil disturbances:

16       a.  **Department Response to Demonstrations:** Demonstrations are often highly
17           emotional incidents. The demonstrators and others in the area are committed to
            their various causes and their rights, which may be in conflict. In such situations,
18           officers will strive to remain objective in order to maintain effectiveness. Once an
            officer's objectivity is lost or even appears to be lost, the officer's mere presence
19           at a demonstration may increase tensions and make the police task even more
            difficult. Officers assigned to the scene of a demonstration will strive to maintain
20           an outward appearance of calmness, whether the task involved is simply standing
            by protecting demonstrators from hostile onlookers or making necessary arrests of
21           violent demonstrators. (Duty Manual § L 2302).

22       b.  **Equality of Treatment:** Officers will treat demonstrators, onlookers or counter
            demonstrators with equal treatment. (Duty Manual § L 2303).

23       c.  **Response to Violent Conduct:** Where a demonstrator uses physical violence
24           upon another person or property, *officers should promptly make an arrest, unless*
            *the supervising officer at the scene concludes that making the arrest would divert*
25           *limited manpower or be unnecessarily risky* in reducing the ability of officers to
            perform their duties most effectively. (Duty Manual § L 2304) (emphasis added).

26       d.  **Response to Illegal Conduct:** Arrests will occasionally have to be made because
27           of a demonstrator's nonviolent but nevertheless illegal conduct; for example,
            illegal obstruction of the streets or of a building entrance. In such situations the
28           officer in command at the scene will decide if such arrests are to be made.
            Moreover, before any such arrest is made, demonstrators are warned that they



First Amended Complaint                                    Case No. 5:16-cv-03957-LHK

must move or risk arrest. (Duty Manual § L 2305).

e.  **Coordination of Departmental Actions:** *Department members will strive to ensure that a disciplined and coordinated Department response is maintained at the scene of a demonstration.* Department members will not act alone unless loss of life or great bodily harm could result from the conduct of demonstrators. When mere property damage is imminent, members will coordinate their response through assigned supervisors and perform tasks as directed. Supervisors will remain at the scene and continue to seek information concerning location and number of demonstrators, emotion condition of the crowd, and resources available to effectively maintain order. (Duty Manual § L 2307) (emphasis added).

f.  **Department Response to Civil Disorders:** Due to the variety of situations existing during a civil disorder, it is not possible to establish procedures which would cover all contingencies. Therefore, the Department has established the following procedures to assist members assigned to the scene of a civil disturbance." (Duty Manual § L 2309).

g.  **First Officer at Scene:** The first officer at the scene of a disturbance should observe the situation from a distance and evaluate it before taking action. If the situation demands, such officer will notify the district supervisor. (Duty Manual § L 2310).

h.  **Coordination of Effort:** Actions by officers are coordinated by a supervisor. Only requested units will respond to the scene. Officers will report to the supervisor after parking their vehicles in one group away from the crowd. One officer is assigned to guard the vehicles against damage. Individual officers should avoid driving their cars into the center of the crowd and operating individually. (Duty Manual § L 2311).

i.  **Supplementary Information:** Riot experience throughout the United States has shown that in many cases minor incidents involving the police were responsible for initiating the trouble. With this in mind, the following procedures are observed unless specific orders to the contrary are issued by competent authority.

    - Arrests must be thoroughly justified and only necessary force must be used in making them.

    - Incidents must be handled as quickly as possible without creating a disturbance or attracting other persons.

    - Areas of an incident or small riot should be closed off and ingress not allowed. Persons wishing to leave should be allowed to do so.

    - The Deputy Chief of the Bureau of Field Operations or his designated alternate is responsible for field operations involving civil disturbances. Reports from the field will go directly to the Deputy Chief or designee in overall command. The officer in overall command will have the responsibility for deciding whether or not to notify the Assistant Chief of Police. (Duty Manual § L 2313).

j.  **Requests For Assistance:** While the control of riots is primarily the responsibility of the Police Department, officers can expect assistance from other agencies if the riot grows very large. In the event such assistance is necessary, the Chief of the Police or, if unavailable, one of his/her immediate subordinates will notify the highest ranking officer available at the Sheriff's Department who will in

11



First Amended Complaint

Case No. 5:16-cv-03957-LHK

1   turn make appropriate requests. The Chief of Police or a designee is delegated the
    responsibility of notifying the City Manager that a request for assistance has been
2   made. (Duty Manual § L 2314).

3       67.     In accordance with these procedures, and at the direction of Police Chief Garcia

4   and/or Captain Loyd Kinsworthy, Commander of the Special Operations Division for the City of San

5   Jose Police Department, and/or DOES 1-15, the City requested additional officers through the

6   designated mutual aid request channels to staff the Rally. According to emails obtained by

7   Plaintiffs through Public Records Act requests, the City requested between fifty and seventy

8   additional officers. On June 1, 2016, Sergeant Brett Moore of the Santa Clara Sheriff's Office

9   requested, on behalf of the San Jose Police Department, additional officers from nearby agencies to

10  assist with the Rally, including for "(50) officers with helmets, batons, gas masks and shields if

11  available."

12      68.     Several law enforcement agencies offered to provide additional officers and vehicle

13  support, including six officers from the Palo Alto Police Department, two officers from Los Gatos

14  Police Department, twenty officers from the Santa Clara Police Department, five officers from

15  Campbell Police Department, three to five officers and two to three motor units from the Gilroy Police

16  Department, and ten to twelve officers from the Sunnyvale Department of Public Safety. The Santa

17  Clara County Sheriff provided thirty deputies and supervisory personnel, including a video team, and

18  arrest holding and transport units.

19      69.     The San Jose Police Department also requested assistance from other agencies,

20  including the California Highway Patrol. In one such request made by email on May 31, 2016,

21  Lieutenant Mike Sullivan of the San Jose Police Department expressly informed Jeff Moring of the

22  California Highway Patrol, of the San Jose Police Department's concern that the Rally may

23  become violent, based on other recent Trump campaign rallies in Albuquerque, New Mexico, and

24  Anaheim, Fresno, and San Diego, California, all of which spurred violent anti-Trump protests, and

25  dozens of arrests. A true and correct copy of this email is as follows:

26  //

27  //

28  //



First Amended Complaint                                    Case No. 5:16-cv-03957-LHK

**From:** Sullivan, Michael E (PD LT)
**Sent:** Tuesday, May 31, 2016 2:37 PM
**To:** jmoring@chp.ca.gov
**Cc:** Kinsworthy, Loyd
**Subject:** Air Support for SJPD / Presidential Candidate Donald Trump Visit

Hi Jeff, my name is Mike Sullivan and I'm a lieutenant with the San Jose Police Department.  I'm currently the commander of our Special Investigations Unit/Intel.  I met you a few times in Levi Stadium's command post prior to SB 50 and was extremely impressed with the air picture the CHP provides that venue.

This Thursday (6-2-16), Presidential Candidate Donald Trump is coming to our AOR.  He will be attending a rally at our Convention Center's South Hall.  His planners are expecting 12,000 to 15,000 people, which was confirmed by the USSS.  The event starts at 1900 and should be done by 2030 hrs.

I'm respectfully requesting air to ground support from your fixed wing aircraft from 1500 hrs. to 2200 hrs.  Your aircraft would be vital in providing situational awareness to our police command post (PCC) located at 201 W. Mission St., SJ, CA.  Our concerns stem from recent protests/incidents in Albuquerque, New Mexico, Anaheim, Fresno, and San Diego not to mention that there are two freeways within a mile of our Convention Center.

Sergeant Ray Carreira, from SCPD, told me that you might have spare equipment that will assist us in piping your live feed into our PCC. Thanks in advance for considering this request. Sully ▮▮▮▮▮

70.     Other email records confirm that the City was warned that approximately 12,000 to 15,000 people would attend the Rally, an estimate confirmed by the United States Secret Service, as the email above references.

71.     The City Defendants had ample and advanced warning of the high likelihood that a large, violent, anti-Trump protest would break out at and around the Rally, and were aware of the high likelihood that arrests would need to be made. In fact, such knowledge spurred the City Defendants to take what few measures they took to prepare for such violence, including requesting fifty to seventy mutual aid officers, and requiring these and other officers to wear riot gear.

72.     In several inter-agency emails regarding the San Jose Police Department's presence at the Rally, Captain Loyd Kinsworthy was identified as the primary point of contact for all units deployed at the Rally. Lieutenants Lisa Gannon, Kevin Abruzzini, Paul Messier, Paul Spagnoli, Johnson Fong, and Jason Ta ("Lieutenants"), along with dozens of sergeants and officers under their command, were also organized to be deployed at the Rally, as indicated in internal San Jose Police Department emails from the day before the Rally.

73.     Captain Kinsworthy and the Lieutenants also directed and controlled the actions of

13

First Amended Complaint

Case No. 5:16-cv-03957-LHK

1    numerous San Jose police officers and/or mutual aid officers at the Rally, including DOES 1-15.

2        74.    According to police records obtained by Plaintiffs, Lieutenant Fong also worked as the

3    "Commander for the skirmish line."

4        75.    Police Chief Garcia was directly and personally involved in preparing for and planning

5    the San Jose Police Department's presence at the Rally. Between May 28, 2016 and the Rally, Garcia

6    personally corresponded and/or spoke with members of the Trump campaign staff to organize the

7    police response. On June 1, 2016, Garcia sent an email to Mayor Liccardo and the San Jose City

8    Council, with the subject line "Trump Rally." In this email, Garcia explicitly warned that "[r]ecent

9    Trump rallies in other communities in California have drawn large crowds, and some violence has

10   been reported." Garcia also identified his plans for addressing safety concerns at the Rally, including

11   by closing Market Street at William Street and south of San Carlos Street, and San Salvador at 1st

12   Street. Garcia was also kept informed, through email, of the various preparations being made.

13       76.    On June 1, 2016, Sergeant Enrique Garcia of the San Jose Police Department's Media

14   Relations Unit, emailed Police Chief Garcia a proposed "Media Advisory." As proposed, the Media

15   Advisory stated "[t]he San Jose Police Department recognizes and respects everyone's right to express

16   their First Amendment. However, we are taking a zero tolerance approach to violent protesters. We

17   will utilize all resources within the Department and through mutual aid to ensure a safe event for

18   everyone." Sergeant Garcia also noted that Assistant Chief of Police, David Knopf, had approved the

19   wording of this advisory. A true and correct copy of this email is as follows:

20

21

22

23

24

25

26   //

27   //

28   //

14

First Amended Complaint                                                Case No. 5:16-cv-03957-LHK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-------- Original message --------
From: "Garcia, Enrique" <ENRIQUE.GARCIA@sanjoseca.gov>
Date: 6/1/2016 5:58 PM (GMT-08:00)
To: "Garcia, Edgardo" <EDGARDO.GARCIA@sanjoseca.gov>, "Knopf, Dave"
<CHRISTOPHER.KNOPF@sanjoseca.gov>
Subject: RE: Draft Press Release

DK approved it with the time changes below:

Media Advisory: Donald Trump Rally at San Jose McEnery Convention Center

Filed under Press Release, on 6/2/2016 2:46:00 PM by Author: Sergeant Enrique Garcia #2936.

Media Advisory

WHAT:  Donald Trump Rally

WHEN:  Thursday, June 2, 2016, 7:00 PM - 8:30 PM

WHERE: South Hall at the San Jose McEnery Convention Center

Republican presidential candidate Donald Trump is scheduled to speak at a campaign rally on Thursday, June 2, 2016, in the South Hall at the San José McEnery Convention Center, from 7:00 p.m. to 8:30 p.m. The campaign anticipates there will be approximately 12,000 to 15,000 people attending.

The San Jose Police Department recognizes and respects everyone's right to express their First Amendment. However, we are taking a zero tolerance approach to violent protesters. We will utilize all resources within the Department and through mutual aid to ensure a safe event for everyone.

Chief Eddie Garcia said, "Tomorrow, we will protect the First Amendment, our Community, and our Officers."

In anticipation of the event, there will be temporary restrictions to vehicular and foot traffic in the downtown area. Expect traffic delays and plan alternate modes of transportation. Beginning at 12:00 p.m., the following streets will be closed adjacent to the Convention Center:

77.     Police Chief Edgardo Garcia edited Sergeant Enrique Garcia's initial Media Advisory, by removing all references to the City's "zero tolerance approach to violent protesters" and that the City "will utilize all resources within the Department and through mutual aid . . . ." A true and correct



15

First Amended Complaint                                    Case No. 5:16-cv-03957-LHK

1    copy of this edited email is as follows:

**From:** Garcia, Edgardo
**Sent:** Wednesday, June 01, 2016 6:16 PM
**To:** Garcia, Enrique <ENRIQUE.GARCIA@sanjoseca.gov>; Knopf, Dave <CHRISTOPHER.KNOPF@sanjoseca.gov>
**Subject:** RE: Draft Press Release

My changes are in bold....thx.

Republican presidential candidate Donald Trump is scheduled to speak at a campaign rally on Thursday, June 2, 2016, in the South Hall at the San José McEnery Convention Center, from 7:00 p.m. to 8:30 p.m. The campaign anticipates there will be approximately 12,000 to 15,000 people attending.

The San Jose Police Department recognizes and respects everyone's right to express their First Amendment, **and we will do everything possible to ensure the event is safe for all attendees and surrounding neighborhoods**.

Chief Eddie Garcia said, **"We will do everything possible to protect the First Amendment, those attending, our Community, and our Officers."**

In anticipation of the event, there will be temporary restrictions to vehicular and foot traffic in the downtown area. Expect traffic delays and plan alternate modes of transportation. Beginning at 12:00 p.m., the following streets will be closed adjacent to the Convention Center:

78.     Absent an order from the Police Chief Garcia, or another City Defendant authorized with such authority, the City would have implemented its original "zero tolerance" approach to violent protesters, and would have utilized all possible mutual aid resources available – but it did neither. According to news reports, the City and the San Jose Police Department have previously (and since) taken quick and decisive action against criminal activity, even where such activity is taking place amidst large crowds:

    a.   In the days surrounding the February, 2016 Super Bowl in Santa Clara, the San Jose Police Department assisted the Santa Clara Police Department in arresting 20 individuals for minor offenses, including public drunkenness.

    b.   In October, 2011, the San Jose Police Department successfully arrested seven protesters during the Occupy San Jose protest, four of whom were taken to jail on charges of illegal camping, and three cited and released for trespassing. Then in November, the San Jose police detained another two individuals, and arrested a third, for allegedly assaulting members of the Occupy movement.

16

First Amended Complaint                                    Case No. 5:16-cv-03957-LHK

c.  In 2013, San Jose police officers arrested eleven individuals during a Cinco de Mayo celebration, after approximately 300 people swarmed the downtown San Jose area. According to news reports, no one was injured, despite several bottles being thrown during the celebration. In the previous year's Cinco de Mayo celebration, twenty-three individuals were arrested. As such, the City anticipated violence at the 2013 celebration (as it did here), and made the necessary preparations to respond to outbreaks of violence and crime by making numerous, lawful arrests on the spot, where appropriate.

d.  In July, 2016, approximately sixty protesters staged a "die-in," in solidarity with other protesters around the nation following recent police shootings that garnered national attention. The San Jose police arrested one of the protesters' leaders, without incident.

79.  Instead of following the City's normal "zero tolerance" approach to violent protesters, by making targeted arrests during the protest, the City implemented an *entirely different* policy: the City Defendants instructed all officers to stand by, watch as the attacks occurred, and not intervene, even as citizens were brutally assaulted and their property destroyed, before their eyes.

80.  On information and belief, Police Chief Garcia personally set the City's non-interference policy regarding violent protesters outside the Rally. Plaintiffs assertion is based, in part, on Garcia's altering of the Media Advisory concerning the City's "zero tolerance" plan, his extensive involvement in the planning and preparation for the Rally, as shown through email communications leading up to the Rally, and statements made by several police officers to Plaintiffs as they exited the Rally, indicating that the police were *affirmatively instructed* not to intervene in violent altercations.

81.  After the Rally, Plaintiffs' counsel requested that the City provide all communication concerning the City and Chief Garcia's written plan of action for the Rally, pursuant to the California Public Records Act. While the City provided some emails acknowledging the existence of this plan, including communications with mutual aid agencies requesting a copy of the plan, the City has withheld the written plan itself, and has indicated that it will not comply with its disclosure obligations to produce such documents in this lawsuit.

82.  According to the San Jose Police Officer's Association ("POA") online publication, when addressing the POA about the events that unfolded outside the Rally, Police Chief Garcia stated



17

that "[h]e was notified on the Saturday before the visit but [was given] no indication of where the venue would be. It wasn't until Monday that we were notified of the location, it all happened very quickly. *We immediately turned to special Ops to coordinate and recognized we did not have the staffing to have the arrest teams and personnel to keep the parties separated.* He said that they recognized they could've done things better and is committed to work with the POA to improve things in the future." (Emphasis added).

83.     Thus, by Garcia's own admission, Garcia recognized, well in advance of the Rally, that the City was not going to deploy a sufficient number of officers at the Rally to make arrests – despite San Jose police officers' stated concerns over prior Trump rallies turning violent, requiring the officers at those rallies to make dozens of arrests. Garcia failed to request additional officers through local and regional mutual aid channels, despite having the ability to do so. On information and belief, the City, Police Chief, and Captain Kinsworthy could have requested substantially more officers through such mutual aid channels, but failed to do so, pursuant to the policy set by Police Chief Garcia and/or Captain Kinsworthy.

84.     As the City expected, upon learning of the planned Rally, several organizations, including Silicon Valley Rising and the South Bay Labor Council, began to organize and promote a "Dump the Trump" counter-rally and protest, scheduled for the same day, and organized to take place outside the McEnery Convention Center.

85.     In a public statement before the Rally, Police Chief Garcia stated, "we will do everything possible to protect the First Amendment, those attending our Community, and our Officers."

86.     Despite this representation, the City Defendants not only failed to protect those attending the Rally, but it affirmatively created the danger that ultimately harmed the class members and deprived them of their constitutional and statutory rights.

**The City Defendants Direct Rally Attendees into the Mob of Violent Protesters**

87.     Just before the Rally, and in accordance with the City's policies and Police Chief Garcia, Captain Kinsworthy, and/or DOES 1-15's plan of action, the San Jose Police Department shut down the streets surrounding the convention center to vehicle and pedestrian traffic.

First Amended Complaint                                                      Case No. 5:16-cv-03957-LHK

88.     At or around 6 p.m., the police stationed around the outside of the Rally began reporting that assaults were being committed. Despite this early warning that actual violence was taking place outside the Rally, and the City having easy access to additional officers through mutual aid resources, the City Defendants did not increase the number of officers available at the scene.

89.     As planned or decided at the conclusion of the Rally by Chief Garcia, Captain Kinsworthy, Lieutenants Gannon, Abruzzini, Messier, Spagnoli, Fong, Ta, and/or DOES 1-15 (collectively, the "Individual City Defendants"), Plaintiffs and the other attendees were directed to leave from the east-northeast exit of the McEnery Convention Center by the San Jose police, including by Captain Kinsworthy, the Lieutenants, and/or DOES 1-15, and/or other officers under the Captain and Lieutenants' control. These officers, and other officers stationed inside the convention center, also actively prevented the attendees from leaving through alternative exits, in accordance with instructions received from Chief Garcia, Captain Kinsworthy, and the Lieutenants.

90.     Upon exiting the convention center, the attendees were met with a police skirmish line, composed of and/or controlled by the Individual City Defendants. The officers in this line required the Plaintiffs to turn north as they left the convention center, and to proceed along Market Street, into the crowd of violent anti-Trump protesters.

91.     The Individual City Defendants, and/or police officers under their control, also actively prevented the Rally attendees from proceeding south along Market Street, away from the anti-Trump protesters, or from leaving the convention center through alternative exits.

92.     As discussed below, the class members were chased and subjected to violence, harassment, and intimidation on the basis of their real or perceived political affiliations, and several were beaten, victimized by theft, and/or had objects such as bottles and eggs thrown at them by the protesters, in full view of hundreds of police officers, who did nothing to intervene, protect the assaulted citizens, or arrest the attackers. Protesters also hurled insults, accused the class members of being racists, and held signs reading, "We need socialism" and "A vote for Trump is a vote for fascism," while others waved Mexican flags. At least one individual was seen burning an American flag, and another burning a hat displaying Trump's "Make America Great" campaign slogan.

19

93.     The violence continued to escalate, until dozens of attacks against Rally attendees occurred, leaving many class members bruised and bloodied.

**The City Defendants Fail to Protect Class Members from the Dangers They Created**

94.     The City Defendants instructed and directed the police officers and other City agents under their control, including firefighters, *not* to intervene in the many brutal attacks made against the Rally attendees, due to alleged concerns that intervention might cause a riot.

95.     Instead of stopping the attacks, and as a result of the direction of the Individual City Defendants, several officers and other city personnel, including members of the San Jose Fire Department, refused to respond to pleas for help from several of the Trump supporters. These refusals were made despite the fact that the San Jose police officers were armed and, in many cases, wearing riot gear, and were often mere feet away from ongoing acts of physical violence.

96.     Several officers told Trump supporters that the police were not permitted to provide assistance to those trying to return to their vehicles and leave the area, stating that providing assistance to these citizens was not a part of the City's plan or procedure in relation to the Rally.

97.     In contrast to the passive observer status the San Jose Police Department exhibited after the Rally, the state-wide police officer training programs provided by the California Commission on Peace Officer Standards and Training ("POST"), provides for rescue or arrest teams to be included in crowd control planning specifically to assist citizens or officers who are being attacked. According to POST guidelines for Crowd Management Intervention and Control Strategies, when police officers are confronted with "Isolated Unlawful Behavior," in crowd management situations, the suggested intervention strategies include that the officers "isolate, arrest and remove law violators as quickly as possible." When controlling an "Unlawful Assembly," police officers are directed to arrest individuals "who fail to disperse or who are involved in illegal activity." Likewise, when met with a "Riot," POST guidelines direct officers to "stop the illegal activity" and "arrest law violators." POST guidelines do not, under any of these circumstances, suggest that police officers stand down and passively observe while scores of innocent bystanders are brutally attacked.

98.     The San Jose Police Department failed to declare the demonstration an unlawful assembly until a full thirty minutes or more of violent altercations had ensued, following the

1    conclusion of the Rally. As the anti-Trump rioters began committing assaults no later than 6p.m., this

2    dispersal order could have been issued and enforced much earlier.

3         99.    It was not until approximately one hour after the Rally's conclusion that police brought

4    out megaphones and told demonstrators to leave or face arrest. Before that, rioters were allowed to

5    destroy property and assault Trump supporters, while police stood in formation and watched.

6         100.    During the outbreak of violence after the Rally, San Jose police officers arrested only

7    three individuals, Robert Joshua Trillo, Antonio Moses Fernandez, and Ahmed Abdirahman, each of

8    whom allegedly assaulted and/or battered police officers.

9         101.    The City's officers made no arrests at the Rally in connection with the dozens of

10   similar criminal acts committed against Plaintiffs and other Trump supporters. To Plaintiffs'

11   knowledge, there were no riot, unlawful assembly, arson, or conspiracy charges requested by the San

12   Jose Police Department, despite numerous such instances unfolding outside the Rally, many of which

13   were captured on video. The Santa Clara Sheriff's Office, however, was able to arrest one individual,

14   without incident.

15        102.    Following the Rally, San Jose Police Chief Garcia expressly ratified the conduct of

16   the City's officers, by publicly commending the officers' actions. Garcia lauded the officers'

17   "discipline and restraint," and supported the officers' passive refusal to break-up nearby scuffles,

18   because, as Garcia stated in the days after the Rally, "additional force can incite more violence in

19   the crowd." In a written media advisory, Garcia also stated "[o]ur officers should be commended

20   for both their effectiveness and their restraint."

21        103.    The morning after the Rally, at approximately 11 a.m., Chief Garcia emailed David

22   Vossbrink, the City's Director of Communications, with a proposed public statement. In its initially

23   proposed form, Garcia stated, "[o]ur officers should be commended for both their effectiveness and

24   their restraint. Let me be clear, the violence that occurred last night, will not go unchecked."

25        104.    Vossbrink, who on information and belief was not present at the Rally the day before,

26   responded to Chief Garcia's email, proposing that the statement be modified to: "Let me be clear, the

27   violence that occurred last night *was* not unchecked." (Emphasis added). It did, of course, go

28   unchecked that night. Both Chief Garcia and Vossbrink's versions of the law enforcement debacle the



First Amended Complaint                                             Case No. 5:16-cv-03957-LHK

prior night were false.

105.    On information and belief, Garcia took no disciplinary actions against the officers in response to the many constitutional violations caused by these officers.

106.    Garcia also acted as a final policymaker for the City in so far as he instructed Captain Kinsworthy and Lieutenants Gannon, Abruzzini, Messier, Spagnoli, Fong, Ta, and other officers under the City's control, to direct Plaintiffs and the other Rally attendees into the mob, and by instructing these same officers not to intervene in the many altercations that took place after the Rally.

107.    Chief Garcia's extensive involvement in planning the San Jose Police Department's response to the Rally, as well as Garcia's statements after the Trump Rally, indicating that officers did not intervene in the attacks on Trump supporters so as not to incite further violence, establish that Chief Garcia controlled the officers' actions at and around the Rally, and instructed such officers to act as they did.

108.    For example, in the wake of the Rally, the San Jose Mercury News reported, "[w]hile it appeared to many onlookers that police allowed the violence to proceed unchecked, San Jose police Chief Eddie Garcia insisted that it was more important for police to hold their "skirmish line" formation than to stop individual attacks . . . he said, officers held back to avoid inciting more violence and having the crowd turn on officers. He also said the 250 police weren't enough to control the roughly 400 protesters."

109.    Although Police Garcia publicly stated that the City's 250 officers were too few in number to appropriately respond to the 400 protesters, this is unequivocally false. The Santa Clara Sheriff's Office successfully made one arrest without incident, indicating that such arrests were feasible. The City Defendants, however, failed to make arrests, except when the anti-Trump protesters directed their attacks on the police, which spurred at least three arrests, further indicating that the 250 officers under the City Defendants' control were capable of making targeted arrests. Even if additional officers were to have been needed, the City Defendants had several days to plan and had notice that violent acts were being committed as early as 6 p.m., and Garcia could have easily doubled the police presence by calling for additional officers from local and regional law enforcement departments through well-established mutual aid request procedures. To Plaintiffs' knowledge, no such requests

22

1    were made.

2        110.    Furthermore, the concept of not making arrests during riots, so as to avoid inciting

3    further violence, is a well-established concept regarding making *mass arrests*, and is wholly

4    inapplicable to making targeted arrests. POST guidelines indicate that early arrest of riot leaders

5    usually results in reducing or eliminating violence and property damage – letting the rioters wreak

6    mayhem and anarchy as they please, manifestly does not.

7        111.    The City also failed to properly train the police officers, including the Individual City

8    Defendants. Specifically, the City failed to train its officers not to deny Plaintiffs and the class

9    members their ability to leave through alternative, safe exits; failed to train its officers not to direct

10   Plaintiffs and the class members toward a dangerous mob; and failed to train its officers to protect

11   Plaintiffs and the class members from danger, where the officers placed Plaintiffs and the class

12   members in that danger, which Plaintiffs and the class members would not have been subjected to, but

13   for the Individual City Defendants' actions.

14       112.    As discussed above, the City had ample, advanced, and specific warnings about the

15   high likelihood that a violent anti-Trump protest would occur at and around the Rally, yet the City

16   failed to properly inform and train its officers to act in a manner commensurate with the City

17   Defendants' obligations under the U.S. Constitution. Such training could have been easily and quickly

18   accomplished, including by informing the officers deployed at the Rally not to prevent Rally attendees

19   from avoiding a dangerous mob; not to direct the attendees towards danger; and if such actions are

20   nevertheless taken, that the officers were obligated to intervene in violent attacks to prevent the

21   attendees from being harmed. Such training, however, did not occur.

22       113.    After these events, the City's mayor, Sam Liccardo, also used the situation as a

23   platform to express his personal anti-Trump political views, and spuriously cast blame on Trump

24   for the violence, stating publicly:

25           San Jose police officers performed admirably and professionally to
             contain acts of violence and protect individuals' rights to assemble,
26           protest, and express their political views. While it's a sad statement
             about our political discourse that Mr. Trump has focused on stirring
27           antagonism instead of offering real solutions to our nation's challenges,
             there is absolutely no place for violence against people who are simply
28

First Amended Complaint                                          Case No. 5:16-cv-03957-LHK

exercising their rights to participate in the political process.

114.   According to news reports from shortly after the Rally, Liccardo told the Associated Press by phone, that "[a]t some point Donald Trump needs to take responsibility for the irresponsible behavior of his campaign."

115.   According to email records obtained by Plaintiffs pursuant to a Public Records Act request, within five days of the Rally, the City received over **600** "general complaints about the SJPD's failure to protect its citizens." Clearly, the citizens of San Jose disagreed with the political message Mayor Liccardo sent after the policing failure in his city.

116.   The City and the Individual City Defendants acted with reckless disregard of the Plaintiffs and the class members' safety, and in so doing, effectively prevented Plaintiffs and the class members from supporting the candidate of their choice, and/or discouraged others from doing the same. Such effects were greatly exacerbated by the City's post-Rally actions, including the statements made by the City's mayor.

117.   By their conduct discussed above, the City and the Individual City Defendants violated the class members' constitutional and statutory rights to due process, as guaranteed by the U.S. Constitution, Fourteenth Amendment.

118.   The Plaintiffs and class members were subjected to the violent acts of approximately four hundred anti-Trump protesters, without police intervention, because the City and the Individual City Defendants required the class members to exit the Trump Rally directly into the mob located a block away. The individual stories and claims of the Plaintiffs are described below.

**Hernandez and Haines-Scrodin Are Repeatedly Struck in the Face by Victor Gasca**

119.   Hernandez and Haines-Scrodin attended the Rally, exited the east-northeast exit of the McEnery Convention Center, and were directed by the San Jose police, including the Individual City Defendants and/or officers under the Individual City Defendants' control, to walk through the anti-Trump protesters, rather than being allowed to turn south, in the direction of safety.

120.   Soon after following the directions of the San Jose police, Hernandez and Haines-Scrodin were struck repeatedly in their faces and heads by anti-Trump protester, Victor Gasca.

121.   Several other anti-Trump protesters also battered Hernandez and Haines-Scrodin,

1    while Gasca kept up his assault.

2         122.    While attacking, Gasca yelled racial slurs, including the word "cracker," at

3    Hernandez and Haines-Scrodin.

4         123.    Hernandez suffered a broken nose, abrasions, and other severe bodily injuries as a

5    result of the attack, as well as severe emotional distress.

6         124.    Haines-Scrodin also suffered bodily injuries and severe emotional distress as a result

7    of the attacks.

8         125.    Despite the San Jose police being in close proximity to the brutal assaults on

9    Hernandez and Haines-Scrodin, the San Jose police did not intervene or offer their assistance, much

10   less make any arrests, and failed to do so at the direction of the City Defendants.

11        126.    On August 1, 2016 the Santa Clara District Attorney's Office, on behalf of the People

12   of the State of California, filed a felony complaint against Victor Jesus Gasca, for the crime of assault

13   by means of force likely to produce great bodily injury against Hernandez, in violation of California

14   Penal Code section 245(a)(4), and for the crime of battery against Hanes-Scrodin, in violation of

15   California Penal Code section 242-243(a). According to court records, on June 15, 2016, Gasca wrote

16   an apology letter to Hernandez and Haines-Scrodin, in which Gasca admitted to the physical assaults:

17   "to the guy I hit, deeply apologize."

18        **Frank and Nathan Velasquez Are Assaulted; Nathan Is Struck by Anthony Yi**

19        127.    Frank Velasquez and his son, Nathan Velasquez, attended the Rally and exited the

20   east-northeast exit of the convention center.

21        128.    After being directed by the San Jose police to walk through the anti-Trump protest,

22   rather than to the south, Defendant Anthony Yi, an anti-Trump protester, took Nathan Velasquez's

23   hat, which Nathan had been wearing.

24        129.    After running approximately twenty-five yards, Yi slipped and fell near the

25   intersection of San Carlos Street and Almaden Boulevard, and dropped several hats that he had

26   been carrying.

27        130.    Frank Velasquez picked up one of the hats Yi had dropped, to determine whether

28   this hat was the one taken from Nathan.

First Amended Complaint                                              Case No. 5:16-cv-03957-LHK

131. Nathan then tried to help Yi get back on his feet, as well as determine whether one of the hats Yi had dropped, belonged to Nathan.

132. As Yi stood up, Yi struck Nathan in the head with his fist, causing Nathan severe bodily harm, including a concussion, and severe emotional distress.

133. Yi also possessed a knife at this time, but dropped the knife on the ground during the altercation.

134. Immediately following the attack, Nathan was pursued by a reporter who asked Nathan several questions pertaining to the events that had just occurred.

135. As the reporter was questioning Nathan, Yi and other protesters stood opposite the reporter and continued to make verbal threats and hand gestures, indicating that Yi and other protesters intended to continue their attack.

136. Shortly thereafter, Nathan and his father moved quickly back to the police line, which was about one hundred yards away from the location of the original attack on the corner of San Carlos Street and Almaden Boulevard, and they were pursued by Yi and five or six other protesters.

137. After explaining the situation to the police, Frank and his son were permitted to stand in the vicinity of the police, where they hoped that the violent attacks against them would not continue. The police, however, did not affirmatively protect Frank or Nathan.

138. Nathan Velasquez has been unable to work due to his injuries and the emotional distress caused by Yi's conduct, and has since been diagnosed with post-concussion syndrome. Frank Velasquez has also suffered emotional distress arising from these events, which have negatively affected his ability to manage the affairs of his San Jose-based business, particularly because his customers, employees, and vendors have witnessed an unclear narrative of these events on national news, speculating as to Nathan and Franks' involvement in the attacks, as well as witnessing police standing by and doing nothing to prevent the assaults.

139. On or around June 15, 2016, pursuant to a plea bargain, Yi pled *nolo contendere* to reduced charges of one count of petty theft of personal property against Nathan Velasquez, in violation of California Penal Code section 484-488, and one count of battery against Nathan



Velasquez, in violation of California Penal Code section 242-243(a), in relation to the events described above. Yi was sentenced to two years' court probation and time served, which amounted to forty-five days in Santa Clara County jail.

**McBride, Gasca, and Arciga Confine Casey While Protesters Throw Objects At Her**

140.     Casey, who was wearing a Trump jersey that she purchased on her way into the convention center, decided to the leave the Trump Rally about an hour after arriving, and was met with the police line discussed above, which refused to intervene between the protesters and those departing the Rally, and which directed her into the waiting, violent mob.

141.     As she walked away from the police line, however, Casey began to feel uncomfortable due to the chants and taunts being shouted at her by the crowd of protesters.

142.     Two protesters, one wearing a green shirt and the other wearing a black and white mask, approached Casey, raised their middle fingers in her direction, and began yelling, "Fuck Trump!"

143.     As Casey made her way through the protest, the crowd began to follow and throw objects at her.

144.     According to police records obtained by Plaintiffs, Defendant Anthony James McBride followed Casey as she walked through the crowd.

145.     Fearing for her safety, Casey made her way to the entrance of the Marriott hotel, located approximately two hundred feet from where the police line was located, but she was initially refused entry for several minutes, as the security guards in the hotel held the doors shut.

146.     Bystanders inside the Marriott began yelling to let her inside as the protesters, including McBride, continued to surround and/or throw objects at Casey, including approximately seven eggs, a tomato, and a bottle of water, while others spat at her, as captured by numerous video images of the riot. She was struck in the head by at least one egg that smashed upon impact.

147.     The crowd continued to yell "Fuck Trump" as they attacked her, while she remained trapped between the large crowd of violent protesters and the closed Marriott doors. A video subsequently posted to YouTube.com accurately depicts these events can be found at the following url: https://www.youtube.com/watch?v=mCx3ov55tUw.



First Amended Complaint                                                    Case No. 5:16-cv-03957-LHK

148.     According to written statements made by San Jose police officers, McBride later told the San Jose police that he was approximately three feet from Casey around this time, and that he believed that she deserved to have eggs, tomatoes, and watermelon thrown at her because she was "Dissin them." McBride also admitted to police that he stood in front of Casey, clapping and chanting with the other protesters as objects were being thrown at Casey.

149.     Police records indicate that McBride "said she should not be supporting Trump like that," and that "[h]e said he was smart enough not to touch her in front of the cameras." According to these same records, McBride also indicated that "he has had a personal problem with the white community that were not for minorities. He said he was not for that and it made him mad. He [McBride] said he gave her [Casey] a piece of his mind." Police records also indicate that McBride posted on his Facebook profile, "Whoever brought watermelon and eggs, thumbs up."

150.     McBride, under the Twitter handle "HoolMcBride," also posted the following statements about his involvement at the Rally, via Twitter:

   a.   June 2, 2016: "Time to take out the anger on the white people I talk about in my tweets #TrumpRally"

   b.   June 2, 2016: "Protesters are getting out of hand #Donald Trump;" along with this tweet, McBride posted a video that he recorded while trapping Casey against the Marriott as other protesters threw objects at her.

   c.   June 2, 2016: "Ya boy in the white tee lol but nah that dude provoked an angry group of people and got the consequences."

   d.   June 2, 2016: "I was so heated she flip me off several times. Side note: those dudes with eggs and watermelon have good aim;" along with this tweet, McBride shared another video of Casey being confined and attacked by the mob.

   e.   June 2, 2016: "No property of the city was damaged only those of Trump supporters…that's a pretty peaceful successful protest to me"

   f.   June 2, 2016: "Finally confronted the type of white people I have a burning hate for today. I'll be voting for Bernie and hoping for the best"

   g.   June 2, 2016: "If you weren't at the protest stfu about this peaceful protest bs. It was



First Amended Complaint                                                    Case No. 5:16-cv-03957-LHK

1    peaceful until you taunt people, yell racial slurs, push women…"

2    h.   June 3, 2016: "NBC way to tell the whole story;" along with this tweet, McBride

3          shared a NBC Bay Area news article concerning the attack on Rachel Casey.

4    i.   June 3, 2016: "You won't know what's truly going [sic] unless you're there. Oakland,

5          Ca protest 11/25/26 San Jose, Ca protest 6/2/16"

6    j.   June 3, 2016: "@skyhighmobbin @IamAkademiks I was active yesterday"

7    k.   June 3, 2016: "Still wondering who brought the eggs to the rally and who brought

8          watermelon of all foods lol"

9    151.   McBride also confessed to police that he later kicked a blue BMW in the parking

10   garage (as caught on video by witnesses), struggled with another Trump supporter to pull a Trump

11   sign away from him, before tearing up the sign and striking the Trump supporter in the back with his

12   fist, and that he and three other individuals chased yet another Trump supporter.

13   152.   According to San Jose Police Department Officer Jill Ferrante's written statement, after

14   the crowd threw several eggs and a tomato at Casey, Defendant Daniel Modesto Arciga spat on Casey

15   at the base of her neck.

16   153.   Defendant Gasca was also present and actively participated in surrounding Casey, and

17   preventing her means of escape, while the other protesters kept up the attack. According to Jill

18   Ferrante's June 14, 2016 written statement, Gasca "admitted he was standing directly in front of her

19   [Casey] depriving her of her personal liberty."

20   154.   According to police records, Gasca, Arciga, and McBride cornered Casey, "within

21   arms [sic] reach and violat[ed] her personal liberty."

22   155.   Eventually, the Marriott guards opened the doors and allowed Casey to escape the mob.

23   156.   Despite the police officers being nearby, and having directed Casey into the violent

24   mob in the first place, the police did not take any action to come to Casey's aid.

25   157.   On June 17, 2016, the Santa Clara District Attorney's Office, on behalf of the People

26   of the State of California, filed a complaint against Anthony James McBride. McBride was accused of

27   falsely imprisoning Casey, as well as vandalism, battery, and attempted theft, as a result of his

28   conduct at the Rally.



First Amended Complaint                                                     Case No. 5:16-cv-03957-LHK

1   158.   On August 1, 2016 the Santa Clara District Attorney's Office, on behalf of the People

2   of the State of California, filed a felony complaint against Victor Jesus Gasca, for the crime of false

3   imprisonment against Casey, in violation of California Penal Code section 236-237.

4   159.   On August 15, 2016 the Santa Clara District Attorney's Office, on behalf of the People

5   of the State of California, filed a misdemeanor complaint against Daniel Modesto Arciga, for the

6   crime of battery against Casey, in violation of California Penal Code section 243-243(a).

7   **I.P. Is Assaulted and Denied Assistance by the San Jose Fire Department**

8   160.   I.P., a fourteen-year-old minor, attended the Rally with his father, Craig Parsons.

9   161.   After the rally concluded, I.P. and his father exited the east-northeast exit of the

10   McEnery Convention Center, where a line of police officers prevented I.P. and his father from

11   turning right, to safety. Instead, I.P. and his father were directed by police to turn left, into the anti-

12   Trump protesters.

13   162.   Thereafter, I.P. was struck in the back of his head (commonly known as a "sucker

14   punch"), twice, by H.A., without warning, and without seeing the attacker approaching.

15   163.   At this time, protesters began repeatedly shouting, "Kill him!"

16   164.   I.P. then ran towards a nearby San Jose Fire Department vehicle while being chased

17   by a mob of anti-Trump protesters, and asked for the Fire Department employees' assistance.

18   165.   The San Jose Fire Department refused to offer I.P., a minor, any assistance,

19   including refusing to let I.P. board their stopped fire truck to escape the attackers, despite I.P.'s

20   pleas for help and the imminent danger. Instead, the firefighters just drove away.

21   166.   Shortly after being denied help by the San Jose Fire Department, I.P. was chased by

22   protesters, and S.M. tackled I.P. to the ground.

23   167.   Still, the San Jose Police and Fire Departments, which were present in large numbers

24   in the vicinity, and some of which were wearing riot gear, failed to come to I.P.'s aid, or to make

25   any arrests of his multiple attackers.

26   168.   After being attacked, I.P. made his way to a police skirmish line, and was only later

27   allowed to cross the line to safety.

28   169.   I.P.'s father, Craig Parsons, saw I.P. cross the skirmish line, approached the police,



First Amended Complaint                                        Case No. 5:16-cv-03957-LHK

1  told them that I.P. was his son, and requested to cross the skirmish line to be with I.P., a recent

2  victim of several violent attacks.

3        170.    The police denied Craig Parsons' request.

4        171.    Thereafter, the Santa Clara District Attorney's Office pursued misdemeanor criminal

5  charges against H.A. and S.M., for attacking I.P., and on November 1, 2016, H.A. and S.M. pled

6  guilty to these crimes. H.A. and S.M. are now awaiting sentencing.

7                    **Zambetti Is Beaten with a Bag of Rocks**

8        172.    Zambetti also attended the Rally, left through the east-northeast exit and was

9  directed by the San Jose police to walk through the anti-Trump protest, rather than through

10  alternative, safer routes.

11        173.    Shortly after following the directions of the police, Zambetti was hit in the head by

12  an individual with a bag containing hard objects, which Zambetti believes to have been rocks.

13        174.    Zambetti suffered a concussion and other severe bodily injuries as a result of this

14  attack, and was bleeding from the face and ear area at the scene.

15        175.    Despite the hundreds of San Jose police officers in close proximity to this attack, they

16  refrained from intervening or offering their assistance, as instructed by the City Defendants.

17              **Mark and Mary Doering, Wilson, and Arigoni Are Assaulted**

18        176.    Mark and Mary Doering, a married couple, attended the Rally, arriving by the

19  municipal light rail.

20        177.    Barbara Arigoni, a seventy-one-year old woman, and her friend Michele Wilson,

21  also attended the Rally, and arrived by municipal light rail.

22        178.    Upon exiting the rally, the Doerings were directed by the San Jose police, or other

23  officers under the control of the City Defendants, to return to the light rail system. Arigoni and

24  Wilson similarly were directed to the light rail station by the police.

25        179.    The Doerings, following the police's instruction, walked to the light rail station.

26        180.    The Doerings then carefully made their way through the mob of anti-Trump

27  protesters until they were met with additional police officers near the intersection of West San

28  Carlos Street and Market Street.



First Amended Complaint                                    Case No. 5:16-cv-03957-LHK

181.   Again, the Doerings were told by the police to proceed to the light rail station.

182.   Wilson and Arigoni also proceeded toward the light rail station. Several protesters spat at Wilson and shouted profanities as Wilson and Arigoni walked by, including calling Wilson an "ignorant bitch."

183.   After arriving at the light rail station, the Doerings, Arigoni, and Wilson discovered that the station was inoperable because a police skirmish line near the intersection of West San Carlos Street and Almaden Boulevard, and many protesters, blocked the light rail tracks into the convention center station, or otherwise rendered service to the station impossible.

184.   The Doerings met Arigoni and Wilson at or near the light rail station, where Arigoni and Wilson waited.

185.   The Doerings, Arigoni, Wilson, along with other nearby Trump supporters, then left the area of the light rail station towards the San Jose Civic and Montgomery Theater, away from the protesters and the police skirmish line, in order to take a bus out of the area. Sheriff Deputies had informed Wilson that buses were scheduled to arrive at the San Antonio station, and directed Wilson and the others to that station.

186.   Around this time, the police began declaring from a police helicopter circling overhead that the assembly was unlawful, and that the protesters must disperse.

187.   The Doerings, Arigoni, and Wilson walked up the north-facing sidewalk of West San Carlos Street, towards the bus, as per the instructions received from an officer from the Santa Clara Sherriff's Office, acting under the control of the City Defendants.

188.   As they walked, several anti-Trump protesters screamed at and pushed Wilson, including intentionally bumping into her as she walked past.

189.   As the Doerings, Arigoni, and Wilson approached the intersection of West San Carlos and Market Street, a group of three females, who had covered their faces with bandanas, attacked Arigoni, pulled her by the hair, removed her glasses from her head and broke them, causing her to fear for her safety and suffer bodily harm.

190.   One of these females told Arigoni to "go back to [her] country."

191.   On information and belief, these individuals attacked Arigoni on the basis of her real or

32



1   perceived nationality and/or her political affiliations.

2   192.   As this attack was occurring, approximately eight San Jose police officers, or other

3   officers under the control of the City Defendants, stood nearby, but did not intervene.

4   193.   Witnessing these events, and upon learning that the San Jose police were not coming to

5   Arigoni's aid, Mark Doering confronted the attackers himself, who then focused their attack on Mark.

6   194.   One of the females attempted to bite Mark Doering, while two others started punching

7   him in the shoulders and head, knocking off his glasses and ripping his shirt, as Mark tried to restrain

8   the protester from further attacking Arigoni and himself. At the same time, another male anti-Trump

9   protester began striking Mark's arms and bending Mark's fingers back, in an attempt to free the

10  woman Mark was restraining. This caused Mark and Mary Doering, as well as Arigoni and Wilson, to

11  fear for their safety, and Mark Doering to suffer bodily harm and property damage.

12  195.   Throughout the attack, Mary Doering and Wilson screamed for help from the nearby

13  police, who stood passively on the opposite side of the street. Ms. Wilson also walked directly up to

14  the police officers and asked "Don't you see them? They are beating those men."

15  196.   The approximately eight police officers were within approximately thirty-feet of the

16  attacks on Arigoni and the Doerings.

17  197.   None of these officers intervened during the attacks, called for reinforcement, or gave

18  verbal instructions for the attackers to stop.

19  198.   In response to Wilson's statement, one officer stated that the police had been ordered to

20  not get involved or make arrests, but only to disperse the crowd. Wilson then asked "why not?" The

21  officer explained that the police did not want to incite a riot, and directed Wilson to move along.

22  Wilson replied, "what do you think we have now?" The officers did not further respond or offer

23  assistance, continuing to stand passively as they watched the assaults from a safe distance.

24  199.   One of the nearby police officers also apologized twice to the Doerings, Arigoni, and

25  Wilson, stating, "I'm so sorry," and further stating that the police *could not* do anything, and that they

26  would not arrest the three attackers, all of whom remained nearby and could have been apprehended,

27  had the police desired to do so.

28  200.   Overhearing the police officer's remarks, one of the attackers began shouting that the

33

police would not interfere, encouraging other protesters to commit additional illegal acts against other Trump supporters, which in fact occurred.

201.    Despite the San Jose police directing the Doerings, Arigoni, and Wilson into the mob, toward the location where the attacks occurred, and being present in large numbers during attacks, some wearing riot gear, the San Jose police and other City employees did not intervene or offer any assistance to the Doerings, Arigoni, and/or Wilson. Instead, the police merely watched and apologized, as their superiors had ordered them to do.

**Christina Wong and Her Son Are Assaulted**

202.    Wong attended the Rally with her eighteen-year-old son, hoping to expose him to a major political rally before casting his vote for the first time.

203.    Upon arriving at the convention center, Wong parked in the garage next to the convention center's South Hall.

204.    When the rally ended, Wong and her son exited the main auditorium and headed towards the direction of the parking garage entrance door, located on South Market Street.

205.    Upon reaching the exit closest to the parking garage, Wong and her son were met with a police line and metal fences blocking the most direct path to her vehicle in the parking garage.

206.    Wong told a San Jose police officer that she had parked in the nearby garage, and that she and her son simply wished to leave.

207.    Rather than permit Wong and her son to walk the short distance of approximately two hundred feet, the officer directed her and her son away from the garage, towards the anti-Trump protesters.

208.    The officer said "Good luck!" as she and her son unwittingly began to make their way towards the violent protest.

209.    After hearing the screams, chants, and loud commotions coming from the direction where the officer instructed her to go, she told her son that they needed to find an alternative route, in the opposite direction.

210.    Wong and her son then climbed over a fence in order to get to Almaden Boulevard,

34

1    while discussing whether and how to conceal their Trump signs and hat.

2        211.    Despite climbing over the fence, Wong and her son were soon confronted by anti-

3    Trump protesters, who shoved Wong's son in the shoulder as he passed.

4        212.    Wong and her son then ran for their vehicle, while protesters screamed "Fuck

5    Donald Trump!" and helicopters circled overhead.

6                        **Hyver Dashes for His Car to Escape the Danger**

7        213.    Hyver attended the Trump Rally, and parked his car near the intersection of South

8    2nd Street and East Williams Street, southeast of the convention center.

9        214.    As Hyver was attempting to return to his car after the Rally, rather than permit Hyver

10   to walk south, along Market Street, as Hyver requested, the San Jose police instructed him to turn

11   north, directly into the violent protest.

12       215.    When he left the Rally, Hyver decided not to wear his Trump t-shirt, for fear of his

13   safety in light of the violent mob that he observed outside the Rally.

14       216.    Despite taking this precaution, several of the anti-Trump protesters taunted and jeered

15   at Hyver as he made his way through the crowd, in the near-opposite direction of his vehicle.

16       217.    As he eventually approached his car, Hyver noticed that several people were following

17   him.

18       218.    Terrified for his safety, Hyver ran the approximately 100 remaining feet to his car.

19       219.    As a result of the City Defendants' conduct, including knowingly directing Hyver into

20   a dangerous situation, Hyver does not feel safe attending another Trump event.

21              **The Police Direct Broome, His Wife, and Three-Year-Old Son into the Mob**

22       220.    Broome attended the Rally with his wife, Michelle Broome, and his three-year-old

23   son.

24       221.    As he was leaving the Rally, Broome spoke with police officers inside the Rally, to

25   emphasize his concerns about getting his family safely to his car in the nearby parking garage.

26       222.    The San Jose police officers stated that they could not help him, and that providing

27   assistance to individuals going back to the parking garage was not a part of the San Jose Police

28   Department plan.



35

First Amended Complaint                                    Case No. 5:16-cv-03957-LHK

1      223.    Upon leaving the convention center, Broome was directed by the police into the anti-

2  Trump mob of protesters.

3      224.    Several protesters personally accosted Broome and his family as they made their way

4  through the mob of protesters, and eventually to safety.

5               **Martin Mercado Is Battered By Protesters**

6      225.    Mercado attended the Rally on June 2, 2016 in San Jose.

7      226.    Upon exiting the convention center, the police directed him, and all others leaving the

8  center, directly towards the violent protesters, forcing Mercado to go all the way around to the other

9  side of the parking garage to get to his vehicle. The police blocked all other exits from the convention

10  center.

11      227.    As he made his way through the mob, Mercado witnessed a group of young protesters

12  harass a blind, elderly woman.

13      228.    Upon witnessing this, and other violent acts, Mercado approached a police officer and

14  asked the officer why the police were not providing assistance to people being attacked by the mob of

15  protesters.

16      229.    The officer responded by stating "[w]e have to hold our line."

17      230.    As Mercado continued to make his way through the violent protest, he was spat on and

18  pushed from behind. One anti-Trump protester attempted to steal Mercado's Trump sign which he had

19  been carrying, and in the process injured Mercado's shoulder.

20      231.    When Mercado finally reached the parking garage, the police did not allow Mercado to

21  get inside his vehicle, leaving Mercado unable to escape the area, as chaos continued to ensue.

22              **Christopher Holland Is Assaulted and Battered**

23      232.    Holland attended the Trump Rally on June 2, 2016 in San Jose.

24      233.    Upon arriving at the Rally, Holland observed protesters dancing, playing music, and

25  broadcasting "Fuck Trump" over a megaphone.

26      234.    After exiting the Rally, police officers refused to permit Holland to leave the same way

27  he entered, and instead, directed Holland to take an extended detour to get to the parking lot where

28  Holland had parked his car. This detour required Holland to walk through the violent anti-Trump

36



1   protest that occurred after the Rally.

2         235.    The police prevented Holland from leaving through any other convention center exit.

3         236.    Upon arriving at the parking garage where Holland parked his car, which was across

4   the street from the convention center's main parking garage, Holland observed that there was only

5   minimal police presence in front of the garage.

6         237.    As Holland attempted to make his way to his car, one anti-Trump protester, who

7   covered his face with a Mexican flag bandana, confronted Holland and prevented Holland from

8   continuing to his car. This protester also told Holland, "Fuck you, fuck Trump."

9         238.    Shortly thereafter, Holland was punched in his face by an anti-Trump protester, causing

10   Holland's lip to split open and bleed.

11        239.    Immediately after the attack, a San Jose police officer, who was roughly thirty feet

12   from Holland as the attack occurred, looked directly at Holland for a period of two to three seconds,

13   shrugged his shoulders, and refused to offer any assistance.

14                  **Theodore Jones Is Assaulted and Battered**

15         240.    Jones also attended the Rally on June 2, 2016, as a volunteer tasked with ushering

16   attendees into the convention center and handing out Trump campaign placards.

17         241.    Upon exiting the convention center, a police officer directed Jones, and all others

18   leaving the Rally, to exit towards the violent mob.

19         242.    Upon exiting the Rally, Jones, who was wearing a Trump hat at the time, walked down

20   San Carlos Street.

21         243.    As Jones walked away from the convention center, several anti-Trump protesters

22   surrounded him and started threating him and swearing at him.

23         244.    One protester, Defendant Victor Gasca, approached Jones while holding a long pole

24   with a Mexican flag attached to it, and in a threatening voice told Jones "I'm going to fuck you up,"

25   and repeatedly called Jones a "mother fucker." Gasca also made threatening motions, making it

26   reasonably apparent to Jones that Gasca would strike Jones with a closed fist and/or the flag pole that

27   Gasca was carrying. At one point, Gasca also asked Jones "are you ready for this?"

28



First Amended Complaint                          Case No. 5:16-cv-03957-LHK

245.    Based on Gasca's words and actions, including Gasca's raising a closed fist, Jones reasonably believed that Gasca would strike Jones with a closed fist and/or with the flagpole that Gasca was carrying.

246.    Shortly after this interaction, Gasca darted behind Jones, and Jones was immediately thereafter struck in the right side of his jaw by another anti-Trump protester, Defendant Daniel Modesto Arciga. Upon being struck by Arciga, Jones fell to the ground, and according to a sheriff's deputy who witnessed the attack, Jones briefly lost consciousness.

247.    Seizing upon Jones' vulnerability, Defendant and anti-Trump protester Rafael Chimal Medina, who was close by as the events described above unfolded, then approached Jones, while Jones remained on the ground, and kicked Jones in the head.

248.    Thereafter, a Sheriff's deputy on a motorcycle approached Jones, and, after some time, Jones struggled to his feet, but was disoriented and confused from being struck in the head.

249.    According to police records obtained by Plaintiffs, Sergeant Cobble of the Santa Clara Sheriff's Office, explained to Jones that he should seek medical attention because Jones "was almost knocked out and was being kicked and stomped on by the crowd before he [Sergeant Cobble] could get to him to help him."

250.    On June 14, 2016 a judge of the Superior Court of California, Santa Clara County, issued a $100,000 arrest warrant for Rafael Chimal Medina for assault with a deadly weapon, in violation of California Penal Code 245. On June 17, 2016, the Santa Clara District Attorney's Office, on behalf of the People of the State of California, filed a misdemeanor complaint against Rafael Chimal Medina for the crime of battery against Jones, in violation of California Penal Code section 242-243(a). According to court records, Medina posted a $50,000 bail bond and was released on Supervised Own Recognizance on June 17, 2016.

251.    On August 15, 2016 the Santa Clara District Attorney's Office, on behalf of the People of the State of California, filed a misdemeanor complaint against Daniel Modesto Arciga, for the crime of battery against Jones, in violation of California Penal Code section 243-243(a).

//

//

First Amended Complaint                                    Case No. 5:16-cv-03957-LHK

**Donovan Rost Is Assaulted and Battered**

252.    Rost attended the Rally and, upon leaving, was directed by the police directly into the violent mob of anti-Trump protesters.

253.    Rost proceeded through the mob toward the light rail station, hoping to take the light rail out of the area, to safety.

254.    While waiting for the light rail train to arrive, Rost observed a mob of protesters push another Trump supporter to the ground. Rost then ran toward the Trump supporter being attacked, to help and defend him from further attacks.

255.    As Rost did so, roughly fifty to one hundred anti-Trump protesters ran towards Rost and the other Trump supporter, and began yelling at them.

256.    One protester attempted to punch Rost, but Rost was able to push the protester away and avoid being struck.

257.    As he was in immediate and serious danger, Rost began to run away from the violent mob. As he did so, a protester struck Rost repeatedly with a traffic cone.

258.    Rost continued running down the street toward a parking structure, hoping that the parking structure would offer shelter. However, upon arriving at the structure, it became apparent that the protesters were making their way into the parking structure, and that Rost would not be safe from further attacks there either.

259.    Rost left the parking structure shortly after reaching it, and was forced to go back through the violent protest that he had just left, to go to a different light rail station farther away than the first.

260.    After reaching the second light rail station, the same protester who had attempted to hit Rost earlier, tried to direct the mob's attention to Rost and incite further violence against him.

261.    Rost fled the area, ran to yet another light rail station, and eventually escaped.

**Cole Cassady is Assaulted, Battered, and Robbed**

262.    Cassady attended the Rally, and was amongst the first to leave.

263.    As he made his way to the exit of the convention center, Cassady purchased a Trump t-shirt. Cassady was also wearing a Trump hat.

39

264. Upon leaving the convention center, Cassady was met with a police skirmish line that forced him to walk toward the violent crowd of anti-Trump protesters.

265. As Cassady proceeded through the crowd, he met a group of protesters that shouted "Fuck this hat," referring to Cassady's Trump hat, and forcefully and without permission attempted to take the hat from Cassady.

266. Cassady held on to the hat, starting a tug-of-war over the hat with the protester. The protester eventually succeeded in stealing Cassady's hat, and then lit the hat on fire.

267. As this occurred, Cassady was kicked in the back, had water bottles thrown at him, and was spat on by multiple anti-Trump protesters.

268. Despite being attacked, Cassady did not fight back or engage with the violent protesters. Instead, Cassady repeatedly stated, "God bless," and held up two fingers, signaling "peace."

269. In response, the protesters hurled racial slurs at Cassady.

270. Fearing that the attack would continue to escalate, Cassady ran toward oncoming traffic and flagged down a police officer in riot gear, who appeared to be directing traffic.

271. The officer told Cassady that the officer was not going to intervene or offer him assistance, despite Cassady informing the officer of the dire situation and the recent attacks committed on Cassady by the mob.

272. As the officer refused to help, the officer pulled out his baton in a threatening manner, so Cassady ran away from the officer, and eventually escaped to safety.

**Class Action Allegations**

273. Plaintiffs Hernandez, Nathan Velasquez, Frank Velasquez, Casey, Mark Doering, Mary Doering, Arigoni, Haines-Scrodin, Zambetti, Wong, Parsons, I.P., Hyver, Broome, Mercado, Holland, Jones, Rost, Wilson, and Cassady (collectively, the "Class Representatives") bring this Action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The class that the Class Representatives seek to represent is composed of and defined as follows:

All persons who attended the June 2, 2016 Trump Rally at the McEnery Convention Center in San Jose, California, and who exited the rally from the east-northeast exit, were

40



First Amended Complaint

Case No. 5:16-cv-03957-LHK

denied the ability to leave through alternative exits by the City Defendants, or agents under the City Defendants' control, and/or were directed toward the anti-Trump protest by the City Defendants, or agents under the City Defendants' control, and/or were refused assistance by the City Defendants, or agents under the City Defendants' control after being directed towards the dangerous protest. Excluded from the Class are Defendants' officers and directors and the immediate families of the Defendants' officer and directors. Also excluded from the Class are the Defendants' legal representatives, heirs, successors or assigns, and any entity in which Defendants have or have had a controlling interest (the "Class").

274.    This Class is so numerous that joinder of all members is impracticable. An estimated 7,000 to 10,000 persons attended the Rally, and a majority, if not all, were directed by the police, as instructed by the City Defendants, directly into the violent anti-Trump mob.

275.    Many common questions of law and fact involve and affect the parties to be represented. These common questions of law or fact predominate over any questions affecting only individual members of the Class. Common questions include, but are not limited to, the following:

a.    Whether the City violated the Class's constitutional rights of due process by directing the Class members into a violent mob and ordering the police not intervene as the Class members were heckled and attacked by anti-Trump protesters, or otherwise failing to train the police and fire department to respond in an effective manner to the dangerous situation the City Defendants created;

b.    Whether Garcia acted as a final policymaker for the City, for directing the Class members into the violent mob, and ordering the police not to intervene as the Class members were heckled and attacked by anti-Trump protesters, and whether Garcia ratified the officers' conduct;

c.    Whether the City Defendants are liable for denying the Class members the ability to leave through alternative paths, away from the violent protest;

d.    Whether the City Defendants are liable for directing the Class members toward the violent protest;

e.    Whether the City Defendants are liable for refusing to intervene in attacks committed against the Class members after being directed toward the violent protest; and

41

1      f.     Whether the Class is entitled to equitable relief, including temporary, preliminary, and

2  permanent injunctive relief, enjoining the City Defendants from further violating the Class's civil

3  rights, including by requiring the City Defendants not to deny attendees at future political rallies the

4  ability to leave through safe routes, make reasonable efforts to protect attendees of all future political

5  rallies in San Jose from physical attacks or other displays of violence by protesters where such

6  attendees are made to leave through a particular pathway; prohibiting the City Defendants from

7  instructing the police, fire department employees, or other agents under their control to deny rally

8  attendees the ability to leave through alternative exits, to direct rally attendees toward danger, and/or

9  fail to intervene in attacks made on the rally attendees after having placed the attendees in danger; and

10  prohibiting the City Defendants from maintaining a policy or practice that allows, permits, or

11  encourages these violent acts.

12      276.    The Class Representatives' claims are typical of the claims of the Class they seek to

13  represent, in that the Class Representatives, and all members of the proposed Class (a) attended the

14  Trump Rally on June 2, 2016, in San Jose, California, (b) were directed by San Jose police, or other

15  local police officers acting at the direction of the City Defendants, into the mob of violent anti-Trump

16  protesters, (c) were prevented from exiting the McEnery Convention Center through alternative, safer

17  routes, (d) were not assisted by the police or fire department employees, which refused to intervene or

18  actively protect the Class from the anti-Trump protesters, such that (e) the City Defendants deprived

19  the Class members of their constitutional rights.

20      277.    The Class Representatives will fairly and adequately protect the interests of the Class,

21  and have retained attorneys experienced in class actions and complex litigation as their counsel.

22      278.    The City Defendants have acted on grounds generally applicable to the Class, thereby

23  making final injunctive relief appropriate.

24      279.    The Class Representatives aver that the prerequisites for class action treatment apply to

25  this action, and that questions of law or fact common to the Class predominate over any questions

26  affecting only individual members, and that class action treatment is superior to other available

27  methods for the fair and efficient adjudication of the controversy which is the subject of this action.

28  The Class Representatives further state that the interest of judicial economy will be served by



First Amended Complaint                                  Case No. 5:16-cv-03957-LHK

concentrating litigation concerning these claims in this Court, and that the management of this Class will not be difficult.

## FIRST CLAIM FOR RELIEF

### Violation of the Fourteenth Amendment (42 U.S.C. § 1983)

### (By Class Against Defendants Garcia, Kinsworthy, Gannon, Abruzzini, Messier, Spagnoli, Fong, Ta, in their individual capacities, and DOES 1-15)

280.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

281.    This claim is brought by the Class against Police Chief Garcia, Captain Kinsworthy, and Lieutenants Gannon, Abruzzini, Messier, Spagnoli, Fong, Ta, and DOES 1-15, in their individual capacities. Each of these Defendants, acting under color of state law, required that the Class members exit the Rally by walking directly into the violent mob; prevented the Class members' ability to exit through alternative, safe pathways; and failed to aid Plaintiffs and Class members upon witnessing and causing, by virtue of their actions, the many assaults, batteries, and false imprisonments perpetrated on Plaintiffs and Class members.

282.    Specifically, Police Chief Garcia instructed the San Jose police officers deployed at and around the Rally, directly or through a chain of command, to direct the Rally attendees to exit by the east-northeast exit of the McEnery Convention Center. Police Chief Garcia also instructed the officers not to make arrests or intervene in attacks during the aftermath of the Rally.

283.    As a direct result of Police Chief Garcia's commands, the San Jose police, and mutual aid officers under the City's control, directed Plaintiffs and the other Class members into a violent mob, prevented Plaintiffs and the other Class members from leaving through alternative, safer paths, and failed to protect Plaintiffs and the other Class members from the attacks perpetrated on Plaintiffs and the other Class members thereafter, which attacks would not have occurred but for Garcia's order.

284.    Captain Kinsworthy and Lieutenants Gannon, Abruzzini, Messier, Spagnoli, Fong, and Ta, who were physically present at and/or outside the Rally, carried out Police Chief Garcia's orders, as described above.

285.    Alternatively, Captain Kinsworthy and/or the Lieutenants themselves instructed other

43



police officers to direct Plaintiffs and the other Class members into the violent mob, to prevent Plaintiffs and the other Class members from exiting through alternative means, and not to make arrests or intervene in attacks during the aftermath of the Rally, and they followed these directions as well.

286.    The Individual City Defendants had actual, ample, and advanced warning of the likelihood that violence would occur at the Rally, as evidenced by, *inter alia,* email communications within the San Jose Police Department specifically contemplating the violence that occurred at other Trump rallies; the Individual City Defendants' proximity to the ongoing attacks against Plaintiffs and other Trump supporters after the Rally; and the police officers' use of riot gear to protect themselves from the same dangers the Individual City Defendants directed Plaintiffs and the Class members toward.

287.    Accordingly, the Individual City Defendants acted with deliberate indifference, reckless and/or conscious disregard of a known and obvious danger, by directing Plaintiffs into the mob, preventing Plaintiffs from leaving the event through other, safer paths, and by failing to intervene in the many attacks perpetrated on Plaintiffs and the Class members, which would not have occurred but for the Individual City Defendants' actions.

288.    The Individual City Defendants created a dangerous situation by denying the Class members the ability to exit the Rally safely, through alternative routes, by affirmatively directing the Class members through the violent mob of anti-Trump protestors, and by failing to protect Plaintiffs and the Class members from harm, which would not have befallen Plaintiffs but for the Individual City Defendants' actions. These actions include refusing to allow individuals who approached police officers, pleading for help, to simply step past the police lines to safety. Accordingly, the Individual City Defendants violated Plaintiffs and the Class members Fourteenth Amendment rights to Due Process.

289.    As a direct and proximate consequence of the Individual City Defendants' violations of the Class members' federal civil rights under 42 U.S.C. § 1983 and the Fourteenth Amendment, Plaintiffs and the Class members were physically, mentally, and emotionally injured and damaged, in addition to being deprived of their constitutional rights.

290.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their

First Amended Complaint                                            Case No. 5:16-cv-03957-LHK

1  rights under the law. The Class Representatives are therefore entitled to an award of attorneys' fees

2  and/or costs pursuant to 42 U.S.C. § 1988.

3        291.    Plaintiffs and the Class are also entitled to compensatory damages and seek injunctive

4  relief, enjoining the Individual City Defendants from further violating Plaintiffs and the Class's civil

5  rights, including by requiring the Individual City Defendants not to deny attendees at future political

6  rallies the ability to leave through safe routes, make reasonable efforts to protect attendees of all future

7  political rallies in San Jose from physical attacks or other displays of violence by protesters where

8  such attendees are made to leave through a particular pathway; prohibiting the City Defendants from

9  instructing the police, fire department employees, or other agents under their control to deny rally

10  attendees the ability to leave through alternative exits, to direct rally attendees toward danger, and/or

11  fail to intervene in attacks made on the rally attendees after having placed the attendees in danger; and

12  prohibiting the Individual City Defendants from maintaining a policy or practice that allows, permits,

13  or encourages these violent acts.

14  **SECOND CLAIM FOR RELIEF**

15  **Violation of the Fourteenth Amendment (42 U.S.C. § 1983 - *Monell*)**

16  **(By Class Against City of San Jose)**

17        292.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully

18  set forth herein.

19        293.    The City is liable for the actions taken by the Individual City Defendants, as alleged

20  above, for the following reasons:

21        a.    The Individual City Defendants acted in accordance with officially adopted and

22            promulgated City policies, requiring that the officers direct Plaintiffs into the mob

23            and not intervene in the attacks committed upon Plaintiffs by anti-Trump

24            protesters. Such policies include, but are not limited to, the policies and

25            procedures promulgated in the Duty Manual and the City's action plan created by

26            the City, Police Chief Garcia, Captain Kinsworthy, and/or DOES 1-15,

27            specifically for the Rally. Plaintiffs' counsel requested the written action plan,

28            pursuant to the California Public Records Act, however, the City withheld the

45

1    plan itself when responding to the request;

2    b.   Police Chief Garcia acted as a final policymaker for the City when setting the

3         City's policy regarding the handling of civil disturbances at the Rally, including

4         by instructing the other Individual City Defendants, as well as other San Jose

5         police and mutual aid officers, to direct Plaintiffs into the violent mob, refuse

6         Plaintiffs the ability to exit through alternative means, and not intervene in the

7         attacks committed on Trump supporters as Plaintiffs left the convention center

8         into the violent mob;

9    c.   The City failed to adequately train or supervise the police officers. Specifically,

10        the City failed to train its officers not to deny Plaintiffs and the class members

11        their ability leave through alternative, safe exits; failed to train its officers to not

12        direct Plaintiffs and the class members toward a dangerous mob; and failed to

13        train its officers to protect Plaintiffs and the class members from danger created

14        by the Individual City Defendants' actions.  As discussed above, the City had

15        ample and advanced warning that violence was likely to occur, because violence

16        had already occurred at other Trump rallies; however, despite this knowledge, the

17        City failed to train its officers to appropriately respond to similar acts of violence

18        that occurred after the Rally in this case. Accordingly, there was an obvious need

19        for the officers to receive appropriate training, which the City did not provide; and

20   d.   Police Chief Garcia ratified the Individual City Defendants' unconstitutional acts

21        by publicly declaring his support for those actions and by failing to reprimand

22        officers for their conduct, indicating that the City is likely to engage in such

23        behavior again.

24        294.    As a direct and proximate consequence of the Individual City Defendants' violations of

25   the Class members' federal civil rights under 42 U.S.C. § 1983 and the Fourteenth Amendment,

26   Plaintiffs were physically, mentally, and emotionally injured and damaged, in addition to being

27   deprived of their constitutional rights, and the City is liable for such damages.

28        295.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their

First Amended Complaint                                          Case No. 5:16-cv-03957-LHK

1    rights under the law. The Class Representatives are therefore entitled to an award of attorneys' fees

2    and/or costs pursuant to 42 U.S.C. § 1988.

3        296.    Plaintiffs are also entitled to compensatory damages and seek injunctive relief,

4    enjoining the City from further violating Plaintiffs civil rights, including by requiring the City not to

5    deny attendees at future political rallies the ability to leave through safe routes, make reasonable

6    efforts to protect attendees of all future political rallies in San Jose from physical attacks or other

7    displays of violence by protesters where such attendees are made to leave through a particular

8    pathway; prohibiting the City Defendants from instructing the police, fire department employees, or

9    other agents under their control to deny rally attendees the ability to leave through alternative exits, to

10   direct rally attendees toward danger, and/or fail to intervene in attacks made on the rally attendees

11   after having placed the attendees in danger; and prohibiting the City from maintaining a policy or

12   practice that allows, permits, or encourages these violent acts.

13                          **THIRD CLAIM FOR RELIEF**

14                 **Violation of Bane Act (Cal. Civ. Code § 52.1)**

15   **(By Class Against City of San Jose, Garcia, Kinsworthy, Gannon, Abruzzini, Messier,**

16                    **Spagnoli, Fong, Ta, and DOES 1-15)**

17       297.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully

18   set forth herein.

19       298.    The City Defendants, by committing the above-described conduct, interfered, and

20   attempted to interfere, by threats, intimidation, and coercion, with Plaintiffs and the Class members'

21   peaceable exercise and enjoyment of rights secured by the Constitution and the laws of the United

22   States and California, including the deprivation of Plaintiffs' Due Process rights under the Fourteenth

23   Amendment.

24       299.    The City Defendants instructed police officers to require the Plaintiffs and the Class

25   members to exit the convention center in the direction of the violent mob; prevented Plaintiffs and the

26   Class members from using alternative, safer routes; and failed to assist Plaintiffs and the Class

27   members after directing them to the dangerous situation. Such actions constitute threats, intimidation,

28   or coercion, and resulted in violations of Plaintiffs and the Class members' civil and statutory rights.

47

First Amended Complaint                                    Case No. 5:16-cv-03957-LHK

300.   As a result of the wrongful acts alleged herein, Plaintiffs and the Class members are entitled to compensatory  damages, in an amount to be proven at trial.

301.   The City Defendants committed the wrongful acts alleged herein maliciously, fraudulently, and oppressively, and/or with reckless and conscious disregard for the rights and safety of Plaintiffs and the Class members and/or with an improper and evil motive amounting to malice. The Class members are thus entitled to recover punitive damages, in addition to compensatory damages, from the City Defendants in an amount according to proof at trial.

302.   Plaintiffs and the Class are also entitled to attorneys' fees pursuant to California Civil Code § 52.1(h), and seek injunctive relief, enjoining the City Defendants from further violating the Class's civil rights, including by requiring the City Defendants to protect attendees of all future political rallies in San Jose from physical attacks or other displays of violence by protesters; prohibiting the City Defendants from instructing the police, fire department employees, or other agents under their control to deny rally attendees the ability to leave through alternative exits, to direct rally attendees toward danger, and/or fail to intervene in attacks made on the rally attendees after having placed the attendees in danger; and prohibiting the City Defendants from maintaining a policy or practice that allows, permits, or encourages these violent acts.

## FOURTH CLAIM FOR RELIEF

### Negligence

### (By Class Against City of San Jose)

303.   Plaintiffs incorporate by reference their allegations in the preceding paragraphs as if fully set forth herein.

304.   Pursuant to Government Code § 815.2(a), the City is vicariously liable for the negligent actions of Captain Kinsworthy, and Lieutenants Gannon, Abruzzini, Messier, Spagnoli, Fong, and Ta, and DOES 1-15, who were physically present at and/or outside the Trump Rally, restricted Plaintiffs and the Class members' ability to depart from the Rally safely, directed Plaintiffs and the Class members into a violent mob of anti-Trump protesters, and failed to provide aid after creating the dangerous situation that caused Plaintiffs and the Class members harm.

305.   The City is also vicariously liable for Police Chief Garcia's negligence, including, but



48

1  not limited to, ordering the above-mentioned police officers to act as they did.

2  306.   At all times herein mentioned, the City Defendants, and each of them, had a duty of

3  care to avoid placing Plaintiffs and the Class Members in unreasonably dangerous situations by

4  restricting Plaintiffs and the Class members' ability to depart from the Trump Rally safely, and to

5  avoid directing Plaintiffs and the Class members into a violent mob of anti-Trump protesters. After

6  placing Plaintiffs and the Class members in harm's way, the City and its agents also acquired the duty

7  to affirmatively provide aid and prevent Plaintiffs and the Class members from being injured.

8  307.   The wrongful conduct of the City, Police Chief Garcia, Captain Kinsworthy, and

9  Lieutenants Gannon, Abruzzini, Messier, Spagnoli, Fong, and Ta, and DOES 1-15, as set forth herein,

10  did not comply with the standard of care to be exercised by reasonable persons, and proximately

11  caused each of the Class members to suffer injuries and damages, as set forth herein.

12  308.   As a proximate result of the City Defendants' negligent conduct, Plaintiffs and the

13  Class have suffered severe emotional and mental distress from being chased, assaulted, intimidated,

14  and/or otherwise aggressively confronted by the violent mob of anti-Trump protesters, and several

15  were beaten and/or struck with objects, which occurred as a result of the City Defendants' conduct.

16  309.   As alleged above, Chief Garcia, Captain Kinsworthy, and/or Lieutenants Gannon,

17  Abruzzini, Messier, Spagnoli, Fong, and Ta, and/or DOES 1-15, as well as the host of police officers

18  deployed around the convention center, did not exercise discretion (i.e. did not exercise personal

19  deliberation, decision, and judgement) in denying Plaintiffs and the Class members the ability to use

20  alternative, safe exits, in directing Plaintiffs and the Class members into the violent mob, or in denying

21  Plaintiffs and the Class members assistance after placing Plaintiffs and the Class members in danger.

22  Instead, the City's officers performed ministerial actions, in accordance with the City's policies and

23  procedures, and/or under the orders of Police Chief Garcia or other competent authority. As several

24  police officers stated to certain Plaintiffs at the Rally, the officers were *instructed* not to intervene in

25  the attacks.

26  310.   The Class is therefore entitled to compensatory damages, according to proof at trial.

27  //

28  //

49

1

**FIFTH CLAIM FOR RELIEF**

2

**Assault**

3

**(By Juan Hernandez and Dustin Haines-Scrodin against Victor Gasca)**

4          311.     Hernandez and Haines-Scrodin incorporate by reference all allegations in the preceding

5     paragraphs as if fully set forth herein.

6          312.     Gasca intentionally, willfully, wantonly, and maliciously threatened to strike

7     Hernandez and Haines-Scrodin, each, and to inflict severe bodily injury, in a manner so as to cause

8     Hernandez and Haines-Scrodin reasonably to believe that each was about to be struck in a harmful and

9     offensive manner.

10         313.     In light of Gasca's violent demeanor and conduct surrounding these events, including

11    but not limited to striking Hernandez and Haines-Scrodin in the head, a reasonable person in

12    Hernandez and Haines-Scrodin's situation would have been offended by the threatened violent

13    touching.

14         314.     At no time did Hernandez or Haines-Scrodin consent to Gasca's threatened conduct.

15         315.     As a direct and proximate result of Gasca's threatening conduct, coupled with the

16    present ability to carry out such threats, Hernandez and Haines-Scrodin felt imminent apprehension of

17    such contact, and therefore suffered severe emotional distress and other injuries to their persons, in an

18    amount to be shown according to proof.

19         316.     Gasca's conduct was not limited to threats; rather, Gasca actually struck Hernandez and

20    Haines-Scrodin in their heads, repeatedly.

21         317.     As a direct and proximate result of Gasca's conduct, Hernandez and Haines-Scrodin

22    were required to obtain medical services and treatment, in an amount according to proof at trial, and

23    will, in the future, be compelled to incur additional obligations for medical treatment, in an amount

24    according to proof at trial.

25         318.     Hernandez and Haines-Scrodin are informed and believe and allege thereon that such

26    acts directed towards each of them were malicious and belligerent, and were done with a conscious

27    disregard of Hernandez and Haines-Scrodin's right to be free from such tortious and criminal

28    behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294,

First Amended Complaint                                                    Case No. 5:16-cv-03957-LHK

1    entitling Hernandez and Haines-Scrodin to punitive damages, in addition to compensatory damages, in

2    an amount appropriate to punish and set an example of Gasca.

### SIXTH CLAIM FOR RELIEF

**Battery**

**(By Juan Hernandez and Haines-Scrodin against Victor Gasca)**

6        319.    Hernandez and Haines-Scrodin incorporate by reference all allegations in the preceding

7    paragraphs as if fully set forth herein.

8        320.    Gasca intentionally and/or recklessly struck Hernandez in the head, broke his nose, and

9    inflicted severe bodily injury on Hernandez, and also struck Haines-Scrodin in the face repeatedly.

10        321.    Gasca did such acts with the intent to cause a harmful or offensive contact with the

11    body of Hernandez, and with the body of Haines-Scrodin.

12        322.    At no time did Hernandez or Haines-Scrodin consent to Gasca's harmful touching.

13        323.    As a direct and proximate result of Gasca's conduct, Hernandez and Haines-Scrodin

14    each suffered severe bodily injuries. Hernandez and Haines-Scrodin have also suffered damages

15    related to the shock and emotional distress of being violently attacked, as well as physical pain and

16    suffering.

17        324.    As a direct and proximate result of Gasca's conduct, Hernandez was required to obtain

18    medical services and treatment, in an amount according to proof at trial, and will, in the future, be

19    compelled to incur additional obligations for medical treatment, in an amount according to proof at

20    trial.

21        325.    As a direct and proximate result of Gasca's conduct, Haines-Scrodin was harmed, in an

22    amount according to proof at trial.

23        326.    Hernandez and Haines-Scrodin are informed and believe and allege thereon that such

24    acts directed towards them were malicious and belligerent, and the acts were done with a conscious

25    disregard of Hernandez and Haines-Scrodin's right to be free from such tortious and criminal

26    behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294,

27    entitling Hernandez and Haines-Scrodin to punitive damages, in addition to compensatory damages, in

28    an amount appropriate to punish and set an example of Gasca.

51

**SEVENTH CLAIM FOR RELIEF**

**Violation of the Ralph Act (Cal. Civ. Code § 51.7)**

**(By Juan Hernandez and Haines-Scrodin against Victor Gasca)**

327.    Hernandez and Haines-Scrodin incorporate by reference all allegations in the preceding paragraphs as if fully set forth herein.

328.    Gasca used violence, or intimidation by threats of violence, against Hernandez and Haines-Scrodin, including by striking Hernandez and Haines-Scrodin in the head, causing each of them injury.

329.    Hernandez and Haines-Scrodin are informed and believe and thereon allege that Gasca's acts of actual or intended violence or intimidation were motivated by prejudice against Hernandez and Haines-Scrodin, based on Hernandez and Haines-Scrodin's real or perceived political affiliations and/or real or perceived races or nationalities, which Gasca perceived based upon, among other reasons, Hernandez and Haines-Scrodin's attendance at the Trump Rally and visual appearances.

330.    As a direct and proximate result of Gasca's wrongful conduct, Hernandez and Haines-Scrodin suffered harm, including physical bodily injury and emotional distress.

331.    Under the provisions of California Civil Code § 52(b), Gasca is liable for punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000, per violation.

**EIGHTH CLAIM FOR RELIEF**

**Assault**

**(By Andrew Zambetti against DOE 16)**

332.    Zambetti incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

333.    DOE 16 intentionally, willfully, wantonly, and maliciously threatened to strike Zambetti and to inflict severe bodily injury, in a manner so as to cause Zambetti to reasonably believe he was about to be struck in a harmful and offensive manner.

334.    In light of DOE 16's violent demeanor and conduct surrounding these events, including but not limited to striking Zambetti in the head with a bag filled with hard objects, believed to be

First Amended Complaint                                                      Case No. 5:16-cv-03957-LHK

1  rocks, a reasonable person in Zambetti's situation would have been offended by the threatened, violent
2  touching.

3       335.   At no time did Zambetti consent to DOE 16's threatened conduct.

4       336.   As a direct and proximate result of DOE 16's threatening conduct, coupled with the
5  present ability to carry out such threats, Zambetti felt imminent apprehension of such contact, and he
6  therefore suffered severe emotional distress and other injuries to his person, in an amount to be shown
7  according to proof.

8       337.   As a direct and proximate result of DOE 16's conduct, Zambetti was required to obtain
9  medical services and treatment, in an amount according to proof at trial, and will, in the future, be
10  compelled to incur additional obligations for medical treatment, in an amount according to proof at
11  trial.

12       338.   Zambetti is informed and believes and alleges thereon that such acts directed toward
13  him were malicious and belligerent, and the acts were done with a conscious disregard of Zambetti's
14  right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or
15  malice pursuant to California Civil Code § 3294, entitling Zambetti to punitive damages, in addition to
16  compensatory damages, in an amount appropriate to punish and set an example of DOE 16.

17                              **NINTH CLAIM FOR RELIEF**

18                                      **Battery**

19                         **(By Andrew Zambetti against DOE 16)**

20       339.   Zambetti incorporates by reference all allegations in the preceding paragraphs as if fully
21  set forth herein.

22       340.   DOE 16 intentionally and/or recklessly performed acts which resulted in striking
23  Zambetti in the head, inflicting severe bodily injury.

24       341.   DOE 16 performed such acts with the intent to cause a harmful or offensive contact
25  with the body of Zambetti.

26       342.   At no time did Zambetti consent to DOE 16's harmful touching.

27       343.   As a direct and proximate result of DOE 16's conduct, Zambetti suffered severe bodily
28  injuries. Zambetti has also suffered damages related to the shock and emotional distress of being



53

violently attacked, as well as physical pain and suffering.

344.    As a direct and proximate result of DOE 16's conduct, Zambetti was required to obtain medical services and treatment, in an amount according to proof at trial, and will, in the future, be compelled to incur additional obligations for medical treatment, in an amount according to proof at trial.

345.    Zambetti is informed and believes and alleges thereon that such acts directed toward him were malicious and belligerent, and the acts were done with a conscious disregard of Zambetti's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Zambetti to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set an example of DOE 16.

### TENTH CLAIM FOR RELIEF

### Violation of the Ralph Act (Cal. Civ. Code § 51.7)

### (By Andrew Zambetti against DOE 16)

346.    Zambetti incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

347.    DOE 16 used violence, or intimidation by threats of violence, against Zambetti, including by striking Zambetti in the head, severely injuring Zambetti.

348.    Zambetti is informed and believes and thereon alleges that DOE 16's acts of actual or intended violence or intimidation were motivated by prejudice against Zambetti, based on Zambetti's real or perceived political affiliations, which DOE 16 perceived based upon, among other reasons, Zambetti's attendance at the Trump Rally.

349.    As a direct and proximate result of DOE 16's wrongful conduct, Zambetti suffered harm, including physical bodily injury and emotional distress.

350.    Under the provisions of California Civil Code § 52(b), DOE 16 is liable for punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000.

//

//



54

**ELEVENTH CLAIM FOR RELIEF**

**Assault**

**(By I.P. against H.A. and S.M.)**

351.    I.P. incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

352.    H.A. and S.M. intentionally, willfully, wantonly, and maliciously threatened to strike I.P. and to inflict severe bodily injury, in a manner so as to cause I.P. to reasonably believe he was about to be struck, tackled, or otherwise harmed, and did so in a harmful and offensive manner.

353.    In light of H.A. and S.M.'s violent demeanor and conduct surrounding these events, including but not limited to H.A. striking I.P. in the head twice and S.M. chasing and tackling I.P., a reasonable person in I.P.'s situation would have been offended by the threatened, violent touching.

354.    At no time did I.P. consent to H.A and S.M.'s threatened conduct.

355.    As a direct and proximate result of H.A. and S.M.'s threatening conduct, coupled with the present ability to carry out such threats, I.P. felt imminent apprehension of such contact, and he therefore suffered severe emotional distress and other injuries to his person, in an amount to be shown according to proof at trial.

356.    As a direct and proximate result of H.A. and S.M.'s conduct, I.P. was harmed in an amount according to proof at trial, and will, in the future, be compelled to incur additional obligations for medical treatment, in an amount according to proof at trial.

357.    I.P. is informed and believes and alleges thereon that such acts directed towards him were malicious and belligerent, and the acts were done with a conscious disregard of I.P's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling I.P. to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set an example of H.A and S.M.

**TWELFTH CLAIM FOR RELIEF**

**Battery**

**(By I.P. against H.A. and S.M.)**

358.    I.P. incorporates by reference all allegations in the preceding paragraphs as if fully set

forth herein.

359.    H.A. and S.M. intentionally and/or recklessly did acts, which resulted in H.A. striking I.P. in the head twice, and S.M. tackling I.P., and thereby inflicting bodily injury.

360.    H.A. and S.M. acted with the intent to cause a harmful or offensive contact with the body of I.P.

361.    At no time did I.P. consent to any of H.A. and S.M.'s harmful touching.

362.    As a direct and proximate result of H.A. and S.M.'s conduct, I.P. suffered severe bodily injuries. I.P. has also suffered damages related to the shock and emotional distress of being violently attacked, as well as physical pain and suffering.

363.    As a direct and proximate result of H.A. and S.M.'s conduct, I.P. was required to obtain medical services and treatment, in an amount according to proof at trial, and will, in the future, be compelled to incur additional obligations for medical treatment, in an amount according to proof at trial.

364.    I.P. is informed and believes and alleges thereon that such acts directed towards him were malicious and belligerent, and the acts were done with a conscious disregard of I.P's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling I.P. to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set examples of H.A and S.M.

### THIRTEENTH CLAIM FOR RELIEF

### Violation of the Ralph Act (Cal. Civ. Code § 51.7)

### (By I.P. against H.A. and S.M.)

365.    I.P. incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

366.    H.A. and S.M. used violence, or intimidation by threats of violence, against I.P., including by H.A. striking I.P. in the head, twice, and S.M. chasing and tackling I.P. to the ground.

367.    I.P. is informed and believes and thereon alleges that H.A. and S.M.'s acts of actual or intended violence or intimidation were motivated by prejudice against I.P., based on I.P.'s real or perceived political affiliations and/or race, which H.A. and S.M. perceived based upon, among other



reasons, I.P.'s attendance at the Trump Rally and his appearance.

368.    As a direct and proximate result of H.A. and S.M.'s wrongful conduct, I.P. suffered harm, including physical bodily injury and emotional distress.

369.    Under the provisions of California Civil Code § 52(b), H.A. and S.M. are liable for punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000, per violation.

## FOURTEENTH CLAIM FOR RELIEF

### Assault

### (By Nathan Velasquez and Frank Velasquez against Anthony Yi)

370.    Nathan Velasquez and Frank Velasquez incorporate by reference all allegations in the preceding paragraphs as if fully set forth herein.

371.    Yi intentionally, willfully, wantonly, and maliciously threatened to violently touch Nathan Velasquez and Frank Velasquez, and to inflict severe bodily injury, in a manner so as to cause Nathan Velasquez and Frank Velasquez to reasonably believe that each was about to be struck or violently touched in a harmful and offensive manner.

372.    In light of Yi's violent demeanor and conduct surrounding these events, including but not limited to striking Nathan Velasquez in the head, a reasonable person in Nathan Velasquez and Frank Velasquez's situation would have been offended by the threatened violent touching.

373.    At no time did Nathan Velasquez or Frank Velasquez consent to Yi's threatened conduct.

374.    As a direct and proximate result of Yi's threatening conduct, coupled with the present ability to carry out such threats, Nathan Velasquez and Frank Velasquez felt imminent apprehension of such contact, and they therefore suffered severe emotional distress and other injuries to their persons, in an amount to be shown according to proof at trial.

375.    As a direct and proximate result of Yi's conduct, Nathan Velasquez was required to obtain medical services and treatment, in an amount according to proof at trial, and will, in the future, be compelled to incur additional obligations for medical treatment, in an amount according to proof at trial. Frank Velasquez also suffered harm in an amount according to proof at trial.



First Amended Complaint

Case No. 5:16-cv-03957-LHK

376.     Nathan Velasquez and Frank Velasquez are informed and believe and allege thereon that such acts directed towards them were malicious and belligerent, and the acts were done with a conscious disregard of Nathan Velasquez and Frank Velasquez's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Nathan Velasquez and Frank Velasquez to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set an example of Yi.

**FIFTEENTH CLAIM FOR RELIEF**

**Battery**

**(By Nathan Velasquez against Anthony Yi)**

377.     Nathan Velasquez incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

378.     Yi intentionally and/or recklessly did acts which resulted in striking Nathan Velasquez in the head, inflicting severe bodily injury.

379.     Yi did such acts with the intent to cause a harmful or offensive contact with the body of Nathan Velasquez.

380.     At no time did Nathan Velasquez consent to Yi's harmful touching.

381.     As a direct and proximate result of Yi's conduct, Nathan Velasquez suffered severe bodily injuries. Nathan Velasquez has also suffered damages related to the shock and emotional distress of being violently attacked, as well as physical pain and suffering.

382.     As a direct and proximate result of Yi's conduct, Nathan Velasquez was required to obtain medical services and treatment, in an amount according to proof at trial, and will, in the future, be compelled to incur additional obligations for medical treatment, in an amount according to proof at trial.

383.     Nathan Velasquez is informed and believes and alleges thereon that such acts directed towards him were malicious and belligerent, and the acts were done with a conscious disregard of Nathan Velasquez's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Nathan Velasquez to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set



First Amended Complaint                                           Case No. 5:16-cv-03957-LHK

1    an example of Yi.

2                        **SIXTEENTH CLAIM FOR RELIEF**

3                 **Violation of the Ralph Act (Cal. Civ. Code § 51.7)**

4             **(By Nathan Velasquez and Frank Velasquez against Anthony Yi)**

5           384.    Nathan Velasquez and Frank Velasquez incorporate by reference all allegations in the

6    preceding paragraphs as if fully set forth herein.

7           385.    Yi used violence, or intimidation by threats of violence, against Nathan Velasquez and

8    Frank Velasquez, including by striking Nathan Velasquez in the head, severely injuring Nathan

9    Velasquez, and by threatening both with violent touching.

10          386.    Nathan Velasquez and Frank Velasquez are informed and believe and thereon allege

11   that Yi's acts of actual or intended violence or intimidation were motivated by prejudice against

12   Nathan Velasquez and Frank Velasquez, based on Nathan Velasquez and Frank Velasquez's real or

13   perceived political affiliations, which Yi perceived based upon, among other reasons, Nathan

14   Velasquez and Frank Velasquez's attendance at the Trump Rally.

15          387.    As a direct and proximate result of Yi's wrongful conduct, Nathan Velasquez and

16   Frank Velasquez suffered harm, including physical bodily injury and emotional distress.

17          388.    Under the provisions of California Civil Code § 52(b), Yi is liable for punitive

18   damages, in addition to compensatory damages, under of Civil Code § 51.7, reasonable attorneys'

19   fees, and an additional penalty of $25,000 per violation.

20                      **SEVENTEENTH CLAIM FOR RELIEF**

21                 **Intentional Infliction of Emotional Distress**

22                 **(By Nathan Velasquez against Anthony Yi)**

23          389.    Nathan Velasquez incorporates by reference all allegations in the preceding paragraphs

24   as if fully set forth herein.

25          390.    Yi's above-described conduct was extreme, unreasonable, and outrageous.

26          391.    In engaging in the above-described conduct, Yi intentionally ignored or recklessly

27   disregarded the foreseeable risk that Nathan Velasquez would suffer extreme emotional distress as a

28   result of Yi's conduct.



59

First Amended Complaint                                          Case No. 5:16-cv-03957-LHK

1    392.    As a direct and proximate result of Yi's conduct, Nathan Velasquez suffered severe

2    emotional distress, and has been unable to return to work.

3    393.    Nathan Velasquez is informed and believes and alleges thereon that such acts directed

4    towards him were malicious and belligerent, and the acts were done with a conscious disregard of

5    Nathan Velasquez's right to be free from such tortious and criminal behavior, such as to constitute

6    oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Nathan Velasquez to

7    punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set

8    an example of Yi.

9                    **EIGHTEENTH CLAIM FOR RELIEF**

10                   **Negligent Infliction of Emotional Distress**

11                   **(By Nathan Velasquez against Anthony Yi)**

12   394.    Nathan Velasquez incorporates by reference all allegations in the preceding paragraphs

13   as if fully set forth herein.

14   395.    Yi's above-described conduct was extreme, unreasonable, and outrageous, including by

15   striking Nathan Velasquez in the head.

16   396.    In engaging in the above-described conduct, Yi negligently disregarded the foreseeable

17   risk that Nathan Velasquez would suffer extreme emotional distress as a result of Yi's conduct.

18   397.    As a direct and proximate result of Yi's conduct, Nathan Velasquez suffered severe

19   emotional distress, and has been unable to return to work.

20   398.    Nathan Velasquez is informed and believes and alleges thereon that such acts directed

21   towards him were malicious and belligerent, and the acts were done with a conscious disregard of

22   Nathan Velasquez's right to be free from such tortious and criminal behavior, such as to constitute

23   oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Nathan Velasquez to

24   punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set

25   an example of Yi.

26   //

27   //

28   //



First Amended Complaint                                     Case No. 5:16-cv-03957-LHK

## NINETEENTH CLAIM FOR RELIEF

### Assault

**(By Rachel Casey against Daniel Arciga, Anthony McBride, Victor Gasca, and DOES 17-35)**

399.    Casey incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

400.    Arciga, McBride, Gasca, and DOES 17-35 intentionally, willfully, wantonly, and maliciously threatened to violently touch Casey and to inflict severe bodily injury, in a manner so as to cause Casey to reasonably believe she was about to be touched in a harmful and offensive manner.

401.    In light of Arciga, McBride, Gasca, and DOES 17-35s' violent demeanor and conduct surrounding these events, including but not limited to striking Casey in the head, a reasonable person in Casey's situation would have been offended by the threatened, violent touching.

402.    At no time did Casey consent to Arciga, McBride, Gasca, and DOES 17-35s' threatened conduct.

403.    As a direct and proximate result of Arciga, McBride, Gasca, and DOES 17-35s' threatening conduct, coupled with the present ability to carry out such threats, Casey felt imminent apprehension of such contact, and she therefore suffered severe emotional distress and other injuries to her person, in an amount to be shown according to proof at trial.

404.    As a direct and proximate result of Arciga, McBride, Gasca, and DOES 17-35s' conduct, Casey was harmed, in an amount according to proof at trial.

405.    Casey is informed and believes and alleges thereon that such acts directed towards her were malicious and belligerent, and the acts were done with a conscious disregard of Casey's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Casey to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set examples of Arciga, McBride, Gasca, and DOES 17-35.

//

//

//

61



**TWENTIETH CLAIM FOR RELIEF**

**Battery**

**(By Rachel Casey against Daniel Arciga, Anthony McBride, Victor Gasca, and DOES 17-35)**

406.    Casey incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

407.    Arciga, McBride, Gasca, and DOES 17-35 intentionally and/or recklessly did acts which resulted in object being thrown at Casey, inflicting bodily injury. Such acts include, but are not limited, to Arciga spitting on Casey, and McBride and Gasca's encouraging, soliciting, conspiring, and actively participating in the attacks on Casey, Arciga, McBride, and Gasca's preventing Casey from escaping, while other members of the mob threw objects at her.

408.    Arciga, McBride, Gasca, and DOES 17-35 did such acts with the intent to cause a harmful or offensive contact with the body of Casey.

409.    At no time did Casey consent to Arciga, McBride, Gasca, and DOES 17-35s' harmful touching.

410.    As a direct and proximate result of Arciga, McBride, Gasca, and DOES 17-35s' conduct, Casey suffered severe bodily injuries. Casey has also suffered damages related to the shock and emotional distress of being violently attacked, as well as physical pain and suffering.

411.    As a direct and proximate result of Arciga, McBride, Gasca, and DOES 17-35s' conduct, Casey was harmed, in an amount according to proof at trial.

412.    Casey is informed and believes and alleges thereon that such acts directed towards her were malicious and belligerent, and the acts were done with a conscious disregard of Casey's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Casey to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set examples of Arciga, McBride, Gasca, and DOES 17-35.

//

//

//



First Amended Complaint                                    Case No. 5:16-cv-03957-LHK

**TWENTY-FIRST CLAIM FOR RELIEF**

**False Imprisonment**

**(By Rachel Casey against Daniel Arciga, Anthony McBride, Victor Gasca and DOES 17-35)**

413.    Casey incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

414.    Arciga, McBride, Gasca, and DOES 17-35 intentionally deprived Casey of her freedom of movement by use of threats, force, and intimidation.

415.    The confinement, restraint, and/or detention compelled Casey to stay or go until she was permitted to enter the Marriott.

416.    Casey did not knowingly or voluntarily consent to this confinement, restraint, and/or detention.

417.    As a direct and proximate result of Arciga, McBride, Gasca, and DOES 17-35s' wrongful conduct, Casey was harmed, in an amount according to proof at trial.

418.    Casey is informed and believes and alleges thereon that such acts directed towards her were malicious and belligerent, and the acts were done with a conscious disregard of Casey's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Casey to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set examples of Arciga, McBride, Gasca, and DOES 17-35.

**TWENTY-SECOND CLAIM FOR RELIEF**

**Violation of the Ralph Act (Cal. Civ. Code § 51.7)**

**(By Rachel Casey against Daniel Arciga, Anthony McBride, Victor Gasca, and DOES 17-35)**

419.    Casey incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

420.    Arciga, McBride, Gasca, and DOES 17-35s used violence, or intimidation by threats of violence, against Casey. Such acts include Arciga spitting on Casey, and McBride and Gasca falsely imprisoning Casey while other members of the mob threw objects at Casey, injuring her.

421.    Casey is informed and believes and thereon alleges that Arciga, McBride, Gasca, and

63

DOES 17-35s' acts of actual or intended violence or intimidation were motivated by prejudice against Casey, based on Casey's real or perceived political affiliations, which Arciga, McBride, Gasca, and DOES 17-35 perceived based upon, among other reasons, Casey's attendance at the Trump Rally.

422.    As a direct and proximate result of Arciga, McBride, Gasca, and DOES 17-35s' wrongful conduct, Casey suffered harm, including physical bodily injury and emotional distress.

423.    Under the provisions of California Civil Code § 52(b), Arciga, McBride, Gasca, and DOES 17-35 are liable for punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000 each.

### TWENTY-THIRD CLAIM FOR RELIEF

### Assault

### (By Barbara Arigoni and Michele Wilson against DOES 36-38)

424.    Arigoni and Wilson incorporate by reference all allegations in the preceding paragraphs as if fully set forth herein.

425.    DOES 36-38 intentionally, willfully, wantonly, and maliciously threatened to harmfully and offensively touch Arigoni and Wilson, and to inflict severe bodily injury, in a manner so as to cause Arigoni and Wilson to reasonably believe Arigoni and Wilson were about to be harmed.

426.    In light of DOES 36-38s' violent demeanor and conduct surrounding these events, including but not limited to pulling Arigoni's hair and breaking her glasses, a reasonable person in Arigoni and Wilson's situation would have been offended by the threatened, violent touching.

427.    At no time did Arigoni or Wilson consent to DOES 36-38s' threatened conduct.

428.    As a direct and proximate result of DOES 36-38s' threatening conduct, coupled with the present ability to carry out such threats, Arigoni and Wilson felt imminent apprehension of such contact, and therefore suffered severe emotional distress and other injuries to their persons, in an amount to be shown according to proof at trial.

429.    As a direct and proximate result of DOES 36-38s' conduct, Arigoni and Wilson were harmed, in an amount according to proof at trial.

430.    Arigoni and Wilson are informed and believe and allege thereon that such acts directed towards Arigoni and Wilson were malicious and belligerent, and the acts were done with a conscious



First Amended Complaint                                           Case No. 5:16-cv-03957-LHK

disregard of Arigoni and Wilson's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Arigoni and Wilson to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set examples of DOES 36-38.

### TWENTY-FOURTH CLAIM FOR RELIEF

### Battery

### (By Barbara Arigoni against DOES 36-38)

431.    Arigoni incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

432.    DOES 36-38 intentionally and/or recklessly did acts which resulted in pulling Arigoni's hair, taking her glasses, breaking her glasses, and causing her bodily injury.

433.    DOES 36-38 did such acts with the intent to cause a harmful or offensive contact with the body of Arigoni.

434.    At no time did Arigoni consent to DOES 36-38s' harmful touching.

435.    As a direct and proximate result of DOES 36-38s' conduct, Arigoni suffered severe bodily injuries. Arigoni has also suffered damages related to the shock and emotional distress of being violently attacked, as well as physical pain and suffering.

436.    As a direct and proximate result of DOES 36-38s' conduct, Arigoni was harmed, in an amount according to proof at trial.

437.    Arigoni is informed and believes and alleges thereon that such acts directed towards her were malicious and belligerent, and the acts were done with a conscious disregard of Arigoni's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Arigoni to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set examples of DOES 36-38.

### TWENTY-FIFTH CLAIM FOR RELIEF

### Violation of the Ralph Act (Cal. Civ. Code § 51.7)

### (By Barbara Arigoni and Michele Wilson against DOES 36-38)

438.    Arigoni and Wilson incorporate by reference all allegations in the preceding paragraphs



First Amended Complaint

as if fully set forth herein.

439.   DOES 36-38 used violence, or intimidation by threats of violence, against Arigoni and Wilson, including by pulling Arigoni's hair and breaking her glasses, injuring Arigoni, and assaulting Arigoni and Wilson.

440.   Arigoni and Wilson are informed and believe and thereon alleges that DOES 36-38s' acts of actual or intended violence or intimidation were motivated by prejudice against Arigoni and Wilson, based on Arigoni and Wilson's real or perceived political affiliations, which DOES 36-38 perceived based upon, among other reasons, Arigoni and Wilson's attendance at the Trump Rally.

441.   As a direct and proximate result of DOES 36-38s' wrongful conduct, Arigoni suffered harm, including physical bodily injury and severe emotional distress. Wilson also suffered harm, including, but not limited, to severe emotional distress.

442.   Under the provisions of California Civil Code § 52(b), DOES 36-38 are liable for punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000.

### TWENTY-SIXTH CLAIM FOR RELIEF

### Assault

### (By Mark Doering and Mary Doering against DOES 36-38)

443.   Mark Doering and Mary Doering incorporate by reference all allegations in the preceding paragraphs as if fully set forth herein.

444.   DOES 36-38 intentionally, willfully, wantonly, and maliciously threatened to harmfully and offensively touch Mark Doering and Mary Doering, and to inflict severe bodily injury, in a manner so as to cause the Doerings to reasonably believe they were about to be harmed.

445.   In light of DOES 36-38s' violent demeanor and conduct surrounding these events, including but not limited to attempting to bite Mark Doering, striking his head and shoulders, and breaking his glasses, a reasonable person in the Doerings' situation would have been offended by the threatened, violent touching.

446.   At no time did Mark Doering or Mary Doering consent to DOES 36-38s' threatened conduct.

First Amended Complaint                                        Case No. 5:16-cv-03957-LHK

447.   As a direct and proximate result of DOES 36-38's threatening conduct, coupled with the present ability to carry out such threats, Mark Doering and Mary Doering felt imminent apprehension of such contact, and therefore suffered severe emotional distress and other injuries to their persons, in an amount to be shown according to proof.

448.   As a direct and proximate result of DOES 36-38's conduct, Mark Doering and Mary Doering were harmed in an amount according to proof at trial.

449.   Mark Doering and Mary Doering are informed and believe and allege thereon that such acts directed towards them were malicious and belligerent, and the acts were done with a conscious disregard of the Doerings' right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Mark Doering and Mary Doering to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set examples of DOES 36-38.

## TWENTY-SEVENTH CLAIM FOR RELIEF

### Battery

### (By Mark Doering against DOES 36-38)

450.   Mark Doering incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

451.   DOES 36-38 intentionally and/or recklessly did acts which resulted in striking Mark Doering in his head and shoulders, taking his glasses, breaking his glasses, and causing him bodily injury.

452.   DOES 36-38 did such acts with the intent to cause a harmful or offensive contact with the body of Mark Doering.

453.   At no time did Mark Doering consent to DOES 36-38's harmful touching.

454.   As a direct and proximate result of DOES 36-38's conduct, Mark Doering suffered severe bodily injuries. Mark Doering has also suffered damages related to the shock and emotional distress of being violently attacked, as well as physical pain and suffering.

455.   As a direct and proximate result of DOES 36-38's conduct, Mark Doering was harmed, in an amount according to proof at trial.

456.    Mark Doering is informed and believes and alleges thereon that such acts directed towards him were malicious and belligerent, and the acts were done with a conscious disregard of Mark Doering's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Mark Doering to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set examples of DOES 36-38.

**TWENTY-EIGHTH CLAIM FOR RELIEF**

**Violation of the Ralph Act (Cal. Civ. Code § 51.7)**

**(By Mark Doering and Mary Doering against DOES 36-38)**

457.    Mark Doering and Mary Doering incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

458.    DOES 36-38 used violence, or intimidation by threats of violence, against Mark Doering and Mary Doering, including by attempting to bite Mark Doering, hitting his head and shoulders, and by breaking Mark Doering's glasses, and otherwise injuring Mark Doering.

459.    Mark Doering and Mary Doering are informed and believe and thereon allege that DOES 36-38s' acts of actual or intended violence or intimidation were motivated by prejudice against Mark Doering and Mary Doering, based on Mark Doering and Mary Doering's real or perceived political affiliations, which DOES 36-38 perceived based upon, among other reasons, the Doerings' attendance at the Trump Rally.

460.    As a direct and proximate result of DOES 36-38s' wrongful conduct, Mark Doering and Mary Doering suffered harm, including Mark Doering suffering physical bodily injury and Mark Doering and Mary Doering suffering emotional distress.

461.    Under the provisions of California Civil Code § 52(b), DOES 36-38 are liable for punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000 per violation.

//

//

//



First Amended Complaint                                             Case No. 5:16-cv-03957-LHK

1

**TWENTY-NINTH CLAIM FOR RELIEF**

2

**Assault**

3

**(By Martin Mercado against DOES 39-40)**

4        462.    Mercado incorporates by reference all allegations in the preceding paragraphs as if fully

5    set forth herein.

6        463.    DOES 39-40 intentionally, willfully, wantonly, and maliciously threatened to violently

7    touch Mercado and to inflict severe bodily injury, in a manner so as to cause Mercado to reasonably

8    believe he was about to be touched in a harmful and offensive manner.

9        464.    In light of DOES 39-40s' violent demeanor and conduct surrounding these events,

10    including but not limited to spitting on Mercado and forcefully taking Mercado's Trump sign, a

11    reasonable person in Mercado's situation would have been offended by the threatened, violent

12    touching.

13        465.    At no time did Mercado consent to DOES 39-40s' threatened conduct.

14        466.    As a direct and proximate result of DOES 39-40s' threatening conduct, coupled with

15    the present ability to carry out such threats, Mercado felt imminent apprehension of such contact, and

16    he therefore suffered severe emotional distress and other injuries to his person, in an amount to be

17    shown according to proof.

18        467.    As a direct and proximate result of DOES 39-40s' conduct, Mercado was harmed, in an

19    amount according to proof at trial.

20        468.    Mercado is informed and believes and alleges thereon that such acts directed towards

21    him were malicious and belligerent, and the acts were done with a conscious disregard of Mercado's

22    right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or

23    malice pursuant to California Civil Code § 3294, entitling Mercado to punitive damages, in addition to

24    compensatory damages, in an amount appropriate to punish and set examples of DOES 39-40.

25

**THIRTIETH CLAIM FOR RELIEF**

26

**Battery**

27

**(By Martin Mercado against DOES 39-40)**

28        469.    Mercado incorporates by reference all allegations in the preceding paragraphs as if fully

69



First Amended Complaint                                                  Case No. 5:16-cv-03957-LHK

1   set forth herein.

2         470.    DOES 39-40 intentionally and/or recklessly did acts which resulted in Mercado being

3   spat on and having his Trump sign nearly forcefully taken from him.

4         471.    DOES 39-40 did such acts with the intent to cause a harmful or offensive contact with

5   the body of Mercado.

6         472.    At no time did Mercado consent to DOES 39-40s' harmful touching.

7         473.    As a direct and proximate result of DOES 39-40s' conduct, Mercado suffered severe

8   bodily injuries. Mercado has also suffered damages related to the shock and emotional distress of

9   being violently attacked, as well as physical pain and suffering.

10        474.    As a direct and proximate result of DOES 39-40s' conduct, Mercado was harmed in an

11  amount according to proof at trial.

12        475.    Mercado is informed and believes and alleges thereon that such acts directed towards

13  him were malicious and belligerent, and the acts were done with a conscious disregard of Mercado's

14  right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or

15  malice pursuant to California Civil Code § 3294, entitling Mercado to punitive damages, in addition to

16  compensatory damages, in an amount appropriate to punish and set examples of DOES 39-40.

17                              **THIRTY-FIRST CLAIM FOR RELIEF**

18                         **Violation of the Ralph Act (Cal. Civ. Code § 51.7)**

19                            **(By Martin Mercado against DOES 39-40)**

20        476.    Mercado incorporates by reference all allegations in the preceding paragraphs as if fully

21  set forth herein.

22        477.    DOES 39-40 used violence, or intimidation by threats of violence, against Mercado.

23  Such acts include spitting and attempting to forcefully take Mercado's Trump sign from Mercado.

24        478.    Mercado is informed and believes and thereon alleges that DOES 39-40s' acts of actual

25  or intended violence or intimidation were motivated by prejudice against Mercado, based on

26  Mercado's real or perceived political affiliations, which DOES 39-40s' perceived based upon, among

27  other reasons, Mercado's attendance at the Trump Rally.

28        479.    As a direct and proximate result of DOES 39-40s' wrongful conduct, Mercado suffered

70

harm, including physical bodily injury and emotional distress.

480.    Under the provisions of California Civil Code § 52(b), DOES 39-40 are liable for punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000 each.

**THIRTY-SECOND CLAIM FOR RELIEF**

**Assault**

**(By Christopher Holland against DOE 41)**

481.    Holland incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

482.    DOE 41 intentionally, willfully, wantonly, and maliciously threatened to violently touch Holland and to inflict severe bodily injury, in a manner so as to cause Holland to reasonably believe he was about to be touched in a harmful and offensive manner.

483.    In light of DOE 41's violent demeanor and conduct surrounding these events, including but not limited to preparing for, and actually, striking Holland in the face with a closed fist, a reasonable person in Holland's situation would have been offended by the threatened, violent touching.

484.    At no time did Holland consent to DOE 41's threatened conduct.

485.    As a direct and proximate result of DOE 41's threatening conduct, coupled with the present ability to carry out such threats, Holland felt imminent apprehension of such contact, and he therefore suffered severe emotional distress and other injuries to his person, in an amount to be shown according to proof at trial.

486.    As a direct and proximate result of DOE 41's conduct, Holland was harmed, in an amount according to proof at trial.

487.    Holland is informed and believes and alleges thereon that such acts directed towards him were malicious and belligerent, and the acts were done with a conscious disregard of Holland's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Holland to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set an example of DOE 41.

1

**THIRTY-THIRD CLAIM FOR RELIEF**

2

**Battery**

3

**(By Christopher Holland against DOE 41)**

4

488.    Holland incorporates by reference all allegations in the preceding paragraphs as if fully

5

set forth herein.

6

489.    DOE 41 intentionally and/or recklessly did acts which resulted in Holland being stuck

7

in the face.

8

490.    DOE 41 did such acts with the intent to cause a harmful or offensive contact with the

9

body of Holland.

10

491.    At no time did Holland consent to DOE 41's harmful touching.

11

492.    As a direct and proximate result of DOE 41's conduct, Holland suffered severe bodily

12

injuries. Holland has also suffered damages related to the shock and emotional distress of being

13

violently attacked, as well as physical pain and suffering.

14

493.    As a direct and proximate result of DOE 41's conduct, Holland was harmed, in an

15

amount according to proof at trial.

16

494.    Holland is informed and believes and alleges thereon that such acts directed towards

17

him were malicious and belligerent, and the acts were done with a conscious disregard of Holland's

18

right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or

19

malice pursuant to California Civil Code § 3294, entitling Holland to punitive damages, in addition to

20

compensatory damages, in an amount appropriate to punish and set an example of DOE 41.

21

**THIRTY-FOURTH CLAIM FOR RELIEF**

22

**Violation of the Ralph Act (Cal. Civ. Code § 51.7)**

23

**(By Christopher Holland against DOE 41)**

24

495.    Holland incorporates by reference all allegations in the preceding paragraphs as if fully

25

set forth herein.

26

496.    DOE 41 used violence, or intimidation by threats of violence, against Holland. Such

27

acts include striking Holland in the face with a fist.

28

497.    Holland is informed and believes and thereon alleges that DOE 41's acts of actual or



72

1    intended violence or intimidation were motivated by prejudice against Holland, based on Holland's

2    real or perceived political affiliations, which DOE 41 perceived based upon, among other reasons,

3    Holland's attendance at the Trump Rally.

4         498.    As a direct and proximate result of DOE 41's wrongful conduct, Holland suffered

5    harm, including physical bodily injury and emotional distress.

6         499.    Under the provisions of California Civil Code § 52(b), DOE 41 is liable for punitive

7    damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees,

8    and an additional penalty of $25,000 each.

9                        **THIRTY-FIFTH CLAIM FOR RELIEF**

10                                      **Assault**

11                  **(By Theodore Jones against Victor Gasca)**

12        500.    Jones incorporates by reference all allegations in the preceding paragraphs as if fully set

13   forth herein.

14        501.    Gasca intentionally, willfully, wantonly, and maliciously threatened to violently touch

15   Jones and to inflict severe bodily injury, in a manner so as to cause Jones to reasonably believe he was

16   about to be touched in a harmful and offensive manner.

17        502.    In light of Gasca's violent demeanor and conduct surrounding these events, including,

18   but not limited to, Gasca raising a fist as if to strike Jones, a reasonable person in Jones' situation

19   would have been offended by the threatened, violent touching.

20        503.    At no time did Jones consent to Gasca's threatened conduct.

21        504.    As a direct and proximate result of Gasca's threatening conduct, coupled with the

22   present ability to carry out such threats, Jones felt imminent apprehension of such contact, and he

23   therefore suffered severe emotional distress and other injuries to his person, in an amount to be shown

24   according to proof.

25        505.    As a direct and proximate result of Gasca's conduct, Jones was harmed in an amount

26   according to proof at trial.

27        506.    Jones is informed and believes and alleges thereon that such acts directed towards him

28   were malicious and belligerent, and the acts were done with a conscious disregard of Jones' right to be



First Amended Complaint                                    Case No. 5:16-cv-03957-LHK

free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Jones to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set an example of Gasca.

### THIRTY-SIXTH CLAIM FOR RELIEF

### Battery

### (By Theodore Jones against Rafael Medina and Daniel Arciga)

507.    Jones incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

508.    Medina and Arciga intentionally and/or recklessly did acts which resulted in Jones being stuck in the head, twice.

509.    Medina and Arciga did such acts with the intent to cause a harmful or offensive contact with the body of Jones.

510.    At no time did Jones consent to Medina or Arciga's harmful touching.

511.    As a direct and proximate result of Medina and Arciga's conduct, Jones suffered severe bodily injuries. Jones has also suffered damages related to the shock and emotional distress of being violently attacked, as well as physical pain and suffering.

512.    As a direct and proximate result of Medina and Arciga's conduct, Jones was harmed, in an amount according to proof at trial.

513.    Jones is informed and believes and alleges thereon that such acts directed towards him were malicious and belligerent, and the acts were done with a conscious disregard of Jones' right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Jones to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set examples of Medina and Arciga.

### THIRTY-SEVENTH CLAIM FOR RELIEF

### Violation of the Ralph Act (Cal. Civ. Code § 51.7)

### (By Theodore Jones against Victor Gasca, Rafael Medina, and Daniel Arciga)

514.    Jones incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.



74

515.    Gasca, Medina, and Arciga used violence, or intimidation by threats of violence, against Jones. Such acts include Gasca raising a fist as if to strike Jones, Gasca verbally harassing Jones, and Medina and Arciga physically battering Jones in the head.

516.    Jones is informed and believes and thereon alleges that Gasca, Medina, and Arciga's acts of actual or intended violence or intimidation were motivated by prejudice against Jones, based on Jones' real or perceived political affiliations, which Gasca, Medina, and Arciga perceived based upon, among other reasons, Jones attendance at the Trump Rally.

517.    As a direct and proximate result of Gasca, Medina, and Arciga's wrongful conduct, Jones suffered harm, including physical bodily injury and emotional distress.

518.    Under the provisions of California Civil Code § 52(b), Gasca, Medina, and Arciga are liable for punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000 each.

## THIRTY-EIGHTH CLAIM FOR RELIEF

### Assault

### (By Donovan Rost against DOES 42-43)

519.    Rost incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

520.    DOES 42-43 intentionally, willfully, wantonly, and maliciously threatened to violently touch Rost and to inflict severe bodily injury, in a manner so as to cause Rost to reasonably believe he was about to be touched in a harmful and offensive manner.

521.    In light of DOES 42-43s' violent demeanor and conduct surrounding these events, including but not limited to hitting Rost with a traffic cone, and striking Rose with a fist, a reasonable person in Rost's situation would have been offended by the threatened, violent touching.

522.    At no time did Rost consent to DOES 42-43s' threatened conduct.

523.    As a direct and proximate result of DOES 42-43s' threatening conduct, coupled with the present ability to carry out such threats, Rost felt imminent apprehension of such contact, and he therefore suffered severe emotional distress and other injuries to his person, in an amount to be shown according to proof at trial.



First Amended Complaint                                            Case No. 5:16-cv-03957-LHK

1   524.   As a direct and proximate result of DOES 43-44s' conduct, Rost was harmed, in an

2   amount according to proof at trial.

3   525.   Rost is informed and believes and alleges thereon that such acts directed towards him

4   were malicious and belligerent, and the acts were done with a conscious disregard of Rost's right to be

5   free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice

6   pursuant to California Civil Code § 3294, entitling Rost to punitive damages, in addition to

7   compensatory damages, in an amount appropriate to punish and set examples of DOES 42-43.

8                                **THIRTY-NINTH CLAIM FOR RELIEF**

9                                              **Battery**

10                            **(By Donovan Rost against DOES 42-43)**

11   526.   Rost incorporates by reference all allegations in the preceding paragraphs as if fully set

12   forth herein.

13   527.   DOES 42-43 intentionally and/or recklessly did acts which resulted in Rost being hit

14   with a traffic cone and struck with a fist.

15   528.   DOES 42-43 did such acts with the intent to cause a harmful or offensive contact with

16   the body of Rost.

17   529.   At no time did Rost consent to DOES 42-43s' harmful touching.

18   530.   As a direct and proximate result of DOES 42-43s' conduct, Rost suffered severe bodily

19   injuries. Rost has also suffered damages related to the shock and emotional distress of being violently

20   attacked, as well as physical pain and suffering.

21   531.   As a direct and proximate result of DOES 42-43s' conduct, Rost was harmed, in an

22   amount according to proof at trial.

23   532.   Rost is informed and believes and alleges thereon that such acts directed towards him

24   were malicious and belligerent, and the acts were done with a conscious disregard of Rost's right to be

25   free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice

26   pursuant to California Civil Code § 3294, entitling Rost to punitive damages, in addition to

27   compensatory damages, in an amount appropriate to punish and set examples of DOES 42-43.

28   //



First Amended Complaint                                            Case No. 5:16-cv-03957-LHK

**FORTIETH CLAIM FOR RELIEF**

**Violation of the Ralph Act (Cal. Civ. Code § 51.7)**

**(By Donovan Rost against DOES 42-43)**

533.    Rost incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

534.    DOES 42-43 used violence, or intimidation by threats of violence, against Rost. Such acts hitting Rost with a traffic cone and striking Rost with a closed fist.

535.    Rost is informed and believes and thereon alleges that DOES 42-43s' acts of actual or intended violence or intimidation were motivated by prejudice against Rost, based on Rost's real or perceived political affiliations, which DOES 42-43s' perceived based upon, among other reasons, Rost's attendance at the Trump Rally.

536.    As a direct and proximate result of DOES 42-43s' wrongful conduct, Rost suffered harm, including physical bodily injury and emotional distress.

537.    Under the provisions of California Civil Code § 52(b), DOES 42-43 are liable for punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000 each.

**FORTY-FIRST CLAIM FOR RELIEF**

**Assault**

**(By Cole Cassady against DOES 44-55)**

538.    Cassady incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

539.    DOES 44-55 intentionally, willfully, wantonly, and maliciously threatened to violently touch Cassady and to inflict severe bodily injury, in a manner so as to cause Cassady to reasonably believe he was about to be touched in a harmful and offensive manner.

540.    In light of DOES 44-55s' violent demeanor and conduct surrounding these events, including but not limited to kicking Cassady in the back, spitting on Cassady, throwing bottles at Cassady, and forcefully taking Cassady's hat, a reasonable person in Cassady's situation would have been offended by the threatened, violent touching.

77



1    541.    At no time did Cassady consent to DOES 44-55s' threatened conduct.

2    542.    As a direct and proximate result of DOES 44-55s' threatening conduct, coupled with

3    the present ability to carry out such threats, Cassady felt imminent apprehension of such contact, and

4    he therefore suffered severe emotional distress and other injuries to her person, in an amount to be

5    shown according to proof.

6    543.    As a direct and proximate result of DOES 44-55s' conduct, Cassady was harmed in an

7    amount according to proof at trial.

8    544.    Cassady is informed and believes and alleges thereon that such acts directed towards

9    him were malicious and belligerent, and the acts were done with a conscious disregard of Cassady's

10   right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or

11   malice pursuant to California Civil Code § 3294, entitling Cassady to punitive damages, in addition to

12   compensatory damages, in an amount appropriate to punish and set examples of DOES 44-55.

13   **FORTY-SECOND CLAIM FOR RELIEF**

14   **Battery**

15   **(By Cole Cassady against DOES 44-55)**

16   545.    Cassady incorporates by reference all allegations in the preceding paragraphs as if fully

17   set forth herein.

18   546.    DOES 44-55 intentionally and/or recklessly did acts which resulted in Cassady being

19   kicked in the back, spat on, hit with bottles being thrown at him, and having his hat forcefully taken

20   from him.

21   547.    DOES 44-55 did such acts with the intent to cause a harmful or offensive contact with

22   the body of Cassady.

23   548.    At no time did Cassady consent to DOES 44-55s' harmful touching.

24   549.    As a direct and proximate result of DOES 44-55s' conduct, Cassady suffered severe

25   bodily injuries. Cassady has also suffered damages related to the shock and emotional distress of being

26   violently attacked, as well as physical pain and suffering.

27   550.    As a direct and proximate result of DOES 44-55s' conduct, Cassady was harmed, in an

28   amount according to proof at trial.



First Amended Complaint                                    Case No. 5:16-cv-03957-LHK

551. Cassady is informed and believes and alleges thereon that such acts directed towards him were malicious and belligerent, and the acts were done with a conscious disregard of Cassady's right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Cassady to punitive damages, in addition to compensatory damages, in an amount appropriate to punish and set examples of DOES 44-55.

### FORTY-THIRD CLAIM FOR RELIEF

### Violation of the Ralph Act (Cal. Civ. Code § 51.7)

### (By Cole Cassady against DOES 44-55)

552. Cassady incorporates by reference all allegations in the preceding paragraphs as if fully set forth herein.

553. DOES 44-55 used violence, or intimidation by threats of violence, against Cassady. Such acts include kicking Cassady in the back, spitting on Cassady, throwing bottles at Cassady, and forcefully taking Cassady's hat.

554. Cassady is informed and believes and thereon alleges that DOES 44-55s' acts of actual or intended violence or intimidation were motivated by prejudice against Cassady, based on Cassady's real or perceived political affiliations, which DOES 44-55s' perceived based upon, among other reasons, Cassady's attendance at the Trump Rally.

555. As a direct and proximate result of DOES 44-55s' wrongful conduct, Cassady suffered harm, including physical bodily injury and emotional distress.

556. Under the provisions of California Civil Code § 52(b), DOES 44-55 are liable for punitive damages under of Civil Code § 51.7, in addition to compensatory damages, reasonable attorneys' fees, and an additional penalty of $25,000 each.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray on behalf of themselves, and all those similarly situated, for the following:

    i.    For all damages legally and/or proximately caused to Plaintiffs by Defendants in an amount to be determined at trial;

    ii.    For punitive and exemplary damages for all claims for which such damages are



79

1              authorized;

2      iii.    For temporary, preliminary, and permanent injunctive relief, enjoining the City

3              Defendants from further violating the Class's civil rights, including by requiring that

4              the City Defendants not deny attendees at future political rallies the ability to leave

5              through safe routes and make reasonable efforts to protect attendees of all future

6              political rallies in San Jose from physical attacks or other displays of violence by

7              protesters where such attendees are made to leave through a particular pathway;

8              prohibiting the City Defendants from instructing the police, fire department employees,

9              or other agents under their control to deny rally attendees the ability to leave through

10            alternative exits, to direct rally attendees toward danger, and/or fail to intervene in

11            attacks made on the rally attendees after having placed the attendees in danger; and

12            prohibiting the City Defendants from maintaining a policy or practice that allows,

13            permits, or encourages these violent acts.

14     iv.    For civil penalties under California Civil Code §52(b) for which such penalties are

15            authorized;

16     v.     For an award of attorneys' fees incurred in bringing this Action against Defendants,

17            pursuant to 42 U.S.C. § 1988 and/or Cal. Civ. Code §§ 52.1(h), 52(b);

26  //

27  //

28  //



First Amended Complaint                                 Case No. 5:16-cv-03957-LHK

1      vi.     For costs of suit incurred herein; and

2      vii.    For such other and further relief as the Court deems just and proper.

3  Date: November 14, 2016        DHILLON LAW GROUP INC.

By: _____

HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
KRISTA L. BAUGHMAN (SBN: 264600)
kbaughman@dhillonlaw.com
GREGORY R. MICHAEL (SBN: 306814)
gmichael@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Attorneys for Plaintiffs and the Proposed Class



81

First Amended Complaint                        Case No. 5:16-cv-03957-LHK

1

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and all those similarly situated, demand trial by jury on all Class claims in this action of all issues so triable.

Date: November 14, 2016          DHILLON LAW GROUP INC.

By: _____
HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Attorneys for Plaintiffs and Proposed Class

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs Juan Hernandez, Dustin Haines-Scrodin, Andrew Zambetti, I.P., Nathan Velasquez, Frank Velasquez, Rachel Casey, Barbara Arigoni, Mark Doering, Mary Doering, Martin Mercado, Christopher Holland, Theodore Jones, Donovan Rost, Michele Wilson, and Cole Cassady demand trial by jury on all individual claims they bring against their attackers in this action of all issues so triable.

Date: November 14, 2016          DHILLON LAW GROUP INC.

By: _____
HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Attorneys for Plaintiffs and Proposed Class



82

First Amended Complaint                                          Case No. 5:16-cv-03957-LHK