1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

12   JUAN HERNANDEZ, et al.,

13            Plaintiffs,

14        v.

15   CITY OF SAN JOSE, et al.,

16            Defendants.

Case No. 16-CV-03957-LHK

**ORDER DENYING PLAINTIFFS'
MOTION FOR CLASS
CERTIFICATION**

Re: Dkt. No. 125

17

18        This case arises out of the June 2, 2016 rally for then-presidential candidate Donald J.

19   Trump that took place at the McEnery Convention Center in downtown San Jose, California (the

20   "Rally"). ECF No. 35 ("FAC") ¶ 63. Twenty named plaintiffs bring this putative class action on

21   behalf of themselves and all others similarly situated (collectively, "Plaintiffs") against The City

22   of San Jose and various individual officers of the San Jose Police Department ("SJPD")

23   (collectively, "Defendants"). Plaintiffs' claims for money damages, declaratory judgment, and

24   injunctive relief stem from Defendants' handling of the protest that occurred in response to the

25   Rally. *Id.* ¶¶ 290-91, 295-96, 310. Before the Court is Plaintiffs' motion for class certification

26   pursuant to Federal Rule of Civil Procedure 23. Having considered the parties' briefing, the

27   relevant law, and the record in this case, the Court DENIES Plaintiffs' motion for class

28

certification.

## I.   BACKGROUND

### A.   Factual Background

This action has substantially narrowed over the course of the litigation.  The First Amended Complaint ("FAC") sets forth the basic allegations relevant to the remaining claims as follows:

Plaintiffs are individuals who attended the Rally in June 2016.  FAC ¶ 273.  Defendants are The City of San Jose (the "City") and SJPD officers Loyd Kinsworthy, Lisa Gannon, Kevin Abruzzini, Paul Messier, Paul Spagnoli, Johnson Fong, Jason Ta, and Does 1-15.  FAC ¶¶ 281, 293, 304.  The SJPD was responsible for securing the area around the Rally site in order to ensure the safety of the presidential candidate, the Rally participants, and the general public.  On the night of the Rally, a violent anti-Trump protest allegedly broke out in response to the Rally.  *See, e.g.*, *id.* ¶ 92.  The gravamen of Plaintiffs' suit is that Defendants' crowd control tactics following the Rally subjected the Rally participants to physical harm and/or property damage by the protestors.  *See id.* ¶ 1.  Specifically, Plaintiffs claim that Defendants acted with "deliberate indifference, reckless and/or conscious disregard of a known and obvious danger by directing Plaintiffs into the mob, preventing Plaintiffs from leaving the event through other, safer paths, and by failing to intervene in the many attacks perpetrated on Plaintiffs and the Class members."  *Id.* ¶ 287.

As Plaintiffs were leaving the Rally, SJPD and other law enforcement officers directed Plaintiffs to use the east-northeast exit of the Convention Center.  *Id.* ¶ 89.  A police line outside the exit "directed the Trump supporters to turn north and to proceed along Market Street, into [a] crowd of violent anti-Trump protesters."  *Id.* ¶ 90.  "The police also actively prevented the . . . Rally attendees from proceeding south along Market Street, away from the anti-Trump protesters, or from leaving the convention center through alternative exits."  *Id.* ¶ 91.  In so doing, Plaintiffs claim, the officers "affirmatively direct[ed] the Class members through the violent mob of anti-Trump protestors."  *Id.* ¶ 288.  Plaintiffs further allege that violence had been reported as early as 6:00 p.m. on the night of the Trump Rally, and yet the officers continued to force Plaintiffs to

follow this route even after they realized that doing so placed Plaintiffs in serious danger. *Id.* ¶ 1. As a result, Plaintiffs were allegedly subjected to acts of "violence, harassment, and intimidation" on the part of the protestors. *Id.* at 19. According to Plaintiffs, officers witnessed many of these attacks but failed to intervene, despite "pleas for help from several of the Trump supporters." *Id.* ¶ 95. Defendants allegedly refused even to "allow individuals . . . to simply step past the police lines to safety." *Id.* ¶ 288.

Plaintiffs specifically identify fourteen individual incidents in which protestors allegedly attacked one or more Rally participants. *Id.* ¶¶ 119-272. Each involved a different attacker or group of attackers. Although Plsaintiffs allege all the attackers were protestors, that is a disputed issue of fact.

Kinsworthy, Gannon, Abruzzini, Messier, Spagnoli, Fong, and Ta (collectively, the "On-Duty Officers") were allegedly among the SJPD officers on duty that night. *Id.* ¶ 284. Kinsworthy was allegedly the "primary point of contact for all units deployed at the Rally." *Id.* ¶ 72. Fong was allegedly the "sub-commander at the Trump Rally" and acted as the "Commander for the skirmish line." *Id.* ¶¶ 45, 74. The FAC does not specifically identify the roles of Gannon, Abruzzini, Messier, Spagnoli, Ta, or Does 1-15.

After the Rally, Chief Garcia allegedly praised officers for their "discipline and restraint" because "additional force can incite more violence in the crowd." *Id.* ¶ 102. Plaintiffs claim that the City thus ratified the actions of the SJPD officers and are liable for the officers' actions. *Id.* ¶ 293.

## B. Procedural History

### 1. Original Complaint and First Motion to Dismiss

Plaintiffs filed their original complaint on July 14, 2016. ECF No. 1 ("Original Complaint"). In the Original Complaint, fourteen plaintiffs asserted 28 claims for relief on behalf of themselves and others similarly situated. *Id.* Those claims fell into two categories: (1) state law and federal law claims against the City, Mayor Sam Liccardo ("Liccardo"), Chief of Police Edgardo Garcia ("Garcia"), and fifteen Doe Defendants, as the individual SJPD officers were not

United States District Court
Northern District of California

yet named, *id.* ¶¶ 153-185; and (2) state law claims against various private citizens who had allegedly committed acts of aggression and violence against the plaintiffs, *id.* ¶¶ 186-336.

On August 4, 2016, the City, Liccardo, Garcia, and the Doe officers filed a motion to dismiss the four claims against them pursuant to Federal of Civil Procedure 12(b)(6). ECF No. 6. The Court granted in part and denied in part the motion to dismiss on October 13, 2016. ECF No. 30. The Court granted leave to amend for all the claims that it dismissed and noted that failure to cure the deficiencies identified in its order would result in dismissal with prejudice. *Id.* at 26.

### 2. First Amended Complaint ("FAC")

On November 14, 2016, Plaintiffs filed the FAC, which is now the operative complaint in this case. ECF No. 35. The FAC added six more named plaintiffs, for a total of twenty: Juan Hernandez, Nathan Velasquez, Frank Velasquez, Rachel Casey, Mark Doering, Mary Doering, Barbara Arigoni, Dustin Haines-Scrodin, Andrew Zambetti, Christina Wong, Craig Parsons, the minor I.P., Greg Hyver, Todd Broome, Martin Mercado, Christopher Holland, Theodore Jones, Donovan Rost, Michele Wilson, and Cole Cassady (collectively, "Named Plaintiffs"). *Id.* Like the Original Complaint, the FAC contains two categories of claims: those against defendants associated with the City and those against private citizens. In the FAC, the claims in the first category are against the City, Garcia, seven named SJPD officers—Loyd Kinsworthy, Lisa Gannon, Kevin Abruzzini, Paul Messier, Paul Spagnoli, Johnson Fong, and Jason Ta—and fifteen Doe police officers (collectively, "FAC City Defendants"). *Id.* ¶¶ 280-310. Plaintiffs bring four causes of action against the FAC City Defendants: (1) a claim under 42 U.S.C. § 1983 against Garcia and the individual SJPD officers for violations of the Fourteenth Amendment ("Count 1"), *id.* ¶¶ 280-291; (2) a claim under 42 U.S.C. § 1983 against the City for violations of the Fourteenth Amendment ("Count 2"), *id.* ¶¶ 292-96; (3) a claim under the Bane Act against all FAC City Defendants ("Count 3"), *id.* ¶¶ 297-302; and (4) a California common law negligence claim against the City ("Count 4"), *id.* ¶¶ 303-310.

In addition, the FAC contains 39 claims against 46 private citizens, 40 of which are Doe defendants (collectively, "FAC Individual Defendants"). *Id.* ¶¶ 311-556. These claims arise from

4

the various distinct incidents in which a protestor or group of protestors allegedly attacked one or more Named Plaintiffs. *Id.* ¶¶ 119-272. Criminal proceedings have been brought against a number of these individual attackers. *See, e.g.*, FAC ¶¶ 139, 157-159, 171.

### 3. Second Motion to Dismiss

On December 22, 2016, the FAC City Defendants moved to dismiss the four claims against them pursuant to Rule 12(b)(6). ECF No. 44. The Court granted in part and denied in part this motion on March 14, 2017. ECF No. 72.

As to Count 1, Plaintiffs alleged that the SJPD had violated Plaintiffs' substantive due process rights under the Fourteenth Amendment in two ways: (1) by devising a crowd-control plan for the Rally that created or exposed Plaintiffs to danger, and (2) by executing the crowd-control plan on the evening of the Rally, even after it became clear the plan was subjecting Plaintiffs to danger. FAC ¶¶ 280-291; *see* ECF No. 72 at 15. The SJPD prepared the so-called Incident Action Plan in preparation for the Rally. *See* ECF No. 126-3 ("Kinsworthy Deposition") Ex. 5. Garcia was only alleged to have been involved in devising the Incident Action Plan, and not in policing on the night of the Rally. ECF No. 72 at 18. The Court held the first theory (based on devising the Incident Action Plan) was insufficient to support a Fourteenth Amendment claim and therefore dismissed Count 1 with prejudice to the extent it relied upon that theory. *Id.* at 13-14, 16. The Court permitted Plaintiffs to proceed with their Fourteenth Amendment claim on the basis of the second theory (executing the Incident Action Plan at the Rally), however. *Id.* at 18. In so doing, the Court rejected the FAC City Defendants' argument that qualified immunity foreclosed Plaintiffs' claims. *Id.* at 20.

Count 2 alleges that the City is vicariously liable for the legal violations of the individual SJPD officers under Count 1. The Court found that Plaintiffs had stated a claim that the City had ratified the SJPD officers' allegedly unconstitutional actions on the night of the Rally. *Id.* at 25. In accordance with its holding regarding Count 1, the Court allowed Count 2 to proceed only to the extent it was based upon this ratification theory and the actions of the SJPD officers on the night of the Rally. *Id.* at 26. To the extent the claim was based upon alternative theories of

5

vicarious liability, the Court dismissed the claim with prejudice. *Id.* at 31. Similarly, as to Count 4, the Court permitted a negligence claim against the City based upon the SJPD officers' actions on the night of the Rally but not upon the devising of the Incident Action Plan. *Id.* at 32.

Finally, the Court dismissed Count 3, the Bane Act claim, with prejudice. *Id.* at 31. Because the Court had dismissed all of the claims against Garcia with prejudice, the Court also dismissed Garcia from the case. *Id.* at 35.

### 4. Appeal, Stay, and Severance

On March 28, 2017, the remaining FAC City Defendants (i.e., those other than Garcia) filed a notice of appeal to the Ninth Circuit to seek interlocutory review of the Court's finding that the individual SJPD officers were not entitled to qualified immunity with regard to Plaintiffs' § 1983 claims. ECF No. 80; *see* ECF No. 82 at 2. These defendants also filed a motion to stay the entire action pending resolution of the appeal. ECF No. 82; s*ee* ECF No. 96 at 7. Then, on March 30, 2017, the same defendants moved to sever misjoined parties. ECF No. 84. On May 15, 2017, the Court issued an order resolving both motions. ECF No. 96. First, the Court denied the motion for severance but nevertheless severed the claims *sua sponte* into 12 separate actions. *Id.* at 11, 20. Action #1 comprised the claims against the FAC City Defendants, whereas Actions #2 through #12 concerned the Individual Defendants. *Id.* at 21-22. The Court then found that it lacked jurisdiction over Actions #2 through #12—which only alleged state law claims—and therefore dismissed them without prejudice for refiling in state court. *Id.* at 23. In its order, the Court noted that criminal proceedings were ongoing in state court as to six of the Individual Defendants. *Id.* at 18. At the December 5, 2018 case management conference, however, Plaintiffs indicated they had chosen not to pursue any of the eleven civil actions in state court. *See* ECF No. 106.

The Court retained jurisdiction over Action #1 and granted the motion to stay the case. ECF No. 96 at 28. On July 27, 2018, the Ninth Circuit affirmed this Court's decision, ECF No. 100, and the Court reopened the case on December 5, 2018, ECF No. 107.

### 5. Summary of Plaintiffs' Remaining Claims

Case No. 16-CV-03957-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    Thus, although the FAC is the operative complaint in this case, the FAC has been

2    significantly narrowed by the Court's previous orders. The Named Plaintiffs are Juan Hernandez,

3    Nathan Velasquez, Frank Velasquez, Rachel Casey, Mark Doering, Mary Doering, Barbara

4    Arigoni, Dustin Haines-Scrodin, Andrew Zambetti, Christina Wong, Craig Parsons, the minor I.P.,

5    Greg Hyver, Todd Broome, Martin Mercado, Christopher Holland, Theodore Jones, Donovan

6    Rost, Michele Wilson, and Cole Cassady—all of whom attended the Rally in June 2016. FAC ¶

7    273. The current Defendants are the City and SJPD officers Kinsworthy, Gannon, Abruzzini,

8    Messier, Spagnoli, Fong, Ta, and Does 1-15. *Id.* ¶¶ 281, 293, 304.

9    Three claims for relief remain: Counts 1, 2, and 4. Count 1 is the § 1983 claim against the

10   individual SJPD officers, and Count 2 is the § 1983 claim against the City. As to these two

11   claims, Plaintiffs request attorneys' fees and/or costs, compensatory damages, and injunctive

12   relief. *Id.* ¶¶ 290-91, 295-96. Count 4 is the negligence claim against the City for compensatory

13   damages. *Id.* ¶ 310. All three claims are predicated on the alleged actions of the SJPD officers on

14   the night of the Rally and not on the devising of the Incident Action Plan in advance of the Rally.

15   **6. Motion for Class Certification**

16   On May 30, 2019, Plaintiffs filed their Motion for Class Certification. ECF No. 125.

17   Specifically, Plaintiffs move to certify the following Class as an injunctive relief class pursuant to

18   Federal Rule of Civil Procedure 23(b)(2):

19            Class: All persons who attended the June 2, 2016 Donald J. Trump
              campaign Rally (the "Rally") at the South Hall of the McEnery
20            Convention Center in San Jose, California, and who, upon exiting the
              Rally, were either (1) directed, or otherwise required, by agents of the
21            City of San Jose to leave in the direction of, or along a route toward,
              anti-Trump protestors, and/or (2) were prevented by agents of the City
22            of San Jose from leaving by any alternate route. Excluded from the
              Class are the City of San Jose's officers, directors, agents, legal
23            representatives, heirs, successors, and assigns that attended the Rally
              in his, her, or their capacity as such. Also excluded from the Class
24            are counsel for Plaintiffs and Defendants (the "Class");

25   Mot. for Class Cert. at 1. Plaintiffs move to certify the following Subclass as a damages class

26   pursuant to Rule 23(b)(3),

27

28   Case No. 16-CV-03957-LHK
     ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Subclass: All members of the Class who sustained injury to their persons or damage to their property upon leaving the Rally (the "Subclass").

*Id.* Plaintiffs also move to (1) certify Plaintiffs as named representatives of the Class; (2) certify Plaintiffs as named representatives of the Subclass; (3) appoint Dhillon Law Group as class counsel pursuant to Rule 23(g); and (4) authorize notice of the pending action and of Subclass members' right to opt out. *Id.* Defendants oppose the motion. *See* ECF No. 135 ("Def. Opp."). The motion has now been fully briefed. ECF Nos. 135, 137.

## II.   LEGAL STANDARD

Class actions are governed by Federal Rule of Civil Procedure 23. To certify a class under Rule 23, Plaintiffs must show that the proposed class satisfies all four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *See* Fed. R. Civ. P. 23(a)-(b); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Rule 23(a) provides that a district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These requirements are commonly referred to as numerosity, commonality, typicality, and adequacy of representation, respectively. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

Turning to Rule 23(b), there are three possible types of class actions. *See* Fed. R. Civ. P. 23(b)(1)-(3). For certification of the Class, plaintiffs rely upon subsection (b)(2), which permits class treatment for the purpose of injunctive relief. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011) ("Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive."). A class may be certified under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that

8

it can be enjoined or declared unlawful only as to all of the class members or as to none of them."
*Wal-Mart*, 564 U.S. at 360.

In addition, Plaintiffs seek to certify the Subclass as a damages class under subsection (b)(3). On top of the four prerequisites under Rule 23(a), Rule 23(b)(3) damages classes must meet the requirements of predominance and superiority. *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1115 (9th Cir. 2017). That is, the moving party must establish "that the questions of law or fact common to class members *predominate* over any questions affecting only individual members and that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3) (emphases added).

In deciding whether to certify a class under Rule 23, a court must undertake a "rigorous analysis" of whether the requirements of the Rule have been satisfied. *Wal-Mart*, 564 U.S. at 351." Rule 23 does not set forth a mere pleading standard." *Id.* at 350. Rather, the party seeking class certification "bears the burden of affirmatively demonstrating through evidentiary proof that the class meets the prerequisites of Rule 23(a)." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1003–04 (9th Cir. 2018). Hence, a court may look beyond the pleadings to any "material sufficient to form a reasonable judgment on each Rule 23(a) requirement," including evidence that would be inadmissible at trial. *Id.* at 1005 ("[A] district court should analyze the persuasiveness of the evidence presented at the Rule 23 stage.").

In many cases, this rigorous analysis "may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,* 568 U.S. 455, 466 (2013) (internal quotation marks omitted). At the same time, the United States Supreme Court has instructed courts not to "engage in free-ranging merits inquiries at the certification stage." *Id.* "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* For instance, a court may "consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take." *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 176 (3d Cir. 2009). Ultimately, whether the moving party has met the prerequisites

of Rule 23 is a matter within the "broad discretion" of the trial court. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended by*, 273 F.3d 1266 (9th Cir. 2001).

## III.    DISCUSSION

Plaintiffs move to certify the Class as a damages class under Rule 23(b)(2) and the Subclass as an injunctive relief class under Rule 23(b)(3).

For the reasons below, the Court denies certification of the Subclass as a damages class because Plaintiffs have failed to satisfy Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance requirement. The Court also denies certification of the Class as an injunctive relief class because the Named Plaintiffs lack standing to pursue injunctive relief.[1]

### A.    Subclass: Damages Class under Rule 23(b)(3)

Plaintiffs move to certify the Subclass of "[a]ll members of the Class who sustained injury to their persons or damage to their property upon leaving the Rally" as a damages class pursuant to Rule 23(b)(3). Mot. for Class Cert. at 1. Plaintiffs request damages as to Counts 1, 2, and 4, which are brought under theories of state-created danger and negligence. Defendants oppose certification on the grounds that none of the requirements of either Rule 23(a) or Rule 23(b)(3) are satisfied. The Court agrees that neither Rule 23(b)(3)'s predominance requirement nor Rule 23(a)'s commonality have been met. Therefore, without deciding that Plaintiffs' have satisfied Rule 23's other prerequisites, the Court concludes that class certification is not appropriate and denies Plaintiffs' motion to certify the Subclass.

#### 1.    Predominance and Commonality

The Court first reviews the legal standards for predominance and commonality before considering the individualized issues that defeat both prerequisites in the instant case. "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal

---

[1] As a result, the Court need not reach the other class certification requirements under Rule 23(a), Rule 23(b)(2), or Rule 23(b)(3). The Court also need not decide whether to certify the Named Plaintiffs and their counsel as Class Representatives and Class Counsel, respectively.

Case No. 16-CV-03957-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

quotation marks omitted). What is more, of the three types of classes provided for by Rule 23, the (b)(3) damages class is the most extraordinary. The United States Supreme Court has called it an "adventuresome innovation, . . . designed for situations in which class-action treatment is not as clearly called for," *id.* at 34 (internal quotation marks omitted), but "may nevertheless be convenient and desirable," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 616 (1997). In other words, the "notion that the adjudication of common issues will help achieve judicial economy" is integral to the Rule 23(b)(3) class. *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009). Accordingly, the purpose of the predominance requirement is to "test[] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623.

Predominance means that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016). To meet the predominance requirement, "common questions must be a significant aspect of the case that can be resolved for all members of the class in a single adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014). For the purposes of Rule 23, a "common" question is one that is "capable of classwide resolution." *Wal-Mart*, 564 U.S. at 350. In contrast, an "individual" question is one for which "members of a proposed class will need to present evidence that varies from member to member." *Tyson Foods*, 136 S. Ct. at 1045 (quotation marks omitted).

Of particular relevance here, "Rule 23(b)(3)'s predominance requirement takes into account questions of damage." *Just Film*, 847 F.3d at 1120. Although "the amount of damages is invariably an individual question and does not defeat class action treatment," *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013), plaintiffs must show that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. In other words, Plaintiffs must establish "that their damages arise from a course of conduct that impacted the class." *Just Film*,

847 F.3d at 1120. In *Comcast*, for instance, the plaintiffs had to show "that the existence of individual injury resulting from the alleged antitrust violation . . . was capable of proof at trial through evidence that [was] common to the class rather than individual to its members." 569 U.S. at 30.

In undertaking the predominance analysis, "the Court must consider how a trial on the merits would be conducted if a class were certified." *Moore v. Apple Inc.*, 309 F.R.D. 532, 543 (N.D. Cal. 2015) (internal quotation marks omitted). Specifically, the Court's analysis "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 469 (N.D. Cal. 2014). Common issues cannot predominate where "individualized inquiries" are necessary that "go to key elements of the class's claims." *Andrews v. Plains All Am. Pipeline, L.P.*, No. 18-55850, 2019 WL 2880970, at *1 (9th Cir. July 3, 2019).

In some cases, the need for individualized inquiries will defeat not only predominance, but also Rule 23(a)'s threshold requirement of commonality. It is often said that "even a single common question" can satisfy the commonality requirement. *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013) (internal quotation marks omitted). However, the United States Supreme Court has, in recent years, propounded more specific guidance as to the commonality standard, because "any competently crafted class complaint literally raises common 'questions.'" *Wal-Mart*, 564 U.S. at 349 (internal citation omitted). Rather, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (internal quotations omitted). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Id.* at 349–50. It is not enough that the class members "have all suffered a violation of the same provision of law." *Id.* at 350. Instead, this requirement is usually met when the putative class members "challenge policies or practices that apply to all members of the class." 5–23 Moore's Federal Practice—Civil

12

§ 23.23 n.7.5.1; *accord Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093, 1105 (9th Cir. 2017) [hereinafter *CREEC*].

## 2. Analysis

Plaintiffs move to certify the Subclass as to Counts 1, 2, and 4—all three remaining causes of action. Analysis of predominance "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Counts 1 and 2 are both brought under 42 U.S.C. § 1983, which provides a cause of action for constitutional violations committed "under color of state law." *Jensen v. City of Oxnard*, 145 F.3d 1078, 1082 (9th Cir. 1998). As this Court explained in a previous order, Plaintiffs' § 1983 claims rely upon the "state-created danger" doctrine. *See* ECF No. 72; Mot. for Class Cert. at 12. Under this doctrine, a plaintiff's substantive due process rights under the Fourteenth Amendment have been violated where "state action affirmatively places the plaintiff in a position of danger, that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Johnson v. City of Seattle,* 474 F.3d 634, 639 (9th Cir. 2007) (alterations and internal quotation marks omitted). The danger, furthermore, must be "known or obvious" to the state actor. *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011). That is because the state action doctrine requires a "culpable mental state" of "deliberate indifference" on the part of the state actor, which means "the state actor must recognize an unreasonable risk and actually intend to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Campbell v. State of Washington Dep't of Soc. & Health Servs.*, 671 F.3d 837, 845-46 (9th Cir. 2011) (alterations and internal quotation marks omitted).

In the FAC, Plaintiffs contend that the On-Duty Officers created a dangerous situation on the night of the Rally by (1) requiring Rally participants to leave the Rally via a particular route and (2) refusing to intervene in altercations amongst Rally participants and protestors, even after it became clear those actions were exposing Plaintiffs to harm at the hands of the protestors. *See* FAC ¶¶ 292-302. Specifically, Plaintiffs claim the designated route led them directly into a mob of violent protestors, who then attacked Plaintiffs while the officers stood idly by.

Plaintiffs further contend that this same conduct amounted to negligence, which is Count 4. Plaintiffs claim Defendants "had a duty of care to avoid placing Plaintiffs . . . in unreasonably dangerous situations" and then "acquired the duty to affirmatively provide aid and prevent Plaintiffs . . . from being injured" by "placing Plaintiffs . . . in harm's way." FAC ¶ 306.

Plaintiffs bear the burden of demonstrating that these causes of action satisfy the predominance requirement. That requires Plaintiffs to show that each Subclass member's damages "arise[s] from a course of conduct that impacted the class." *Just Film*, 847 F.3d at 1120. As the Plaintiffs acknowledge, however, the Subclass members' injuries arose from separate altercations with different private individuals. The FAC describes fourteen distinct incidents involving the Named Plaintiffs alone. In order to establish predominance, Plaintiffs must tie these incidents together with a unified theory of harm.

Plaintiffs cannot do so. As discussed at length below, the Subclass members have little in common except their attendance at the Rally and their alleged inability to proceed south on Market Street upon exiting the Rally. They took myriad different paths to varying destinations, at variable times, and encountered distinct groups of private individuals. Their encounters with private individuals culminated in a multitude of different injuries—to the extent they suffered any injury at all. As a result of these differences, the individual Subclass members will need to present evidence tailored to them in order to identify each class member's injury and demonstrate that injury resulted from Defendants' classwide conduct. Plaintiffs effectively conceded this point in the March 15, 2017 joint case management statement, when Plaintiffs "agree[d] to consider the possibility of conducting the trial in phases, including by trying the Class claims (concerning alleged violations of civil rights) separately from the Individual Plaintiffs' claims (concerning personal injuries and other damages)." ECF No. 74 at 8. Although the claims against the Individual Defendants are no longer in this case, the same individual factual inquiries are necessary to establish Plaintiffs' injuries for purposes of the class claims.

The Court therefore concludes that Plaintiffs have not shown that common questions of law or fact predominate over individual questions. In fact, due to the lack of a classwide theory of

Case No. 16-CV-03957-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

injury, the Court is not even persuaded that Plaintiffs' have met Rule 23(a)'s less demanding commonality requirement, *see Comcast*, 569 U.S. at 34. The Court begins its analysis by summarizing the fourteen incidents involving the Named Plaintiffs and then examining six illustrative Plaintiffs in detail. The Court then lays out, in turn, (1) Plaintiffs' failure to identify a classwide course of conduct, which defeats commonality; (2) the individualized inquiries necessary to establish Defendants' liability to each member of the Subclass, which defeats predominance; and (3) the impossibility of calculating damages on a classwide basis, which defeats predominance. Last, the Court briefly considers the implications of the foregoing on the typicality and numerosity requirements.

### a. The Individual Incidents

The Court begins with the FAC, which describes the following fourteen incidents involving the twenty Named Plaintiffs. Below are the FAC's titles and causes of actions for each incident.

(1) "Hernandez and Haines-Scrodin are repeatedly struck in the face by Victor Gasca." *See* FAC ¶¶ 119-126. Gasca was indicted for the crime of battery against Haines-Scrodin in state court. *Id.* ¶ 126. In addition to the class claims, Hernandez and Haines-Scrodin asserted against Gasca a claim for assault, a claim for battery, and a claim for violation of the Ralph Act; these are claims #5- #7 in the FAC. On May 15, 2017, the Court severed these state law claims and dismissed them for lack of jurisdiction. ECF No. 96 at 23. Although the dismissal was without prejudice for refiling in state court, Plaintiffs chose not to refile.

(2) "Frank and Nathan Velasquez are assaulted; Nathan is struck by Anthony Yi." *See* FAC ¶¶ 127-139. Although the FAC states Frank was assaulted, Frank testified in his deposition that only Nathan was assaulted. ECF No. 126-15 ("Pl. Frank Velasquez Dep.") at 63-65. Yi pleaded nolo contendere to criminal charges in state court for the theft and battery against Nathan. *Id.* ¶ 139. In addition to the class claims, Frank and Nathan Velasquez asserted against Yi a claim for assault and a claim for violation of the Ralph Act; these are claims #14 and #16 in the FAC. Nathan also asserted against Yi a claim for battery, a claim for intentional infliction of emotional

distress, and a claim for negligent infliction of emotional distress; these are claims #15, #17, and #18 in the FAC. On May 15, 2017, the Court severed these state law claims and dismissed them for lack of jurisdiction. ECF No. 96 at 23. Although the dismissal was without prejudice for refiling in state court, Plaintiffs chose not to refile.

(3) "McBride, Gasca, and Arciga confine Casey while protestors throw objects at her." *See* FAC ¶¶ 140-159. Anthony McBride was indicted in state court for falsely imprisoning Casey and other unrelated crimes. *Id*. ¶ 157. Victor Gasca was indicted in state court for falsely imprisoning Casey. *Id*. ¶ 158. Daniel Arciga was indicted in state court for battery against Casey. *Id*. ¶ 159. In addition to the class claims, Casey asserted against McBride, Gasca, Arciga, and Does 17-35 a claim for assault, a claim for battery, a claim for false imprisonment, and a claim for violation of the Ralph Act; these are claims #19-#22 in the FAC. On May 15, 2017, the Court severed these state law claims and dismissed them for lack of jurisdiction. ECF No. 96 at 23. Although the dismissal was without prejudice for refiling in state court, Plaintiffs chose not to refile.

(4) "I.P. is assaulted and denied assistance by the San Jose Fire Department." *See* FAC ¶¶ 160-171. Plaintiffs did not name the San Jose Fire Department or any individual employees of the San Jose Fire Department as defendants in this case. Two minors, H.A. and S.M., pled guilty in state court to misdemeanor criminal charges for attacking I.P. FAC ¶ 171. In addition to the class claims, I.P. asserted again H.A. and S.M a claim for assault, a claim for battery, and a claim for violation of the Ralph Act; these are claims #11-#13 in the FAC. On May 15, 2017, the Court severed these state law claims and dismissed them for lack of jurisdiction. ECF No. 96 at 23. Although the dismissal was without prejudice for refiling in state court, Plaintiffs chose not to refile.

(5) "Zambetti is beaten with a bag of rocks." FAC ¶¶ 172-75. In addition to the class claims, Zambetti asserted against Doe 16 a claim for assault, a claim for battery, and a claim for violation of the Ralph Act; these are claims #8-#10 in the FAC. On May 15, 2017, the Court severed these state law claims and dismissed them for lack of jurisdiction. ECF No. 96 at 23.

16

Although the dismissal was without prejudice for refiling in state court, Plaintiffs chose not to refile.

(6) "Mark and Mary Doering, Wilson, and Arigoni are assaulted." FAC ¶¶ 176-201. In addition to the class claims, Arigoni and Wilson asserted against Does 36–38 a claim for assault and a claim for violation of the Ralph Act; these are claims #23 and #25 in the FAC. Arigoni asserted against Does 36–38 a claim for battery; this is claim #24 in the FAC. Mark and Mary Doering asserted against Does 36–38 a claim for assault and a claim for violation of the Ralph Act; these are claims #26 and #28 in the FAC. Mark Doering asserted against Does 36–38 a claim for battery; this is claim #27 in the FAC. On May 15, 2017, the Court severed these state law claims and dismissed them for lack of jurisdiction. ECF No. 96 at 23. Although the dismissal was without prejudice for refiling in state court, Plaintiffs chose not to refile.

(7) "Christina Wong and her son are assaulted." FAC ¶¶ 202-212. Although the FAC states that Christina Wong was assaulted and that an unnamed individual "shoved Wong's son in the shoulder," FAC ¶ 211, Wong testified in her deposition that she was not assaulted and that an unnamed individual "bumped" her son "kind of on the shoulder" as the individual passed her son, ECF No. 126, Ex. 9 ("Pl. Wong Dep.") at 65. Wong and her son did not assert any claims other than the class claims.

(8) "Hyver dashes for his car to escape the danger." FAC ¶¶ 213-19. Hyver claims that unnamed individuals "taunted and jeered" at him as he passed. FAC ¶ 216. Hyver did not assert any claims other than the class claims.

(9) "The Police direct Broome, his wife, and three-year-old son into the mob." *Id.* ¶¶ 220-24. Broome did not assert any claims other than the class claims.

(10) "Martin Mercado is battered by protestors." FAC ¶¶ 225-231. In addition to the class claims, Mercado asserted against Does 39-40 a claim for assault, a claim for battery, and a claim for violation of the Ralph Act; these are claims #29-#31 in the FAC. On May 15, 2017, the Court severed these state law claims and dismissed them for lack of jurisdiction. ECF No. 96 at 23. Although the dismissal was without prejudice for refiling in state court, Plaintiffs chose not to

United States District Court
Northern District of California

refile.

(11) "Christopher Holland is assaulted and battered." FAC ¶¶ 232-239. In addition to the class claims, Holland asserted against Doe 41 a claim for assault, a claim for battery, and a claim for violation of the Ralph Act; these are claims #32-#34 in the FAC. On May 15, 2017, the Court severed these state law claims and dismissed them for lack of jurisdiction. ECF No. 96 at 23. Although the dismissal was without prejudice for refiling in state court, Plaintiffs chose not to refile.

(12) "Theodore Jones is assaulted and battered." FAC ¶¶ 240-251. Rafael Medina was later indicted for assault with a deadly weapon. *Id.* ¶ 250. Daniel Arciga was later indicted for battery. *Id.* ¶ 251. In addition to the class claims, Jones asserted against Gasca a claim for assault, a claim for battery, and a claim for violation of the Ralph Act; these are claims #35-#37 in the FAC. On May 15, 2017, the Court severed these state law claims and dismissed them for lack of jurisdiction. ECF No. 96 at 23. Although the dismissal was without prejudice for refiling in state court, Plaintiffs chose not to refile.

(13) "Donovan Rost is assaulted and battered." FAC ¶¶ 252-261. In addition to the class claims, Rost asserted against Does 42-43 a claim for assault, a claim for battery, and a claim for violation of the Ralph Act; these are claims #38-#40 in the FAC. On May 15, 2017, the Court severed these state law claims and dismissed them for lack of jurisdiction. ECF No. 96 at 23. Although the dismissal was without prejudice for refiling in state court, Plaintiffs chose not to refile.

(14) "Cole Cassady is assaulted, battered, and robbed." FAC ¶¶ 262-272. In addition to the class claims, Cassady asserted against Does 44-55 a claim for assault, a claim for battery, and a claim for violation of the Ralph Act; these are claims #41-#43 in the FAC. On May 15, 2017, the Court severed these state law claims and dismissed them for lack of jurisdiction. ECF No. 96 at 23. Although the dismissal was without prejudice for refiling in state court, Plaintiffs chose not to refile.

Looking just at the face of the FAC, no common issues of law or fact are readily apparent.

18

United States District Court
Northern District of California

On the contrary, each of the fourteen incidents constitutes a distinct nucleus of facts. To name just a few differences, the incidents involved different victims, different attackers, and different harms. Prior to severance, the FAC contained 43 claims by twenty individual plaintiffs against seventeen named defendants and 55 Doe defendants. No more than three Named Plaintiffs were involved in the same incident. There were at least 46 different attackers named as Individual Defendants in the various incidents, not to mention the numerous attackers who were not sued as named or Doe defendants.

Accordingly, "fact-intensive, individual analysis," *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 947 (9th Cir. 2009), will be necessary to prove or disprove the allegations as to each Plaintiff. To further demonstrate the need for individual analysis, the Court examines in detail the incidents of six Plaintiffs.

Christina Wong and her son. According to her deposition, Wong parked in the Convention Center garage, which is located directly north of the Rally site. ECF No. 126, Ex. 9 ("Pl. Wong Dep.") at 26. Wong claims that after the Rally, a police barricade prevented her and her eighteen-year-old son from entering the garage from Market Street. *Id.* at 39, 44-45. She asked an unidentified police officer for permission to cross the barricade, but the officer said no. *Id.* at 45. Wong therefore started walking east on San Salvador. *Id.* at 47. Wong says that she then avoided the "crowd of people" that she saw to the north and made her way to the area south of the Convention Center, on Almaden Boulevard. *Id.* at 50; *see also id.* at 54, 65. Once there, she waited some distance away from the garage where her car was parked for twenty minutes, until "[i]t looked like the commotion had died down." *Id.* at 63. When Wong resumed walking toward the garage, she encountered individuals she believed to be protestors, who "heckled" her and her son. *Id.* at 65. Although the FAC states that Christina Wong was assaulted and that an unnamed individual "shoved Wong's son in the shoulder," Wong testified in her deposition that she was not assaulted and that an unnamed individual "bumped" her son "kind of on the shoulder" as the individual passed her son. *Id.* Wong and her son did not assert any claims other than the class claims. She attributes her psychological injury from being heckled to the officer who would not

let her cross the barricade. *Id.* at 77, 83. She does not allege that an SJPD officer was present during or witnessed the encounter with the hecklers. Wong ignored the hecklers and ran into the garage, where she got into her car without incident. ECF No. 135-3, Ex. 6 ("Def. Wong Dep.") at 65, 70-71.

Donovan Rost. Rost took the light rail to the Rally. ECF No. 135-3, Ex. 9 ("Def. Rost Dep.") at 20. Rost's plan was to use the light rail to leave the Rally as well. ECF No. 137-6 ("Pl. Rost Dep.") at 35-36. When he exited the Rally onto Market Street, however, a line of police officers apparently prevented him from going north on Market Street, *id.* at 36, so he walked one or two blocks east on San Salvador and then proceeded north on First or Second Street. *Id.* at 38-40. Rost arrived at the Convention Center light rail station on San Carlos Street without incident. *Id.* Rost also did not see any police officers at the station. *Id.* at 46. While he was waiting at the station, Rost saw an assault occurring across the street. *Id.* at 45. Rost crossed the street and helped the man being attacked, at which point a group of "30-50 people" attacked him. *Id.* at 45-46, 49-50. Rost says he was punched several times, but that he was not injured by the punches. *Id.* at 50-51. Rost and the man he helped ultimately managed to run away. *Id.* at 51. After waiting for some time, Rost was able to take a train home from a different light rail station. *Id.* at 63-64.

Rachel Casey. Casey took an Uber to the Rally. ECF No. 126-6 ("Pl. Casey Dep.") at 64. Casey says she "just wanted to check [the Rally] out," so she only stayed at the Rally for "about an hour." *Id.* at 64. Then-candidate Trump was still speaking when she left. *Id.* at 74. Upon exiting the Convention Center, officers apparently directed her to walk north on Market Street, which she did. *Id.* at 88. Casey was hungry, so she was looking for a restaurant. *Id.* at 96. She recalls that as she walked, anti-Trump protestors were following her and shouting at her. *Id.* Casey admits that she showed her middle finger to two of those protestors. ECF No. 135-3, Ex. 2 ("Def. Casey Dep.") at 92-94. She further admits that she told protestors "to go back to Mexico." *Id.* at 94. Casey claims that at some point, near the Marriott Hotel, she became surrounded by a group of protestors. Pl. Casey Dep. at 96-97. Those protestors allegedly threw eggs and other

objects at her. *Id.* at 97-98, 109. Casey says she did not see any police officers near her as she was surrounded by protestors, although she had seen officers earlier on. *Id.* at 109. Casey was ultimately able to escape into the hotel and later take an Uber home. *Id.* at 113, 115. Although she had no physical injuries, Casey claims she had "fears" and "emotional . . . ups [and] downs" which caused her to lose sleep and miss work. *Id.* at 141-42.

Frank and Nathan Velasquez. Frank and his son parked in a lot across the street from the Convention Center parking garage, on Almaden Boulevard. ECF No. 126-15 ("Pl. Frank Velasquez Dep.") at 22-24. After the Rally, they were "steered out" through an exit onto Market Street. *Id.* at 38. Frank wanted to go south and take Balbach Street to the car, but the officers guided them north toward San Salvador Street. *Id.* at 44. Frank and Nathan continued north on First Street until they reached San Carlos. *Id.* at 56. Frank and Nathan were apparently walking westbound on San Carlos Street when Anthony Yi, an anti-Trump protestor, stole Nathan's "Make America Great Again" hat. *Id.* at 62-63; FAC ¶ 127-29. Frank did not see any police officers in the area at that time. Pl. Frank Velasquez Dep. at 63. Nathan then ran after Yi, and Frank followed, even though Frank "knew that would create trouble." *Id.* Yi tripped and fell, at which point Nathan attempted to take back his hat. *Id.* Yi then punched Nathan in the head. *Id.* at 63-64. Frank helped Nathan up and the two walked toward a large group of police officers they saw in the distance. *Id.* at 67, 69. They were followed by the protestors. *Id.* at 69. The protestors eventually dispersed, and Frank and Nathan were able to run to their car. *Id.* at 70, 72.

Putting aside any disputed issues of fact, the many differences across the experiences of these six Plaintiffs are glaring. For a start, the altercations took place at different locations in the vicinity of the Rally site. After being forced to walk east on San Salvador, Rost and Wong proceeded in opposite directions: Wong proceeded south of the Convention Center and Rost headed north. Their respective incidents then occurred in those disparate places.

Time is another factor that differentiates the Named Plaintiffs' experiences. Casey, for one, left the Rally after about an hour and during then-candidate Trump's speech, so her alleged assault likely occurred earlier than others. In addition, as a likely consequence, she was able to

United States District Court
Northern District of California

proceed north on Market Street, unlike Rost, Wong, and others.

As a consequence of the attacks being dispersed geographically and temporally, the Named Plaintiffs encountered different groups of attackers and different SJPD officers—to the extent they interacted with an officer at all. None of the six Named Plaintiffs asserted that an officer witnessed the altercation and yet refused to intervene. Plaintiffs also do not claim that any of the On-Duty Officers were involved in more than one of the fourteen incidents alleged in the FAC. The alleged attackers, meanwhile, were private citizens with no apparent affiliation to the City or, according to Plaintiffs, to one another. Notably, Plaintiffs do not allege that the protestors coordinated these alleged attacks. In fact, it is not even clear that all of the attackers were part of the anti-Trump protest at the Rally.

Due to this lack of coordination, the shape of each "attack" was different. Wong's interaction with her attackers was relatively brief, and primarily verbal. She was able to quickly return to her car. By contrast, Casey was apparently followed by the group of protestors for some time and ultimately trapped by them in front of a hotel. Casey and the protestors exchanged words throughout, and the protestors threw objects at her.

Of particular relevance, the Named Plaintiffs' behavior leading up to and during the altercations differed. Wong says that she tried to avoid the protestors. However, other Plaintiffs actively interacted with the protestors. Rost deliberately intervened in an ongoing attack, and Casey showed protestors her middle finger and told them to go back to Mexico. Nathan Velasquez ran after Yi when Yi took his hat, and Frank Velasquez followed suit.

Finally, considering the manifold ways in which the altercations unfolded, it is unsurprising that Plaintiffs' ultimate injuries also span a wide range. Frank does not allege any injury. Wong's injury was essentially psychological, from having been heckled. Casey likewise alleges mostly psychological injuries, but she also claims to have lost sleep and been unable to work. Wong's son was bumped on the shoulder by an alleged protestor walking passed Wong's son, but Wong's son experienced no lasting harm. The same was true of Rost, who was not wounded by the punches he sustained. By contrast, Nathan Velasquez apparently suffered a

Case No. 16-CV-03957-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

concussion when Yi punched him.  FAC ¶ 132.

### b.  Plaintiffs Fail to Identify a Classwide Course of Conduct

Nevertheless, Plaintiffs declare that predominance is satisfied because members of the proposed Subclass "assert the same causes of action, and they will confront the same affirmative defenses, if any."  Mot. for Class Cert. at 21.  This argument is not only general and conclusory, but also inadequate.  Again, it is not enough for commonality, much less predominance, that the would-be class members assert violations of the same law, *viz.* the Fourteenth Amendment and common law negligence.  "[M]erely pointing to a pattern of harm, untethered to the defendant's conduct" is similarly "insufficient" for commonality.  *CREEC*, 867 F.3d at 1104.  Instead, the requirement that the class members have suffered the "same injury" means that the entire class must have experienced a common course of illegal conduct at the hands of the defendant.  *Wal–Mart*, 564 U.S. at 350.

As the FAC demonstrates, it is far from obvious that the Subclass members assert the "same causes of action."  Because each of the fourteen incidents in which the Named Plaintiffs involved different individuals and acts, Plaintiffs' bear a heavy burden to show that they have experienced the same illegal conduct and thereby suffered the same injury.  Moreover, as explained *infra* in Part III.A.2.C, there may well be affirmative defenses such as assumption of the risk or comparative negligence that are applicable only to some members of the Subclass.

To prevail on commonality, Plaintiffs must unite these fourteen incidents with a common question that "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 564 U.S. 338, 350 (2011).  The classwide contention Plaintiffs offer is that "Defendants, negligently and with deliberate indifference, placed them in harms' way by forcing them into an ongoing riot."  Mot. for Class Cert. at 21.

Significantly, Plaintiffs appear to have abandoned their original theory of liability, as alleged in the FAC.  In the FAC, Plaintiffs alleged that Defendants "fail[ed] to intervene in the many attacks perpetrated on Plaintiffs."  FAC ¶ 44; *see also* FAC ¶ 275(e).  Now, in their briefing on the instant motion, Plaintiffs do not attempt to argue that Defendants failed to intervene in the

Case No. 16-CV-03957-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

protestors' attacks on a classwide basis. *See* Mot. for Class Cert. at 16-17, 21. This concession was necessary because Plaintiffs' original theory based upon failure to intervene cannot support class-action treatment. All of the class members' injuries must be traceable to Defendant's classwide conduct, and not to conduct that is peculiar to particular incidents. *See Comcast*, 569 U.S. at 35 (analyzing only plaintiffs' "damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment"); *see also Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016) ("There is . . . no way to determine whether the proposed damages model measures damages that are solely attributable to the theory of liability."). Here, Defendants' alleged failure to intervene in the protestors' attacks did not extend to the entire Subclass. As detailed below, several of the subclass members—the Wongs, Rost, Casey, and the Velasquezes, for a start—have acknowledged that no SJPD officers were present to witness the attack that he or she experienced. Hence, no SJPD officers could have stood idly by or failed to intervene in those situations. It follows that Defendants' alleged failure to intervene was not a "course of conduct that impacted the class," *Just Film*, 847 F.3d at 1120, as necessary for class certification.

That leaves only the allegation that Defendants forced Rally participants to leave the Rally via a designated route. Here, too, Plaintiffs fall short. The Court dismissed all of Plaintiffs' claims that were predicated on the SJPD's devising of the Incident Action Plan. The only theory that remains, then, is that the On-Duty Officers should not have followed the Incident Action Plan on the night of the Rally. But the On-Duty Officers are not a monolith, they are individual officers making independent judgments and decisions. Their individual actions thus do not automatically constitute a classwide course of conduct. Plaintiffs fail to specify how or even whether the On-Duty Officers acted in concert, such as through some sort of centralized decision-making. Nor do Plaintiffs indicate at what point Plaintiffs believe the danger became "known or obvious" to each of the individual On-Duty Officers, such that following the Incident Action Plan was no longer appropriate.

Ultimately, Plaintiffs' briefing does not identify any common issues of law or fact with

particularity. As it is Plaintiffs' burden to "affirmatively demonstrat[e]" that the class meets the predominance requirement, *Sali*, 909 F.3d at 1003, Plaintiffs' failure to show that the Subclass members suffered "the same injury" defeats commonality and thus class certification.

### c. Individualized Inquiries are Necessary to Establish Defendants' Liability for Each Plaintiff's Injury

Even if the Court assumes for the moment that Plaintiffs have articulated a course of conduct that impacted the class—namely, refusing to allow Rally participants to exit the Convention Center by walking south on Market Street—predominance requires that Plaintiffs establish through common proof that this course of conduct caused each of the Subclass members' injuries. The differences across the separate incidents in which the Subclass members were involved makes classwide proof of Defendants' liability all but impossible. Due to the pervasive dissimilarities across the Subclass members' incidents, evidence common to the class is few and far between.

To begin with, the geographic differences pose a problem for classwide liability because the level of danger posed by the protestors may have been "obvious" in one location, but not in another. As a result, common proof cannot establish Defendants' liability for the danger that existed at those locations. The same is true of temporal disparities. Because the crowd conditions were changing rapidly, *see* Mot. for Class Cert. at 4, proof of a state-created danger at the time of Casey's alleged assault would not necessarily extend to any other plaintiffs. Instead, individualized inquiries will be necessary to establish the existence of a state-created danger at each time and location where an altercation took place.

What utterly dooms Plaintiffs' motion, though, is causation. Proximate cause is an element of both negligence, *see S. Coast Framing, Inc. v. WCAB*, 61 Cal. 4th 291, 298 (2015), and the state-created danger doctrine, *see Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018) ("[T]he ultimate injury to the plaintiffs must be foreseeable."); *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (stating that "traditional tort law defines intervening causes that break the chain of proximate causation" in section 1983 actions). The need for

Case No. 16-CV-03957-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

individualized inquiries is especially salient where, as here, the defendant's alleged misconduct is not the "sole cause of the injury." *Andrews*, 2019 WL 2880970, at *1. Specifically, each alleged altercation involved one or more third-party attackers. Defendants are only liable for injuries perpetrated by the third-party attackers if Defendants' alleged refusal to allow Plaintiffs to move freely proximately caused Plaintiffs to be attacked. Without a sufficiently strong connection, it cannot be said that Defendants' actions proximately caused the incident that led to a particular class member's injury.

With such vast variations amongst the incidents in which Plaintiffs were involved, classwide proof of proximate cause is impossible. Each class member will need to offer proof describing what his or her attackers did and establishing a connection between that incident and the actions of the On-Duty Officers. Defendants, meanwhile, will be entitled to argue in each case that the particular plaintiffs' injuries were not foreseeable, and therefore proximately caused only by the third-party attackers. For a start, Defendants may argue that some of the attackers were not protestors, making their connection to Defendants' actions too attenuated.

Common questions of law or fact do not predominate where an individualized case for proximate cause must be made for each member. The Ninth Circuit emphasized this point in *Andrews*, in which plaintiffs sought to certify a class of myriad individuals and business who allegedly suffered economic injury as a result of the shutdown of the defendants' crude oil pipeline. 2019 WL 2880970 at *1. The court held that, due to the existence of "varying economic factors that could have caused" each class member's injury, "individualized inquiries . . . predominate regarding causation and injury." *Id.* at *2; *see also Mazza*, 666 F.3d 581, 596 (9th Cir. 2012).

Relatedly, Defendants may assert a defense of comparative negligence or assumption of risk as to some of the Plaintiffs. As described above, Plaintiff Rost deliberately intervened in an ongoing attack. "Knowledge of the risk is the watchword of assumption of risk." Prosser on Torts § 68 (5th ed. 1984) (citation omitted). After all, as the Supreme Court of South Dakota said of a plaintiff who interceded in a bar fight, "[n]o one can reasonably deny that there is a risk of injury

Case No. 16-CV-03957-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

in stepping into the middle of a fight."). *Duda v. Phatty McGees, Inc.*, 758 N.W.2d 754, 759 (S.D. 2008). The Court also notes that Nathan Velasquez ran after the man who stole his hat, and Casey pointed her middle finger at protestors and told them to go back to Mexico. Based upon Rost's, Casey's, and Nathan Velasquez's actions, Defendants may argue that each of these plaintiffs played a part in precipitating the confrontation. The presence of defenses unique to individual class members further undermines any efficiency that may be gained through a class action. *Gartin v. S & M NuTec LLC*, 245 F.R.D. 429, 441 (C.D. Cal. 2007).

For all these reasons, each Subclass member will need to present evidence peculiar to them in order to establish that his or her injury stemmed from Defendants' classwide conduct. *See, e.g.*, *Andrews*, 2019 WL 2880970, at *1 ("The disparity in class members' connection to the facilities and to Plains will require individuals to present varying evidence as to whether they suffered any economic injury, whether Plains was liable for that injury, and whether the economic loss doctrine bars recovery."); *McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984) (affirming district court's denial of class certification of suit challenging arrests during a mass demonstration "where arrests were made in numerous locations in the District of Columbia and where the duration and conditions of confinement varied greatly"). These individualized inquiries, which strike at the heart of Plaintiffs' claims against Defendant, would "degenerat[e] into a series of individual trials." *Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008). Under these circumstances, Plaintiffs have failed to show that "judicial economy will be served" by class treatment. *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d at 958.

### d. Damages are Not Capable of Measurement on a Classwide Basis

The measurement of damages poses a further obstacle to predominance. The Ninth Circuit has said that "[a] Rule 23(b)(3) plaintiff must show a class wide method for damages calculations as a part of the assessment of whether common questions predominate over individual questions." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd and remanded on other grounds*, 139 S. Ct. 710 (2019). In the instant case, Plaintiffs allege injuries that differ widely not only in degree but in kind. On one end of the spectrum is Nathan Velasquez, who

27

1    suffered a concussion when Yi punched him. On the other end is Christina Wong, whose injury

2    was purely psychological. Casey's injury, moreover, was also psychological, but she claims she

3    experienced physical symptoms such as an inability to sleep. Plaintiffs have not offered a

4    classwide method of measuring damages from these injuries, and the Court doubts that one exists.

5    The attackers behaved differently in each case, so no model could predict a given Subclass

6    member's injury. What is more, the type and extent of the injury will often depend on factors

7    idiosyncratic to the Subclass member.

8         In addition, according to the FAC, several of the Named Plaintiffs' individual attackers are

9    the subject of criminal proceedings. Yi, for instance, pleaded *nolo contendere* to criminal charges

10   for the theft and battery against Nathan Velasquez. FAC ¶ 139. The parties have not updated the

11   Court as to the status of all criminal proceedings. If any Named Plaintiffs ultimately receive

12   criminal restitution from their individual attackers, that Plaintiff's eligibility for civil damages

13   would be affected. That is, because a plaintiff may not be compensated twice for the same

14   damages, any compensatory damages award may potentially be offset by the amount of restitution

15   received. *See, e.g.*, *Safeco v. Rawstron*, No. CV96-5139, 1999 WL 989740, at *12 (C.D. Cal. Apr.

16   28, 1999). The potential for restitution to affect certain Subclass members' damage calculations

17   also thwarts the possibility of measuring damages on a classwide basis.

18        Considering the extent of these differences, "[q]uestions of individual damage calculations

19   will inevitably overwhelm questions common to the class." *See Comcast*, 569 U.S. 27, 34 (2013).

20   Plaintiffs' lack of a workable damages model further supports the Court's conclusion that

21   predominance has not been met. *See id.* (holding plaintiffs' had not shown Rule 23(b)(3)

22   predominance because their "model falls far short of establishing that damages are capable of

23   measurement on a classwide basis").

24                        **e. Typicality and Numerosity**

25        Finally, the Court notes that the factors that render Plaintiffs incapable of satisfying

26   commonality and predominance also cast doubt on Plaintiffs' ability to satisfy typicality and

27   numerosity.

28

Case No. 16-CV-03957-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

To demonstrate typicality, as required by Rule 23(a)(3), Plaintiffs must show that their claims are "typical of the claims . . . of the class." Typicality means that the representative plaintiffs "must be part of the class and possess the same interest and suffer the same injury" as the absent class members. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n. 13 (1982) (internal quotation marks omitted). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). The typicality inquiry focuses upon the "nature of the claim or defense of the class representative[s]" rather than "the specific facts" from which the claim arose. *Id.* (internal quotation marks omitted).

Nevertheless, commonality and typicality often overlap because "both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, at 158 n. 13. First of all, Plaintiffs' failure to identify a common course of conduct allegedly perpetrated by Defendants undercuts Plaintiffs' ability to show that Named Plaintiffs "suffered the same injury" as the rest of the class. *See Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 317 F.R.D. 91, 103 (N.D. Cal. 2016) (no typicality because plaintiffs "failed to identify any . . . policy across the 142 allegedly ADA-noncompliant, which policy could support a finding of commonality"), *aff'd*, 867 F.3d 1093 (9th Cir. 2017). Moreover, as just established, determining whether Defendants are liable for each Named Plaintiff's injury will require highly fact-specific inquiries. Again, the Named Plaintiffs were injured in fourteen distinct incidents, each of which bears little discernable relationship or similarity to the next. Absent class members will presumably be injured in still other altercations, the facts of which could take many different shapes. It is therefore impossible to assure that the Named Plaintiffs will have concordant interests with the absent class members.

In particular, the Ninth Circuit has held typicality is not satisfied where "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to

29

it." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Here, as described above, at least three Named Plaintiffs—Casey, Rost, and Nathan Velasquez—may face defenses of assumption of the risk or comparative negligence. Other Subclass members, by contrast, will not. Because the applicability of the defenses will turn on the particular facts of each incident, it is entirely possible that those representatives will be preoccupied with the unique defenses in their individual incidents.

Turning to numerosity, the Court observes that Plaintiffs do not claim all or even most of the people exposed to the danger Defendants allegedly created were personally injured or sustained property damage. Plaintiffs instead define the Subclass as only those Rally participants who "sustained injury to their persons or damage to their property." "While there is no fixed number that satisfies the numerosity requirement, a class greater than forty often satisfies the requirement, while one less than twenty-one does not." *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 890 (N.D. Cal. 2015) (internal quotation marks omitted).

Here, it is far from clear that any Rally participants other than the twenty Named Plaintiffs sustained such personal injury or property damage. Although numerosity is not usually difficult to demonstrate, "mere conclusory allegations as to the estimated class size are insufficient for plaintiff's burden of proof." *Sueoka v. United States*, 101 F. App'x 649, 653 (9th Cir. 2004). In the instant case, none of Plaintiffs' evidence meets their burden. Plaintiffs' reference to sundry "[c]ity and criminal court records, news, accounts, videos, photographs, and eye witness testimony," Mot. for Class Cert. at 15, is far too vague to support a finding of numerosity. The same is true of the "over 40 complaints relating to police conduct at the Rally" that the City received within eleven days. *Id.* at 15. Plaintiffs do not allege that these complaints came from persons who suffered personal injury or property damage, which is necessary for them to be members of the Subclass.

Lastly, Plaintiffs emphasize that the broader injunctive relief Class comprises "no fewer than 3,000 individuals," which is the SJPD's estimate of attendance at the Rally. *Id.* at 3, 15. Even if the Court accepted Plaintiffs' assertion as to the size of the injunctive relief Class,

30

Plaintiffs have offered no method for systematically identifying the plaintiffs who sustained injury to their persons or damage to their property for inclusion in the damages Subclass. Additionally, Courts have routinely denied class certification where individualized proof is necessary to establish which class members were in fact injured by the defendant's conduct. *See, e.g.*, *Moore*, 309 F.R.D. at 549 ("Even if, on the merits, Plaintiff is correct that iMessage has systematic flaws that could result in the disruption of text messaging services, that determination does not assist the Court in determining whether iMessage actually caused the proposed class members to suffer any interference."). On this record, then, the Court is doubtful that Plaintiffs have met their burden to show numerosity.

### f. Summary

In sum, the Court holds that Plaintiffs have not met Rule 23(a)'s commonality requirement or the "more demanding" predominance requirement under Rule 23(b)(3), *see Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 963 (9th Cir. 2013). The Court is also skeptical that typicality and numerosity have been satisfied, though the Court does not rest its decision on those grounds. The Court therefore denies Plaintiffs' motion to certify the damages Subclass.

### B. Class: Injunctive Relief Class under Rule 23(b)(2)

Plaintiffs move to certify the Class of "[a]ll persons who attended [the Rally] . . . and who, upon exiting the Rally, were either (1) directed, or otherwise required, by agents of the City of San Jose to leave in the direction of, or along a route toward, anti-Trump protestors, and/or (2) were prevented by agents of the City of San Jose from leaving by any alternate route," pursuant to Rule 23(b)(2). Mot. for Class Cert. at 1. Plaintiffs seek to certify the Class as to Counts 1 and 2, both of which include requests for injunctive relief. *See* FAC ¶¶ 291, 296.

Defendants again oppose class certification on just about every possible score. To briefly review, an injunctive relief class may be certified only if Plaintiffs show that Rule 23(a)'s requirements of commonality, typicality, numerosity, and adequacy of representation are met and that certification is proper under Rule 23(b)(2). In the instant case, not only do Defendants contend that none of Rule 23(a)'s four prerequisites are satisfied, they also challenge Plaintiffs'

standing to seek an injunction under Rule 23(b)(2).  Def. Opp. at 29-33.

The Court is mindful that the individualized issues that defeated predominance as to the Subclass also impede certification of the injunctive relief class.  "Rule 23(b)(2) 'does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.'"  *Ellis*, 657 F.3d at 987 (quoting *Wal-Mart*, 564 U.S. at 360-61).  That is because "[c]lass certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive" rather than monetary.  *Zinser*, 253 F.3d at 1195.  As established above, the Named Plaintiffs allege unique injuries and thus may be entitled to individualized monetary damages.

However, the Court need not reach these issues, because Plaintiffs cannot advance past the threshold requirement of standing.  As set forth below, the Court agrees with Defendants that Plaintiffs have failed to establish standing for prospective equitable relief and therefore denies the motion to certify the Class.

### 1.  Standing for Injunctive Relief

As previously stated, Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. Proc. 23(b)(2); *see Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014).  Accordingly, a Rule 23(b)(2) class may only be certified if the named plaintiffs demonstrate their standing to seek injunctive or declaratory relief.  *See, e.g.*, *Bruton v. Gerber Prod. Co.*, No. 12-CV-02412-LHK, 2018 WL 1009257, at *5 (N.D. Cal. Feb. 13, 2018).  Allegations that a defendant's conduct will subject unnamed class members to the alleged harm is insufficient to establish standing to seek an injunction on behalf of the class.  *Hodgers–Durgin v. de la Vina*, 199 F.3d 1037, 1044–45 (9th Cir. 1999) ("Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief.").

In order to have standing for prospective injunctive relief, a plaintiff must establish a "real and immediate threat of repeated injury."  *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939,

United States District Court
Northern District of California

946 (9th Cir. 2011) (en banc) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). "[P]ast wrongs do not in themselves amount to that real and immediate threat of injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). Instead, plaintiff is not entitled to an injunction against past illegal conduct unless he demonstrates "a sufficient likelihood that he will again be wronged in a similar way." *Id.* at 111; *see also Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010) ("Once a plaintiff has been wronged, he is entitled to injunctive relief only if he can show that he faces a real or immediate threat that he will again be wronged in a similar way.") (alterations and internal quotation marks omitted). The threat of harm cannot be "speculative." *Lyons*, 561 U.S. at 111. It must be a "prospect of immediacy and reality." *Id.* at 104 (internal quotation marks omitted); *see also Munns v. Kerry*, 782 F.3d 402, 411–12 (9th Cir. 2015) ("Despite being harmed in the past, the [plaintiffs] must still show that the threat of injury in the future is 'certainly impending' or that it presents a 'substantial risk' of recurrence for the court to hear their claim for prospective relief.") (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

In addition, the need for a "real and immediate threat of repeated injury" has particular force where, as here, a federal court is "asked to oversee state law enforcement authorities." *Lyons*, 461 U.S. at 112. The United States Supreme Court has cautioned that "the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers . . . in the absence of irreparable injury which is both great and immediate." *Id.*; *see also O'Shea*, 414 U.S. at 499.

Finally, "the burden of showing a likelihood of recurrence is firmly on the plaintiff." *Nelsen v. King Cty.*, 895 F.2d 1248, 1251 (9th Cir. 1990) (alterations and internal quotation marks omitted).

## 2. Analysis

With these principles in mind, the Court now turns to the instant case. Plaintiffs seek to certify the injunctive relief class as to Counts 1 and 2, their § 1983 claims under the state-created danger doctrine. To briefly review, Plaintiffs maintain that the On-Duty Officers exposed the

Case No. 16-CV-03957-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Rally participants to violence at the hands of anti-Trump protestors by forcing them to use a

designated route to leave the Rally and then failed to intervene when the protestors attacked Rally

participants. As discussed above, Plaintiffs appear to have abandoned their claim that Defendants'

alleged failure to intervene in the protestors' attacks is applicable to the entire Class.

To establish a likelihood of future harm, a plaintiff must show two things: first, that the

defendant will repeat his conduct and thereby violate similar rights, and second, that the plaintiff

will himself suffer that violation of rights. *See Baldwin v. Cate*, No. C-08-03516 RMW, 2009 WL

482283, at *4 (N.D. Cal. Feb. 25, 2009) (citing *Lyons*, 461 U.S. at 106). The analysis is

"individualized and must consider all the contingencies that may arise in the individual case before

the future harm will ensue." *Nelsen*, 895 F.2d at 1251. Focusing for a moment on the first

requirement, the case law is clear that the defendant must not only repeat his conduct, but that

conduct must be rights-violative and it must inflict injury.

In *Lyons*, for instance, the United States Supreme Court emphasized the "necessity that

Lyons demonstrate that he, himself, will not only again be stopped by the police but will be

choked without any provocation or legal excuse." *Lyons*, 461 U.S. at 106 n.7. "If, for example,

chokeholds were . . . used only to counter resistance to an arrest by a suspect, or to thwart an effort

to escape," there would be no real threat of future injury. *Id.* at 106. In other words, the Court

said, "[i]f Lyons has made no showing that he is realistically threatened by a repetition of his

experience of October 1976, then he has not met the requirements for seeking an injunction in a

federal court." *Id.* at 109.

Here, the right Defendants allegedly violated is the substantive due process right under the

Fourteenth Amendment not to be exposed to a state-created danger. Therefore, it is not enough

that SJPD officers may, at another rally, direct participants to leave via a single pathway. For the

officers' conduct must be repeated under circumstances in which that conduct constitutes a state-

created danger. *See Hightower v. City & Cty. of San Francisco*, 77 F. Supp. 3d 867, 886 (N.D.

Cal. 2014), *aff'd sub nom. Taub v. City & Cty. of San Francisco*, 696 F. App'x 181 (9th Cir. 2017)

(no standing to seek injunctive relief because "Plaintiffs' nudity only constitutes expressive

34

conduct when temporarily proximate to the passage" of a particular statute). What is more, the question whether a state actor "in fact affirmatively place[d]" the plaintiff in danger is highly fact-specific. *See, e.g., Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000) (examining precisely what the officers knew at the time of their actions).

The upshot is that Defendants' allegedly illegal conduct will recur only upon the fulfillment of four contingencies: (1) the Named Plaintiffs must attend a future rally or similar event; (2) a violent protest must break out at this rally and present a danger to the Named Plaintiffs; (3) the danger must be "known and obvious" to the SJPD officers on duty; (4) the SJPD officers must react in the same way, i.e., by sending participants into a mob of protestors and thereafter refusing to assist them. In the Court's view, the confluence of these contingencies is simply too remote a possibility to constitute a "real and immediate threat."

The first contingency, that the Named Plaintiffs will attend another rally, is the easiest one for Plaintiffs to establish. Doing so would seem to be a straightforward matter of showing that another political rally is likely to take place in the San Jose area, and that the Named Plaintiffs would attend. Yet, Plaintiffs have not adduced any evidence to that effect. Plaintiffs say only that "[t]he country is gearing up for the 2020 presidential campaign cycle." Mot. for Class Cert. at 1. Failure to make a threshold showing that the Named Plaintiffs will again be present at a rally or similar event is fatal to Plaintiffs' request for an injunction. *See, e.g.*, *Hodgers-Durgin*, 199 F.3d at 1044 (9th Cir. 1999) (equitable relief not warranted because "it is not sufficiently likely that Mr. Lopez or Ms. Hodgers–Durgin will again be stopped by the Border Patrol").

Assuming the Named Plaintiffs had properly established that they are likely to attend another rally, they still have not shown that a "violent mob," FAC ¶ 1, is likely to develop. This second contingency is equally necessary to create the danger to which the Named Plaintiffs will allegedly again be exposed. *Cf. Freeman v. ABC Legal Servs., Inc.*, 877 F. Supp. 2d 919, 927 (N.D. Cal. 2012) (no standing for an injunction against Defendant's debt collection practices because Plaintiffs failed to show they themselves would be involved in future debt collection suits). That is, protestors must congregate at the rally, and these protestors must again engage in

United States District Court
Northern District of California

acts such as heckling, theft, and battery in order for the Named Plaintiffs to again suffer injury. Importantly, this step in the chain involves choices by independent, private individuals—the hypothetical protestors. The United States Supreme Court has repeatedly emphasized its "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414 (refusing to speculate about whether the Government will attempt to surveil communications to which respondents are parties). After all, a court-ordered injunction can have no effect upon "unfettered choices made by independent actors not before the courts." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (internal quotations omitted).

Plaintiffs have no affirmative evidence that violence will occur at a hypothetical rally, just an allegation in the FAC that "some violence ha[d] been reported" at "recent Trump rallies in other communities in California." FAC ¶ 76. This allegation is not only vague but also lacking in any evidentiary support, and thus cannot give rise to an inference that numerous private individuals will choose to commit harmful acts. *See Lyons*, 461 U.S. at 104 ("Lyons' assertion that he may again be subject to an illegal chokehold" is "hardly evidence" of a real and immediate threat.). Under these circumstances, violent attacks are not assured at a hypothetical future rally, even if protestors do appear.

Moreover, the violence or similar danger at the rally would have to rise to the level of a "known and obvious danger" in order to support application of the state-created danger doctrine. That is, the extent of the danger would have to be great enough to threaten the safety of all Rally participants. In *Lyons*, the United States Supreme Court recognized that, "among the countless encounters between the police and the citizens of a great city such as Los Angeles, there will be certain instances in which strangleholds will be illegally applied and injury and death unconstitutionally inflicted on the victim." *Id.* Yet, the chances that Lyons himself would again be a victim were "no more than speculation." *Id.* So too here. If the violence consists only of a few isolated incidents, it would be "no more than speculation" that the Named Plaintiffs themselves "will again be involved in one of those unfortunate instances." *Lyons*, 461 U.S. at 108.

Case No. 16-CV-03957-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

United States District Court
Northern District of California

On top of that, the events would have to unfold such that officers are able to actually "recognize [the] unreasonable risk," *Campbell*, 671 F.3d at 845-46, before deciding on a course of action. Otherwise, the officers will not be acting with "deliberate indifference," which is necessary under the state-created danger doctrine. Again, Plaintiffs have brought no evidence to bear on the likelihood of these circumstances arising.

Turning to the fourth contingency, the SJPD would have to implement the same crowd-control plan in the same manner. As with the second contingency, predicting the reaction of the SJPD officers "require[s] guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413 (refusing to speculate as to whether the Foreign Intelligence Surveillance Court will authorize certain surveillance). The Court again notes the United States Supreme Court's admonition against engaging in such guesswork. *Id.*

The Ninth Circuit has said that "where . . . the harm alleged is directly traceable to a written policy, there is an implicit likelihood of its repetition in the immediate future." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 986 (9th Cir. 2007). (alterations and internal quotation marks omitted). But the Incident Action Plan to which the On-Duty Officers allegedly adhered is not a policy. Under Plaintiffs' own allegations, the Incident Action Plan was an event-specific plan, tailored to the Trump Rally. *See* FAC ¶ 80-81*; see also* Kinsworthy Deposition Ex. 5. In fact, according to Plaintiffs, the no-interference approach practiced by the On-Duty Officers deviated from "the City's normal 'zero tolerance' approach to violent protestors." FAC ¶ 79; *see also* FAC ¶ 66. The Incident Action Plan thus contrasts sharply with the fixed "policies" that the Ninth Circuit has previously said give rise to an inference of repetition. *See, e.g., Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1492 (9th Cir. 1996) ("[T]he CHP has a clear official policy of allowing officers to stop motorcyclists and issue citations for substandard helmets based on the officer's subjective opinion of whether the helmet would, if tested, conform to federal safety standards."); *LaDuke v. Nelson*, 762 F.2d 1318, 1326 n.12 (9th Cir. 1985), *amended*, 796 F.2d 309 (9th Cir. 1986) ("[T]he agents testified that it was INS policy to conduct complete sweeps of all community residences, with or without information as to specific

residences.").

Plaintiffs nevertheless contend "the evidence shows that these officers can and will do the exact same thing under the same or similar circumstances." ECF No. 137 ("Pl.'s Reply") at 19. The evidence to which Plaintiffs refer comes from the depositions of two of the On-Duty Officers: Herr and Kinsworthy. First, Plaintiffs cite the following exchange from Herr's deposition:

> Q: Knowing what you know now -- and I'm making space to look at Exhibit 5 here -- would you have made any adjustments to the decisions you made on June 2nd?
>
> A: No.
>
> Q: Okay. Would you have placed the barricades in the same locations that they were placed?
>
> A: Yes.

ECF No. 126-20 at 109-110. Second, Plaintiffs point to a similar exchange from Kinsworthy's deposition:

> Q: Knowing what you know now, would you have done anything differently on the day of the rally?
>
> A: Knowing what I know now, yes, . . . I would have asked for more officers, and that way, I would have been able to position the officers differently.
>
> Q: In what way would you have positioned the officers differently?
>
> A: So I would have had more roaming officers along Almaden and San Carlos.
>
> Q: And by "roaming officers," what do you mean?
>
> A: . . . . Teams of officers just like we had around the tent, same type of deployment in those areas.
>
> Q: Okay. Is there anything else you would have done differently on the day of the rally?
>
> A: Nothing I can think of right now.

ECF No. 126-3 at 164-65.

Plaintiffs apparently take the testimony to mean that Kinsworthy and Herr defend the route they allegedly required participants to take and the no-interference approach to violent

altercations. At the outset, the Court notes that the probative value of the responses is limited by the lack of context and the vagueness of the question, "would you have done anything differently?" After all, Defendants deny that they forced Rally participants to walk north into the crowd of protestors. Defendants claim the SJPD officers actually "advised people leaving the rally to take a different route, but most refused." Def. Opp. at 5 (citing ECF No. 135-1 ("Herr. Decl.") ¶ 12). According to Defendants, the officers then erected a barricade to "prevent[] rallygoers from walking north on Market toward protestors," but "[t]he barricade did not prevent rallygoers from going in any other direction on any other street." *Id.* (citing Herr Decl. ¶¶ 12-14, 19). Herr and Kinsworthy's stated lack of regret is therefore unsurprising considering Defendants' version of the facts. Meanwhile, Plaintiffs' questions did not specifically refer to a particular tactic.

Taking the statements at face value, however, they would make the likelihood of the SJPD repeating its actions from the night of the Rally greater than if Herr and Kinsworthy had repudiated their decisions. Still, this evidence only goes so far. The statements of two individual officers are a far cry from a department-wide policy. That Plaintiffs lack a theory of centralized decisionmaking amongst the On-Duty Officers on the night of the Rally seriously undermines the proposition that innominate SJPD officers at a future rally will behave in the same way. Plaintiffs have not shown that Herr or Kinsworthy would likely be present at a future rally, let alone that they would be in a position to make decisions on behalf of the force. Without a "systematic pattern or policy," then, the odds that all the SJPD officers will repeat their actions at the Rally are far too speculative. *Nelsen*, 895 F.2d at 1254.

Finally, even if Plaintiffs had shown that each individual contingency was reasonably likely to occur, Plaintiffs have not established that the entire "string of contingencies necessary to produce an injury," *Hodgers-Durgin*, 199 F.3d at 1041, will transpire. All four contingencies discussed above are necessary for the Named Plaintiffs to experience a recurrence of their injury from June 2, 2016. "Both the Supreme Court and [the Ninth] [C]ircuit have repeatedly found a lack of standing where the litigant's claim relies upon a chain of speculative contingencies."

Case No. 16-CV-03957-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*Nelsen*, 895 F.2d at 1252; *see also id.* ("The 'odds' that Nelsen and Bullene will fulfill all the contingencies necessary to revisit the Center are . . . unlikely."). Considering "the trend towards imposing tighter restrictions on claims of standing for injunctive claims predicated upon allegedly recurrent injuries," *id.* at 1251, the Court concludes Plaintiffs have not met their burden to show an immediate threat of harm here. Plaintiffs therefore lack standing for injunctive relief.

The Court's finding Plaintiffs do not have standing to seek injunctive relief is fatal to certification of the proposed Class. The Court therefore denies Plaintiffs' motion to certify the Class as an injunctive relief class under Rule 23(b)(2).[2]

## IV.    CONCLUSION

Accordingly, the Plaintiffs' motion for class certification is DENIED with prejudice.

**IT IS SO ORDERED.**

Dated: September 17, 2019

_Lucy H. Koh_
_____
LUCY H. KOH
United States District Judge

United States District Court
Northern District of California

---

[2] As above, any discussion of the other class certification requirements or the suitability of the Named Plaintiffs and their counsel as Class Representatives and Class Counsel would not be necessary for the resolution of Plaintiffs' motion.

40

Case No. 16-CV-03957-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION